**THIS IS NOT A SOLICITATION OF ACCEPTANCES OF THE CHAPTER 11 PLAN OF CRUSADER ENERGY GROUP INC. AND THE OTHER DEBTORS IN THESE CHAPTER 11 CASES. ACCEPTANCES MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING "ADEQUATE INFORMATION" WITHIN THE MEANING OF SECTION 1125(a) OF THE BANKRUPTCY CODE. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT AND IS SUBJECT TO AMENDMENT PRIOR TO SUCH APPROVAL BEING GRANTED.**

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

IN RE:

| | | |
|---|---|---|
| | § | |
| **CRUSADER ENERGY GROUP INC.,** *et al,* | § | **CASE NO. 09-31797** |
| | § | **Chapter 11** |
| | § | |
| **DEBTORS.** | § | **(JOINTLY ADMINISTERED)** |

**[PROPOSED] DISCLOSURE STATEMENT FOR THE JOINT PLAN**
**<u>OF REORGANIZATION FOR THE DEBTORS</u>**

**Dated: October 2, 2009**

NOTE: THE DEBTORS, THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS AND THE OTHER PLAN PROPONENTS (AS DEFINED HEREIN) BELIEVE THAT ACCEPTANCE OF THE PLAN DESCRIBED IN THIS DISCLOSURE STATEMENT IS IN THE BEST INTERESTS OF THE DEBTORS' ESTATES AND THEIR CREDITORS. **ACCORDINGLY, THE PLAN PROPONENTS RECOMMEND THAT YOU <u>VOTE TO APPROVE</u> THE PLAN.**

# TABLE OF CONTENTS

ARTICLE I INTRODUCTION ............................................................................. 3
  1.1.    Introduction ............................................................................................. 3
  1.2.    Considerations In Preparation Of The Disclosure Statement And Plan;
          Disclaimers ............................................................................................. 4
  1.3.    Disclosure Statement; Construction ......................................................... 6
  1.4.    Solicitation Package ................................................................................. 7
  1.5.    Voting Procedures, Ballots, And Voting Deadline .................................. 7
  1.6.    The Confirmation Hearing And Objection Deadline ............................... 8
  1.7.    Recommendation Of The Debtors, First Lien Holders, Second Lien
          Holders And Committee To Approve Plan ............................................ 10

ARTICLE II GENERAL INFORMATION REGARDING THE DEBTORS ........................... 11
  2.1.    Background ............................................................................................. 11
  2.2.    Corporate Structure of the Debtors ....................................................... 12
  2.3.    Management of the Debtors .................................................................... 13
  2.4.    Existing Capital Structure Of The Debtors ............................................ 13
  2.5.    Events Leading To Chapter 11 ............................................................... 14

ARTICLE III EVENTS DURING THE CHAPTER 11 CASES ........................................ 15
  3.1.    Commencement of the Chapter 11 Cases ............................................... 15
  3.2.    Appointment of the Official Committee of Unsecured Creditors ........... 16
  3.3.    Use of Cash Collateral ........................................................................... 16
  3.4.    Retention of Professionals by the Debtors ............................................. 18
  3.5.    Bankruptcy Schedules and Statements of Financial Affairs. ................. 19
  3.6.    Meeting of Creditors .............................................................................. 19
  3.7.    Operating Reports .................................................................................. 19
  3.8.    Claims Process ....................................................................................... 19
  3.9.    Exclusivity ............................................................................................. 20
  3.10.   Unexpired Nonresidential Real Property Leases .................................... 20
  3.11.   Retention & Incentive Plans .................................................................. 20
  3.12.   Motion to Restrict Stock Trading .......................................................... 21
  3.13.   Recoupment ........................................................................................... 23
  3.14.   Royalty Payments .................................................................................. 23
  3.15.   Joint Interest Billings ............................................................................ 23
  3.16.   Limited Substantive Consolidation ....................................................... 24
  3.17.   Settlement Between the Second Lien Holders and the Committee ......... 24
  3.18.   The CRO and the CRO Committee ........................................................ 26
  3.19.   Sale and Reorganization Efforts – Plan Transaction .............................. 26
  3.20.   Sale and Reorganization Efforts – Gunn Oil Company Transaction ....... 28
  3.21.   Litigation ............................................................................................... 29

ARTICLE IV FINANCIAL INFORMATION ........................................................... 39
  4.1.    Assets ..................................................................................................... 39
  4.2.    Liabilities ............................................................................................... 39
  4.3.    Other ...................................................................................................... 41

ARTICLE V PLAN OVERVIEW ........................................................................41
    5.1.   Introduction...........................................................................41
    5.2.   Summary of the Plan ............................................................ 42
    5.3.   Summary Of Proposed Distributions Under The Plan ..................... 44

ARTICLE VI INFORMATION REGARDING THE SANDRIDGE TRANSACTION
               AND THE SANDRIDGE PARTIES ............................................50
    6.1.   The SandRidge Transaction...................................................50
    6.2.   Information About the SandRidge Parties.................................... 54
    6.3.   SandRidge Energy Stock ...................................................... 55

ARTICLE VII SUMMARY OF CERTAIN PLAN PROVISIONS............................55
    7.1.   Means For Implementation Of The Plan – Transaction Involving
             Issuance of New Crusader Shares to the Buyer or Transfer of
             Transferred Assets to the Buyer.............................................. 55
    7.2.   Means for Implementation of the Plan – Transaction Involving Issuance
             Of New Crusader Shares To The Buyer.................................... 58
    7.3.   Provisions Governing Distributions Generally.............................. 58
    7.4.   Treatment of Executory Contracts and Unexpired Leases – Transaction
             Involving Issuance of New Crusader Shares to the Buyer ................ 60
    7.5.   Treatment of Executory Contracts and Unexpired Leases – Transaction
             Not Involving Issuance of New Crusader Shares to the Buyer .......... 61
    7.6.   Treatment of Executory Contracts and Unexpired Leases: Employment
             and Benefit Issues .............................................................. 62
    7.7.   Effects of Confirmation........................................................ 62
    7.8.   Retention of Jurisdiction....................................................... 63
    7.9.   The Liquidating Trust.......................................................... 63
    7.10.  Funding of Res of Trust....................................................... 64
    7.11.  The Liquidating Trustee. ...................................................... 64
    7.12.  Compensation of the Liquidating Trustee. ................................. 65
    7.13.  Termination...................................................................... 65
    7.14.  Committee and Liquidating Trust Committee .............................. 65
    7.15.  Reserves Administered by the Liquidating Trust .......................... 66
    7.16.  Procedures for Resolving Disputed, Contingent, and Unliquidated
             Claims............................................................................ 66

ARTICLE VIII CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE
               PLAN AND SECURITIES LAW CONSIDERATIONS..................67
    8.1.   General .......................................................................... 67
    8.2.   Consequences to the Debtors................................................. 68
    8.3.   Federal Income Tax Consequences to Holders of Allowed Second Lien
             Secured Claims ................................................................. 72
    8.4.   Federal Income Tax Consequences to Holders of Allowed Second Lien
             Deficiency Claims.............................................................. 75
    8.5.   Federal Income Tax Consequences of the Liquidating Trust............. 77
    8.6.   Information Reporting and Backup Withholding ........................... 78
    8.7.   Importance of Obtaining Professional Tax Assistance .................... 78
    8.8.   Securities Law Considerations................................................ 78

ARTICLE IX THE BEST INTERESTS OF CREDITORS TEST ............................................. 81
    9.1.    Best Interests Test ........................................................................... 81
    9.2.    Liquidation Analysis ....................................................................... 82

ARTICLE X ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF
          THE PLAN ................................................................................... 83
    10.1.   Alternative Plan(s) ......................................................................... 83
    10.2.   Liquidation Under Chapter 7 .......................................................... 84

ARTICLE XI CERTAIN RISK FACTORS TO BE CONSIDERED ..................................... 84
    11.1.   General Risks .................................................................................. 85
    11.2.   Certain Business and Industry Risks Affecting the Debtors and/or the
          Reorganized Debtors ...................................................................... 85
    11.3.   Certain Bankruptcy Law Considerations ........................................ 92
    11.4.   Certain Tax Considerations, Risks and Uncertainties ..................... 94
    11.5.   Certain Risks Related to the SandRidge Parties ............................. 94

ARTICLE XII THE SOLICITATION; VOTING PROCEDURES ......................................... 96
    12.1.   Voting Deadline .............................................................................. 96
    12.2.   Voting Procedures .......................................................................... 96
    12.3.   Miscellaneous ................................................................................ 96
    12.4.   Fiduciaries and Other Representatives ............................................ 96
    12.5.   Parties Entitled to Vote ................................................................... 97
    12.6.   Agreements upon Furnishing Ballots .............................................. 98
    12.7.   Waivers of Defects, Irregularities, Etc. .......................................... 98
    12.8.   Withdrawal of Ballots; Revocation ................................................. 98
    12.9.   Further Information; Additional Copies .......................................... 99

EXHIBIT A    Plan of Reorganization
EXHIBIT B    Defined Terms
EXHIBIT C    Disclosure Statement Order
EXHIBIT D    M&M Claim Schedule
EXHIBIT E    Well-By-Well Lien Chart
EXHIBIT F    Stock Purchase Agreement
EXHIBIT G    Liquidation Analysis

# DISCLAIMER

ALL HOLDERS OF CLAIMS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE JOINT PLAN OF REORGANIZATION FOR THE DEBTORS DATED SEPTEMBER 22, 2009 (AS AMENDED, MODIFIED AND SUPPLEMENTED FROM TIME TO TIME, THE "PLAN"), IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. ALL SUMMARIES OF THE PLAN AND OTHER STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, THE EXHIBITS ANNEXED TO THE PLAN, ANY SUPPLEMENTS TO THE PLAN, AND THE EXHIBITS ANNEXED TO THIS DISCLOSURE STATEMENT. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF, AND THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS AS OF THE DATE HEREOF, UNLESS OTHERWISE STATED HEREIN, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF. HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD NOT INFER AT THE TIME OF SUCH REVIEW THAT THERE HAVE BEEN NO CHANGES IN THE FACTS SET FORTH HEREIN SINCE THE DATE HEREOF. MOREOVER, THERE MAY BE ERRORS IN THE STATEMENTS AND/OR FINANCIAL INFORMATION CONTAINED HEREIN AND/OR ASSUMPTIONS UNDERLYING SUCH STATEMENTS AND/OR FINANCIAL INFORMATION. THE DEBTORS, THE OTHER PLAN PROPONENTS AND THEIR RESPECTIVE ADVISORS EXPRESSLY DISCLAIM ANY OBLIGATION TO UPDATE OR CORRECT ANY SUCH FINANCIAL INFORMATION OR ASSUMPTIONS.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE LAW. THIS DISCLOSURE STATEMENT AND THE PLAN FOR THE DEBTORS DESCRIBED HEREIN HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION, AND NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES COMMISSION HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN. NEITHER THE OFFER NOR THE ISSUANCE OF ANY SECURITIES PURSUANT TO THE PLAN HAS BEEN REGISTERED UNDER THE 1933 ACT OR ANY SIMILAR STATE SECURITIES OR "BLUE SKY" LAWS. ANY SUCH OFFER OR ISSUANCE IS BEING MADE IN RELIANCE ON THE EXEMPTIONS FROM REGISTRATION THEREUNDER SPECIFIED IN SECTION 1145 OF THE BANKRUPTCY CODE AND SECTION 4(2) OF THE 1933 ACT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING SECURITIES OR CLAIMS OF THE DEBTORS IN THESE CASES SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER PENDING OR THREATENED LITIGATION OR ACTIONS, THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE AND MAY NOT BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS AND SHALL BE INADMISSIBLE FOR ANY PURPOSE ABSENT THE EXPRESS WRITTEN CONSENT OF THE DEBTORS AND THE PARTY AGAINST WHOM SUCH INFORMATION IS SOUGHT TO BE ADMITTED.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN.

THIS DISCLOSURE STATEMENT WILL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY, NOR WILL IT BE CONSTRUED TO CONSTITUTE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE REORGANIZATION AS TO HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, THE DEBTORS.

THE FIRST LIEN HOLDERS, SECOND LIEN HOLDERS AND COMMITTEE, ALTHOUGH CO-PROPONENTS OF THE PLAN, ARE NOT RESPONSIBLE FOR AND SHALL HAVE NO LIABILITY AS TO THE ACCURACY OR ADEQUACY OF ANY OF THE INFORMATION CONTAINED HEREIN.

## DISCLOSURE REGARDING FORWARD-LOOKING STATEMENTS

This Disclosure Statement includes information regarding the Reorganized Debtors and certain other "forward-looking statements" within the meaning of Section 27A of the 1933 Act and Section 21E of the Exchange Act, all of which are based upon various estimates and assumptions that the Debtors believe to be reasonable as of the date hereof. These statements involve risks and uncertainties that could cause the Reorganized Debtors' actual future outcomes to differ materially from those set forth in this Disclosure Statement. Such risks and uncertainties include, but are not limited to:

- the Debtors' ability to effect their proposed restructuring, or any other restructuring on terms acceptable to the Debtors, including the closing of a proposed transaction thereunder;

- the Debtors' ability to continue as a going concern;

- general economic and capital markets conditions, including fluctuations in interest rates;

- difficulty in managing the operation of existing entities;

- loss of key personnel;

- litigation risks and uncertainties;

- distraction of management and costs associated with the Debtors' restructuring efforts, including their chapter 11 filings;

- uncertainties in reserve and production estimates;

- unanticipated recovery or production problems;

- unanticipated results with the drilling or completion of wells;

- the effects of delays in completion of, or shut-ins of, wells and pipelines;

- oil and natural gas prices and competition;

- production expense estimates;

- cash flow estimates;

- future financial performance; and

- planned capital expenditures.

You should understand that the foregoing as well as other risk factors discussed in this Disclosure Statement, including those listed in <u>Article XI</u> of this Disclosure Statement under the heading "Certain Factors to be Considered," could cause future outcomes to differ materially from those expressed in such forward looking statements. Given the uncertainties, you are cautioned not to place undue reliance on any forward-looking statements in determining whether to vote in favor of the Plan or to take any other action. The Debtors undertake no obligation to publicly update or revise information concerning the Debtors' restructuring efforts, borrowing availability, or their cash position or any forward-looking statements to reflect events or circumstances that may arise after the date of this Disclosure Statement, except as required by law.

## ARTICLE I

## INTRODUCTION

### 1.1. <u>Introduction</u>

Crusader Energy Group Inc., and each of Crusader Management Corporation, Crusader Energy Group, LLC, Hawk Energy Fund I, LLC, Knight Energy Group, LLC, Knight Energy Group II, LLC, Knight Energy Management, LLC and RCH Upland Acquisition, LLC filed voluntary petitions for relief under chapter 11 of title 11 of the United States Bankruptcy Code on March 30, 2009, in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division. Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors continue to operate their businesses and to manage their properties as debtors-in-possession during the pendency of the Debtors' bankruptcy cases.

On September 22, 2009, the Debtors filed the *Joint Plan of Reorganization for the Debtors* [Docket No. 665]. The Plan was formulated after extensive negotiations with (i) the Official Committee of Unsecured Creditors, which was appointed by the Office of the United States Trustee on April 14, 2009, (ii) the holders of indebtedness under the Second Amended and Restated Credit Agreement dated June 26, 2008, among Crusader, Union Bank of California, N.A. ("UBOC"), as administrative agent, and the lenders party thereto, and (iii) certain of the holders of indebtedness under the Second Lien Credit Agreement dated July 17, 2008, among Crusader, Wilmington Trust FSB (as successor to JPMorgan Chase Bank, N.A.), as administrative agent, and the lenders party thereto. This Disclosure Statement describes the Debtors' business operations, certain aspects of the Plan, including but not limited to the proposed transaction relating to the Debtors to be effectuated pursuant to the Plan, significant events occurring in the Cases and related matters.

**1.2. Considerations In Preparation Of The Disclosure Statement And Plan; Disclaimers**

BECAUSE ACCEPTANCE OF THE PLAN WILL CONSTITUTE ACCEPTANCE OF ALL THE PROVISIONS THEREOF, HOLDERS OF CLAIMS ARE URGED TO CONSIDER CAREFULLY THE INFORMATION REGARDING TREATMENT OF THEIR CLAIMS CONTAINED IN THIS DISCLOSURE STATEMENT.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO MATERIAL CONDITIONS PRECEDENT. THERE CAN BE NO ASSURANCE THAT THOSE CONDITIONS WILL BE SATISFIED.

THE DEBTORS PRESENTLY INTEND TO SEEK TO CONSUMMATE THE PLAN AND TO CAUSE THE EFFECTIVE DATE TO OCCUR PROMPTLY AFTER CONFIRMATION OF THE PLAN. THERE CAN BE NO ASSURANCE, HOWEVER, AS TO WHEN AND WHETHER CONFIRMATION OF THE PLAN AND THE EFFECTIVE DATE ACTUALLY WILL OCCUR.

TO BE COUNTED, YOUR BALLOT MUST BE DULY COMPLETED, EXECUTED, AND ACTUALLY RECEIVED BY THE VOTING DEADLINE. HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE ENCOURAGED TO READ AND CONSIDER CAREFULLY THIS ENTIRE DISCLOSURE STATEMENT, INCLUDING THE PLAN.

\*\*\*\*\*

THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE PLAN, STATUTORY PROVISIONS, DOCUMENTS RELATED TO THE PLAN, ANTICIPATED EVENTS IN THE CASES, AND FINANCIAL INFORMATION. ALTHOUGH THE DEBTORS BELIEVE THAT THE SUMMARIES ARE FAIR AND ACCURATE, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF THE PLAN OR CERTAIN DOCUMENTS (AND HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD REFER TO THE PLAN AND SPECIFIED DOCUMENTS IN THEIR ENTIRETY AS ATTACHED HERETO), STATUTORY PROVISIONS, EVENTS, OR

INFORMATION.  FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS, EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED.  HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE URGED TO REVIEW THE ENTIRE PLAN, A COPY OF WHICH IS ATTACHED HERETO AS EXHIBIT A, AND THE STOCK PURCHASE AGREEMENT REFERENCED BELOW, A COPY OF WHICH IS ATTACHED HERETO AS <u>EXHIBIT F</u>.  IN THE EVENT ANY PROVISION OF THIS DISCLOSURE STATEMENT IS FOUND TO BE INCONSISTENT WITH A PROVISION OF THE PLAN, THE PROVISION OF THE PLAN SHALL CONTROL.

IN DETERMINING WHETHER TO VOTE TO ACCEPT THE PLAN, HOLDERS OF CLAIMS MUST RELY UPON THEIR OWN EXAMINATION OF THE DEBTORS AND THE TERMS OF THE PLAN, INCLUDING THE MERITS AND RISKS INVOLVED.  THE CONTENTS OF THIS DISCLOSURE STATEMENT SHOULD NOT BE CONSTRUED AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE.  EACH SUCH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL, AND TAX ADVISORS WITH RESPECT TO ANY SUCH MATTERS CONCERNING THIS DISCLOSURE STATEMENT, THE SOLICITATION, THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.

\*\*\*\*\*

THE DEBTORS AND BUYER ARE RELYING ON SECTION 1145(a)(1) AND (2) OF THE BANKRUPTCY CODE AND SECTION 4(2) OF THE 1933 ACT TO EXEMPT FROM REGISTRATION UNDER THE SECURITIES LAWS THE OFFER AND ISSUANCE OF SECURITIES IN CONNECTION WITH THE SOLICITATION AND THE PLAN.

EXCEPT AS SET FORTH HEREIN, NO PERSON HAS BEEN AUTHORIZED BY THE DEBTORS IN CONNECTION WITH THE PLAN OR THE SOLICITATION TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT AND THE EXHIBITS ATTACHED HERETO OR INCORPORATED BY REFERENCE OR REFERRED TO HEREIN, AND, IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATION MAY NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE DEBTORS.  THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY ANY SECURITIES OTHER THAN THOSE TO WHICH IT RELATES, OR AN OFFER TO SELL OR A SOLICITATION OF AN OFFER TO BUY ANY SECURITIES IN ANY JURISDICTION IN WHICH, OR TO ANY PERSON TO WHOM IT IS UNLAWFUL TO MAKE SUCH OFFER OR SOLICITATION.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF, AND THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS AS OF THE DATE HEREOF, UNLESS OTHERWISE STATED HEREIN, AND NEITHER THE DELIVERY OF THIS DISCLOSURE STATEMENT NOR THE DISTRIBUTION OF ANY SECURITIES PURSUANT TO THE PLAN WILL, UNDER ANY CIRCUMSTANCE, CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME SUBSEQUENT TO

THE DATE HEREOF, OR SUCH OTHER DATE AS DESCRIBED HEREIN. ANY ESTIMATES OF CLAIMS OR EQUITY INTERESTS SET FORTH IN THIS DISCLOSURE STATEMENT MAY VARY FROM THE AMOUNTS OF CLAIMS OR EQUITY INTERESTS DETERMINED BY THE DEBTORS OR ULTIMATELY ALLOWED BY THE BANKRUPTCY COURT, AND AN ESTIMATE SHALL NOT BE CONSTRUED AS AN ADMISSION OF THE AMOUNT OF SUCH CLAIM.

INFORMATION INCORPORATED BY REFERENCE INTO THIS DISCLOSURE STATEMENT SPEAKS AS OF THE DATE OF SUCH INFORMATION OR THE DATE OF THE REPORT OR DOCUMENT IN WHICH SUCH INFORMATION IS CONTAINED OR AS OF A PRIOR DATE AS MAY BE SPECIFIED IN SUCH REPORT OR DOCUMENT. ANY STATEMENT CONTAINED IN A DOCUMENT INCORPORATED BY REFERENCE HEREIN SHALL BE DEEMED TO BE MODIFIED OR SUPERSEDED FOR ALL PURPOSES TO THE EXTENT THAT A STATEMENT CONTAINED IN THIS DISCLOSURE STATEMENT OR IN ANY OTHER SUBSEQUENTLY FILED DOCUMENT WHICH IS ALSO INCORPORATED OR DEEMED TO BE INCORPORATED BY REFERENCE, MODIFIES OR SUPERSEDES SUCH STATEMENT. ANY STATEMENT SO MODIFIED OR SUPERSEDED SHALL NOT BE DEEMED, EXCEPT AS SO MODIFIED OR SUPERSEDED, TO CONSTITUTE A PART OF THIS DISCLOSURE STATEMENT.

### 1.3. Disclosure Statement; Construction

This Disclosure Statement has been prepared to comply with section 1125 of the Bankruptcy Code and is hereby transmitted by the Debtors to holders of Claims and Equity Interests for use in the solicitation of acceptances from the holders of Claims (the "Solicitation") of the Plan, a copy of which is attached hereto as **Exhibit A**. **Unless otherwise defined in this Disclosure Statement, capitalized terms used herein have the meanings ascribed to them in the Plan**. Capitalized terms defined herein are set forth on the attached **Exhibit B**.

For purposes of this Disclosure Statement, the following rules of interpretation shall apply: (i) whenever the words "include," "includes" or "including" are used, they shall be deemed to be followed by the words "without limitation," (ii) the words "hereof," "herein," "hereby" and "hereunder" and words of similar import shall refer to this Disclosure Statement as a whole and not to any particular provision, (iii) article, section and exhibit references are to this Disclosure Statement unless otherwise specified, and (iv) with respect to any Distribution under the Plan, "on" a date means on or as soon as reasonably practicable thereafter.

The purpose of this Disclosure Statement is to provide "adequate information" to Persons who hold Claims to enable them to make an informed decision before exercising their right to vote to accept or reject the Plan. By order of the Bankruptcy Court entered on _____, 2009 (the "Disclosure Statement Order"), this Disclosure Statement was approved and held to contain adequate information. A true and correct copy of the Disclosure Statement Order is attached hereto as **Exhibit C**.

THE APPROVAL BY THE BANKRUPTCY COURT OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE PLAN OR A GUARANTEE OF THE ACCURACY

OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN. THE MATERIAL CONTAINED HEREIN IS INTENDED SOLELY FOR THE USE BY HOLDERS OF CLAIMS AND EQUITY INTERESTS IN EVALUATING THE PLAN AND BY HOLDERS OF CLAIMS IN VOTING TO ACCEPT OR REJECT THE PLAN AND, ACCORDINGLY, MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN THE DETERMINATION OF HOW TO VOTE ON THE PLAN. THE PLAN IS SUBJECT TO NUMEROUS CONDITIONS AND VARIABLES AND THERE CAN BE NO ASSURANCE THAT THE PLAN WILL BE EFFECTUATED.

### 1.4. Solicitation Package

Accompanying this Disclosure Statement for the purpose of soliciting votes on the Plan are copies of (i) the notice of, among other things, the time for submitting Ballots to accept or reject the Plan, the date, time, and place of the hearing to consider the confirmation of the Plan and related matters, and the time for filing objections to the confirmation of the Plan, and (ii) a Ballot or Ballots (and return envelope(s)) that you must use in voting to accept or to reject the Plan, or a notice of non-voting status, as applicable. If you did not receive a Ballot and believe that you should have, please contact the Solicitation Agent (as defined below) at the address or telephone number set forth in the next subsection.

### 1.5. Voting Procedures, Ballots, And Voting Deadline

After carefully reviewing the Plan and this Disclosure Statement, and the exhibits thereto, and the detailed instructions accompanying your Ballot, holders of Claims in Classes 4, 5, 6, 7A and 7B should indicate their acceptance or rejection of the Plan by voting in favor of or against the Plan on the enclosed Ballot. The Second Lien Agent is not authorized to submit a vote on behalf of any of the Second Lien Holders of Claims in Class 4 and 7B, who are entitled to vote on the Plan; rather, each Second Lien Holder must submit its own vote on the Plan. In addition, holders of Claims in Class 5 should indicate on their Ballot their election into, or their request to participate in, the 60 percent settlement option described in Section 5.3 of this Disclosure Statement. Such holders should complete and sign their Ballot and return it in the envelope provided so that it is RECEIVED by the Voting Deadline (as defined below).

Each Ballot has been coded to reflect the Class of Claims it represents. Accordingly, in voting to accept or reject the Plan, you must use only the coded Ballot or Ballots sent to you with this Disclosure Statement.

If you have any questions about the procedure for voting your Claim or with respect to the packet of materials that you have received, please contact The BMC Group, Inc. (the "Solicitation Agent") (i) telephonically or (ii) in writing by (a) hand delivery, (b) overnight mail or (c) first class mail using the information below:

by hand delivery or overnight mail at:

Crusader Energy Group Inc.
c/o BMC-Analytics Incorporated
18750 Lake Drive East
Chanhassen, MN 55317-9384
Telephone: 888.909.0100

by first class mail at:

Crusader Energy Group Inc.
c/o BMC Group
Po Box 3020
Chanhassen, MN 55317-3020
Telephone: 888.909.0100

**THE SOLICITATION AGENT MUST RECEIVE ORIGINAL BALLOTS ON OR BEFORE 5:00 P.M., EASTERN TIME, ON _____, 2009 (THE "<u>VOTING DEADLINE</u>") AT THE APPLICABLE ADDRESS ABOVE. EXCEPT TO THE EXTENT ALLOWED BY THE BANKRUPTCY COURT, BALLOTS RECEIVED AFTER THE VOTING DEADLINE WILL NOT BE ACCEPTED OR USED IN CONNECTION WITH THE DEBTORS' REQUEST FOR CONFIRMATION OF THE PLAN OR ANY MODIFICATION THEREOF.**

The Debtors reserve the right to amend the Plan. Amendments to the Plan that do not materially and adversely affect the treatment of Claims or Equity Interests may be approved by the Bankruptcy Court at the Confirmation Hearing without the necessity of re-soliciting votes. In the event re-solicitation is required, the Debtors will furnish new solicitation packets that will include new ballots to be used to vote to accept or reject the Plan, as amended.

### 1.6. <u>The Confirmation Hearing And Objection Deadline</u>

**THE BANKRUPTCY COURT HAS SET _____, 2009, AT _____.M., CENTRAL TIME, AS THE DATE AND TIME FOR THE HEARING ON CONFIRMATION OF THE PLAN AND TO CONSIDER ANY OBJECTIONS TO THE PLAN. THE CONFIRMATION HEARING WILL BE HELD AT THE UNITED STATES BANKRUPTCY COURT, JUDGE HOUSER'S COURTROOM, 1100 COMMERCE, 14TH FLOOR, DALLAS, TEXAS 75242. THE DEBTORS WILL REQUEST CONFIRMATION OF THE PLAN AT THE CONFIRMATION HEARING.**

**THE BANKRUPTCY COURT HAS FURTHER FIXED _____, 2009, AT 5:00 P.M., CENTRAL TIME, AS THE DEADLINE (THE "<u>OBJECTION DEADLINE</u>") FOR FILING OBJECTIONS TO CONFIRMATION OF THE PLAN WITH THE BANKRUPTCY COURT. OBJECTIONS TO CONFIRMATION OF THE PLAN MUST BE SERVED SO AS TO BE RECEIVED BY THE FOLLOWING PARTIES ON OR BEFORE THE OBJECTION DEADLINE:**

*Counsel to the Debtors:*

William L. Wallander, SBT #20780750
Richard H. London, SBT #24032678
Beth Lloyd, SBT #24060179
**VINSON & ELKINS LLP**
Trammell Crow Center
2001 Ross Avenue, Suite 3700
Dallas, Texas 75201-2975
Tel:  214.220.7700
Fax:  214.220.7716
bwallander@velaw.com; rlondon@velaw.com
blloyd@velaw.com

*Counsel to the First Lien Holders:*

Samuel M. Stricklin, SBT #19397050
Ms. Tricia R. DeLeon, SBT #24005885
**BRACEWELL & GIULIANI LLP**
1445 Ross Avenue, Suite 3800
Dallas, Texas 75202-2711
Tel. 214.468.3800
Fax: 214.468.3888
sam.stricklin@bgllp.com; tricia.deleon@bgllp.com

*Counsel to Certain of the Second Lien Holders:*[1]

David M. Bennett, SBT #2139600
Demetra Liggins, SBT #24026844
**THOMPSON & KNIGHT LLP**
1722 Routh Street, Suite 1500
Dallas, Texas 75201
Tel: 214.969.1700
Fax: 214.969.1751
david.bennett@tklaw.com; demetra.liggins@tklaw.com

---

[1] [List to be provided by the Second Lien Holders]

*Counsel to the Committee:*

Richard M. Roberson, SBT #16993800
Michael S. Haynes, SBT #24050735
**GARDERE WYNNE SEWELL LLP**
3000 Thanksgiving Tower
1601 Elm Street
Dallas, Texas 75201-4761
Tel: 214.999.3000
Fax: 214.999.4667
rroberson@gardere.com; mhaynes@gardere.com

*United States Trustee:*

George McElreath
1100 Commerce Street, Room 976
Dallas, TX 75242
Tel: 214.767.8967
Fax: 214.767.8971
george.f.mcelreath@usdoj.gov

*Counsel to the SandRidge Parties:*

Nancy L. Sanborn
**DAVIS POLK & WARDWELL LLP**
450 Lexington Avenue
New York, NY 10017
Tel: 212.450.4955
Fax: 212.701.5800
nancy.sanborn@dpw.com

**ANY OBJECTION TO CONFIRMATION OF THE PLAN MUST BE IN WRITING AND (A) MUST STATE THE NAME AND ADDRESS OF THE OBJECTING PARTY AND THE AMOUNT OF ITS CLAIM OR THE NATURE OF ITS EQUITY INTEREST AND (B) MUST STATE WITH PARTICULARITY THE NATURE OF ITS OBJECTION. ANY CONFIRMATION OBJECTION NOT TIMELY FILED AND SERVED AS SET FORTH HEREIN SHALL BE DEEMED WAIVED AND SHALL NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

### 1.7. <u>Recommendation Of The Debtors, First Lien Holders, Second Lien Holders And Committee To Approve Plan</u>

The Debtors approved the solicitation of acceptances of the Plan and all of the transactions contemplated thereunder. In light of the benefits to be attained by the holders of Claims pursuant to consummation of the transactions contemplated under the Plan, the Debtors recommend that such holders of Claims vote to accept the Plan. The Debtors have reached this decision after considering the alternatives to the Plan that are available to the Debtors and the

possible effect on the Debtors' business operations. These alternatives include liquidation under chapter 7 of the Bankruptcy Code or reorganization under chapter 11 of the Bankruptcy Code with an alternative plan of reorganization. The Debtors determined, after consulting with their financial and legal advisors, the First Lien Holders, Second Lien Holders, and Committee that the transactions contemplated in the Plan would likely result in a distribution of greater value to creditors and shareholders than would a liquidation under chapter 7.

THE DEBTORS, FIRST LIEN HOLDERS, SECOND LIEN HOLDERS AND COMMITTEE SUPPORT THE PLAN, ARE CO-PROPONENTS OF THE PLAN, AND RECOMMEND ALL HOLDERS OF CLAIMS WHOSE VOTES ARE BEING SOLICITED TO TIMELY SUBMIT BALLOTS TO ACCEPT THE PLAN.

## ARTICLE II

## GENERAL INFORMATION REGARDING THE DEBTORS

### 2.1.  Background

Crusader and its seven direct subsidiaries (each of which is a Debtor) operate in the oil and gas industry. The Debtors' core operations consist of exploration for, and acquisition, production, and sale of, crude oil and natural gas. The Debtors hold leases covering approximately 1,000,000 gross acres (440,000 net acres) of oil and gas property (including approximately 12,800 drilling locations), operate approximately 350 wells, and hold working interests in approximately 670 wells. Their assets are located in various portions of Texas, Oklahoma, Colorado, Kansas, Louisiana, Mississippi, Montana, and North Dakota, specifically including the Anadarko Basin, Ft. Worth Basin, Permian Basin, and Williston Basin. The Debtors focus on the development of unconventional resource opportunities, such as the application of horizontal drilling and completion technology. This focus has contributed to the Debtors' over 90% success rate with respect to their calendar year 2008 drilling program. The Debtors are lessees under oil and gas leases and are parties to certain operating agreements, farmout agreements, joint venture agreements, gas marketing agreements, gas transportation agreements, and other agreements.

Financial information concerning the Debtors' financial condition as of the Petition Date can be found in the Debtors' Schedules and Statement of Financial Affairs filed with the Bankruptcy Court and addressed more fully herein. Additionally, current information concerning the Debtors may be found in the Monthly Operating Reports filed with the Bankruptcy Court.

For historical information concerning the Debtors, the Debtors refer to the information Crusader has filed with the United States Securities and Exchange Commission ("SEC"), specifically the documents listed below filed by Crusader with the SEC under Sections 13(a), 13(c), 14, or 15(d) of the Securities Exchange Act of 1934 (excluding any information furnished pursuant to Item 2.02 or Item 7.01 on any Current Report on Form 8-K). Crusader has not filed

any reports with the SEC since filing a Current Report on Form 8-K on April 6, 2009.[2]  The last Quarterly Report filed on Form 10-Q by Crusader was filed for the quarter ended September 30, 2008.  The information contained in the SEC filings referred to herein speaks only as to the date of the reports referenced herein or as of another date specified in such reports.

- Quarterly Report on Form 10-Q for the quarter ended June 30, 2008, filed with the SEC on August 14, 2008;

- Quarterly Report on Form 10-Q for the quarter ended September 30, 2008, filed with the SEC on November 10, 2008;

- Current Reports on Form 8-K filed with the SEC on September 30, 2008, November 6, 2008, November 10, 2008, January 5, 2009, February 27, 2009, March 18, 2009, March 19, 2009, March 27, 2009, March 31, 2009 and April 6, 2009;

- Definitive Proxy Statement on Schedule 14A dated May 23, 2008, as filed with the SEC on May 28, 2008

All documents filed by Crusader with the SEC may be accessed at www.sec.gov and at Crusader's website, www.crusaderenergy.com.  Pleadings filed in the Cases may also be obtained from the website maintained by the Debtors' claims and noticing agent at http://www.bmcgroup.com, following the Case Information links to the Crusader page. Additional information may also be found at the website maintained by the Committee at http://www.gardere.com/sites/creditors/crusader/crusader.aspx.

Copies of certain documents referred to above may be requested, at no cost, by writing or telephoning Crusader at the following address and phone number:

> Crusader Energy Group Inc.
> c/o BMC Group
> Po Box 3020
> Chanhassen, MN 55317-3020
> Telephone: 888.909.0100

## 2.2.    Corporate Structure of the Debtors

The Debtors' current corporate structure is the result of a business combination that was completed on June 26, 2008, as described in Crusader's Proxy Statement dated May 23, 2008.  In the transactions associated with that business combination, Crusader, then named Westside Energy Corporation, acquired seven privately-held entities – Knight Energy Group, LLC, Knight Energy Group II, LLC, RCH Upland Acquisition, LLC, Hawk Energy Fund I, LLC, Knight Energy Management, LLC, Crusader Energy Group, LLC, and Crusader Management Corporation (the Debtor Subsidiaries).  On June 26, 2008, upon consummation of the business combination, Crusader's name was changed from Westside Energy Corporation to "Crusader

---

[2] Crusader filed a Form 15 on May 11, 2009, suspending its obligations to file reports under Sections 13 and 15(d) of the 1934 Act.

Energy Group Inc." As a result of the business combination transaction, Crusader directly owns 100% of each of the Debtor Subsidiaries.

The headquarters for each of the Debtors is located at 4747 Gaillardia Parkway, Oklahoma City, Oklahoma, 73142. At the Debtors' corporate headquarters, Crusader's management oversees the operations, finance, payroll, accounting, and tax functions of all of the Debtors. The Debtors' employees are employed and paid by a common entity: (a) Crusader Management Corporation before January 1, 2009; and (b) Crusader thereafter.

### 2.3.    Management of the Debtors

The current members of the board of directors of Crusader are Robert J. Raymond (Chairman), Joe Colonnetta, James C. Crain, Phil D. Kramer and David D. Le Norman.

The current senior management group of Crusader includes David D. Le Norman, President and Chief Executive Officer; Charles L. Mullens, Jr., Vice-President and General Counsel; Charles A. Paulson, Vice-President of Engineering; and Roy A. Fletcher, Vice-President, Controller, Investor Relations Manager.

### 2.4.    Existing Capital Structure Of The Debtors

(a)    Crusader Common Stock

As of September 28, 2009, Crusader had 198,521,246 shares of common stock outstanding, with a par value of $0.01 per share, and there were 197 holders of record of Crusader common stock as of that date. Prior to March 30, 2009, Crusader common stock was publicly traded on the AMEX under the ticker symbol "KRU." The AMEX halted trading of the Crusader common stock on March 30, 2009, and Crusader filed a Form 25 with the SEC to delist the common stock on April 30, 2009. As a result of the filing of the Form 25, the Crusader common stock was delisted from trading on the AMEX on May 10, 2009. Crusader filed a Form 15 with the SEC on May 11, 2009. As a result of the filing of the Form 25 and the Form 15, Crusader ceased to have any class of securities registered under Section 12 of the Securities Exchange Act of 1934 on August 19, 2009. Crusader common stock is currently trading over-the-counter on the Pink Sheets under the symbol "CKGRQ.PK."

(b)    The Credit Agreements

Crusader is the borrower under that certain Second Amended and Restated Credit Agreement dated as of June 26, 2008, among Crusader, UBOC, and the lenders party thereto, as amended.[3] The First Lien Credit Agreement, with a maturity date of October 4, 2010, was originally a $200,000,000 revolving credit facility with an initial borrowing base limit of $100,000,000 and was later reduced by amendment to a $140,000,000 revolving line of credit with a borrowing base limit of $70,000,000. As discussed below, by letter dated February 23, 2009, UBOC further reduced the borrowing base limit to $25,000,000. The aggregate principal amount of the advances outstanding as of the Petition Date under the First Lien Credit

---

[3] The lenders that are currently parties to the First Lien Credit Agreement are UBOC and JPMorgan Chase Bank, N.A.

Agreement was approximately $30,000,000. As of _____, 2009, $28,000,000 is outstanding under the First Lien Credit Agreement.

Crusader is also the borrower under that certain Second Lien Credit Agreement dated as of July 17, 2008 among Crusader, Wilmington Trust FSB (as successor to JPMorgan Chase Bank, N.A.), as administrative agent, and lenders party thereto.[4]  The Second Lien Credit Agreement is a $250,000,000 term loan facility with a maturity date of July 18, 2013.  The aggregate principal balance outstanding under the Second Lien Credit Agreement is approximately $249,750,000.  Each of the Debtor Subsidiaries has guaranteed the obligations of Crusader under the Credit Agreements.

The obligations under the First Lien Credit Agreement are secured by a first lien on all of the material assets of the Debtors, and the Second Lien Lenders allege that the obligations under the Second Lien Credit Agreement are secured by a subordinate lien on all of the material assets of the Debtors.  In addition, Crusader has pledged its rights, title and interest in the equity of each of the Crusader Subsidiaries to the First Lien Holders and the Second Lien Holders.

(c)     ISDA 2002 Master Agreement

Additionally, certain of the First Lien Holders and Crusader were parties to a certain ISDA 2002 Master Agreement dated as of June 25, 2008 (the "Master Agreement").  An Event of Default (as defined in the Master Agreement) occurred with respect to Crusader under Section 5(a)(vii) of the Master Agreement on March 31, 2009, and an Early Termination Date was declared.  As a result of the Early Termination (as defined in the Master Agreement), certain hedges were terminated resulting in cash proceeds in the amount of $3,103,550 (the "Hedge Termination Amount").  The Debtors and the First Lien Holders agreed that $1,551,818 of the proceeds would be delivered to the Debtors, and $1,551,775 would be remitted to the First Lien Holders to reduce the amount outstanding under the First Lien Credit Agreement.  Such remittance was approved by the Bankruptcy Court by Order [Docket No. 321] entered on June 15, 2009.

**2.5.    Events Leading To Chapter 11**

On February 23, 2009, UBOC, in its capacity as the administrative agent and issuing lender under the First Lien Credit Agreement, notified Crusader that the First Lien Holders had completed a redetermination of Crusader's borrowing base (the "Borrowing Base Redetermination").  As a result of the Borrowing Base Redetermination, the First Lien Holders lowered Crusader's borrowing base from $70,000,000 to $25,000,000.  As the aggregate principal amount of the advances outstanding as of the Petition Date under the First Lien Credit Agreement was $30,000,000, Crusader had a borrowing base deficiency in the approximate amount of $5,000,000 (the "Borrowing Base Deficiency").

Under the First Lien Credit Agreement, Crusader was required to take one of the following actions to eliminate the Borrowing Base Deficiency timely: (a) repay the Borrowing

---

[4] The lenders that are currently parties to the Second Lien Credit Agreement are affiliates of Canyon Partners, Farallon Capital Management, Fortress, Golden Tree Asset Management, LP, Highbridge Principal Strategies, and Highland Capital Management, LP.

Base Deficiency in full by March 5, 2009; (b) pledge additional collateral to cure the Borrowing Base Deficiency by March 25, 2009; (c) repay the Borrowing Base Deficiency in six equal monthly installments with the first installment due on March 25, 2009; or (d) a combination of actions (b) and (c).  Pursuant to a letter to UBOC dated March 5, 2009, Crusader notified UBOC that Crusader was electing to repay the Borrowing Base Deficiency in six equal monthly installments, commencing on March 25, 2009.  The Debtors did not make the first installment payment, which resulted in a monetary default under the First Lien Credit Agreement and a cross default under the Second Lien Credit Agreement.

The Borrowing Base Redetermination significantly impaired the Debtors' liquidity. Other material factors contributing to the Debtors' financial difficulties prior to the Petition Date included historic declines in the prices of crude oil and natural gas between the summer of 2008 and the Petition Date.  These declines adversely affected the Debtors' revenues and cash flows from operations.  Due to the current economic environment, the Debtors have been unable to raise cash or identify capital resources from other sources such as bank funding, private investment or the public debt and equity markets.  The combination of these factors impaired the Debtors' liquidity and compelled the Debtors to commence the Cases in order to maximize the value of their assets for the benefit of their creditors and other constituencies.

## ARTICLE III

## EVENTS DURING THE CHAPTER 11 CASES

### 3.1.    Commencement of the Chapter 11 Cases

On the Petition Date, the Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  Since the Petition Date, the Debtors have operated their businesses as debtors and debtors-in-possession.  On and soon after the Petition Date, the Debtors sought certain relief from the Bankruptcy Court to ensure that their operations continued with the least possible disruption.  Such "First Day Motions" were heard by the Bankruptcy Court as early as April 1, 2009.  After the hearings, the Bankruptcy court entered the following orders:

- *Order Directing Joint Administration of Cases* [Docket No. 37];

- *Order Granting Complex Chapter 11 Bankruptcy Case Treatment* [Docket No. 38];

- *Order (I) Authorizing Debtors to (A) Pay Prepetition Wages and Salaries to Employees and (B) Pay Prepetition Benefits and Continue Benefit Programs in the Ordinary Course and (II) Directing Banks to Honor Checks for Payment of Prepetition Employee Obligations* [Interim Order at Docket No. 39; Final Order at Docket No. 201];

- *Interim Order Granting Application to Employ Vinson & Elkins, LLP as Counsel for the Debtors* [Interim Order at Docket No. 40; Final Order at Docket No. 199].

- *Order Granting Emergency Motions to (I) Approve Maintenance of Certain Prepetition Bank Accounts and Cash Management System; and (II) Continue Use of Existing Checks and Business Forms* [Docket No. 41];

- *Interim Order Granting Application Pursuant to 11 U.S.C. §§ 327(a) and 328(a) Authorizing Employment and Retention of Jefferies & Company, Inc. as Financial Advisors* [Interim Order at Docket No. 42; Final Order at Docket No. 269];

- *Order Authorizing Debtors to Pay Prepetition Sales, Use, Property, Production, and Other Taxes and Related Obligations* [Interim Order at Docket No. 43; Final Order at Docket No. 203];

- *Order (A) Approving- Notice of Case Commencement; (B) Approving Filing of Consolidated List of 40 Largest Unsecured Creditors; and (C) Approving Service by Electronic Means* [Docket No. 44; Order Approving Form of Publication Notice at Docket No. 376];

- *Agreed Interim Order Authorizing Use of Cash Collateral, Granting Adequate Protection, and Authorizing the Debtors to Make Payments to Royalty and Working Interest Owners* [Interim Order at Docket No. 45; Interim Order at Docket No. 75; Second Interim Order at Docket No. 202; Third Interim Order at Docket No. 326; Final Order at Docket No. 524]; and

- *Order Extending Time to File Schedules and Statements of Financial Affairs* [Docket No. 46];

### 3.2. Appointment of the Official Committee of Unsecured Creditors

On April 14, 2009, the Office of the United States Trustee appointed the Committee to represent the interests of the Debtors' unsecured creditors. The United States Trustee added a member to the Committee on May 27, 2009. The current members of the Committee are representatives from: Halliburton Energy Services, Inc., Trinidad Drilling, Global Geophysical Services, Inc., Goober Drilling, LLC, Precision Drilling f/k/a Grey Wolf, Inc., WB Supply Co. and Smith International, Inc. The Committee retained Gardere Wynne Sewell LLP as counsel pursuant to a final Order [Docket No. 325] entered on June 17, 2009.

### 3.3. Use of Cash Collateral

The Bankruptcy Court has entered the following orders regarding the Debtors' use of cash collateral (collectively, the "Interim Cash Collateral Orders"):

- On April 2, 2009, the *Agreed Interim Order Authorizing Use of Cash Collateral, Granting Adequate Protection, and Authorizing the Debtors to Make Payments to Royalty and Working Interest Owners* [Docket No. 45];

- On April 9, 2009, the amended *Agreed Interim Order Authorizing Use of Cash Collateral, Granting Adequate Protection, and Authorizing the Debtors to Make Payments to Royalty and Working Interest Owners* [Docket No. 75];

- On May 7, 2009, the *Second Agreed Interim Order Authorizing Use of Cash Collateral and Granting Adequate Protection* [Docket No. 202];

- On June 17, 2009, the *Third Agreed Interim Order Authorizing Use of Cash Collateral and Granting Adequate Protection* [Docket No. 326]

*The Final Order Authorizing Use of Cash Collateral and Granting Adequate Protection* [Docket No. 524] (the "Final Cash Collateral Order") was entered by the Bankruptcy Court on August 6, 2009.

Under the Final Cash Collateral Order, the Debtors are authorized to use the cash, cash equivalents, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents (the "Cash Collateral") in which the First Lien Holders and Second Lien Holders (collectively, the "Prepetition Lenders") have an interest pursuant to their respective Credit Agreements. The Debtors must use the Cash Collateral in accordance with the approved budget (the "Budget") to continue their ordinary course operations and to maintain the value of their bankruptcy estates. Under the Final Cash Collateral Order, the authority to use Cash Collateral was to terminate on September 18, 2009, subject to extensions on the terms set forth therein. Seven stipulations extending the use of Cash Collateral have been executed by the Debtors and Prepetition Lenders, ultimately extending the authority to use Cash Collateral until November 24, 2009 (as of the present date) [Docket Nos. 521, 584, 615, 656, 659, 663 and 680]. The Debtors anticipate that they will be able to further extend the November 24th deadline to provide them sufficient time to confirm the Plan.

As part of the agreement to use Cash Collateral, the Debtors stipulated to the validity and enforceability of the liens and security interests held by the Prepetition Lenders pursuant to their respective Credit Agreements; however, the Debtors acknowledged that they were not aware of the filing of any mortgages against Crusader Energy Group, LLC or of any perfection in deposit accounts. Additionally, the Committee was given the right to challenge the extent, validity, or priority of the Prepetition Lenders' security interests and liens (the "Challenge Rights") under the Interim Cash Collateral Orders and the Final Cash Collateral Order. Following conclusion of the Committee's analysis of the First Lien Holders' security interests and liens, the Committee allowed the Challenge Right as to the First Lien Holders to expire prior to the entry of the Final Cash Collateral Order. The Committee's Challenge Rights as to the Second Lien Lenders were extended by agreement through August 31, 2009 [Docket No. 476], and were further extended by agreement to September 30, 2009 [Docket No. 581]. On September 25, 2009, a fourth stipulation [Docket No. 679] was filed through which the Challenge Rights were extended until the earlier of the Effective Date of the Plan or thirty days after withdrawal of the Plan (if it is withdrawn).

Pursuant to sections 361, 362, 363(e) and 364(d)(1) of the Bankruptcy Code, in the Final Cash Collateral Order, the Debtors granted various forms of adequate protection for the use of such Cash Collateral to the Prepetition Lenders, Trade Lien Creditors (as defined in the Final

Cash Collateral Order), and Other Secured Creditors (as defined in the Final Cash Collateral Order). For more information regarding the scope of the liens and priority claims provided as adequate protection, reference should be made to the Interim Cash Collateral Orders and the Final Cash Collateral Order.

### 3.4. Retention of Professionals by the Debtors

During the Cases, the Debtors have filed retention applications for certain professionals to represent and assist them in the administration of the Cases. Many of these professionals have been actively involved with the negotiation and development of the terms of the Plan and the transactions contemplated thereunder, and all of these professionals will continue to provide needed services throughout the Cases.

In May 2009, the Debtors retained James R. Latimer, III, a managing director of Blackhill Partners, LLC ("Blackhill"), as their Chief Restructuring Officer. Mr. Latimer has earned the Certified Public Accountant designation and currently holds a Chartered Financial Analyst charter. He has been providing restructuring services to clients since 1998. Mr. Latimer and Blackhill are being compensated on an hourly basis. The Debtors will also reimburse Mr. Latimer and Blackhill for all reasonable out of pocket expenses.

The Debtors retained Jefferies & Company, Inc. ("Jefferies") to act as their financial advisor in connection with the Restructuring. Under the terms of the engagement, as modified by the *Order Granting Application for an Order Pursuant to 11 U.S.C. §§ 327(a) and 328(a) Authorizing Employment of Jefferies and Co. as Financial Advisors* [Docket No. 269], Jefferies received a monthly fee of $125,000 for the first three months, and has and will receive a monthly fee of $150,000 thereafter. Further, Jefferies will be entitled to a transaction fee as summarized below:

- For an M&A transaction, including a sale of the Debtors or all or a material portion of their stock or assets (the "M&A Transaction"), the greater of 1% of the transaction value or $2,000,000.
- 25% of any break-up fee received by the Debtors in connection with any M&A Transaction.
- 50% of the monthly fees in excess of $825,000 will be credited against the applicable transaction fee.

The Debtors have retained Vinson & Elkins LLP ("V&E") as their bankruptcy and restructuring counsel and Hall, Estill, Hardwick, Gable, Golden & Nelson, P.C. ("Hall Estill") as their special counsel and conflicts counsel. V&E and Hall Estill are being compensated on an hourly basis. The Debtors will also reimburse V&E and Hall Estill for all reasonable out of pocket expenses.

The Debtors have retained The BMC Group, Inc. to serve as their claims and noticing agent, and as their Solicitation Agent in connection with the Solicitation. The Debtors will pay the Solicitation Agent reasonable and customary compensation for its services in connection with the Solicitation and other noticing needs of the Debtors, plus reimbursement for reasonable out of pocket expenses. The Debtors also will pay any other customary fees and expenses

attributable to the Solicitation. The Solicitation Agent will perform administrative tasks only and will not make any recommendation to any holder of a Claim with respect to its acceptance or rejection of the Plan.

The Debtors have retained KPMG LLP to serve as their accountants and auditors in these Cases. Additionally, Grant Thornton LLP was retained as tax accountants for the Debtors.

Final orders approving the retention of the above professionals were entered by the Bankruptcy Court as follows: (a) James R. Latimer, as Chief Restructuring Officer [Docket No. 371]; (b) Vinson & Elkins, LLP, as restructuring counsel for the Debtors [Docket No. 199]; (c) Hall, Estill, Hardwick, Gable, Golden & Nelson, P.C., as special and conflicts counsel [Docket No. 327]; (d) Jefferies and Company, as financial advisors for the Debtors [Docket No. 269]; (e) The BMC Group, Inc., as the claims and noticing agent for the Debtors [Docket No. 393]; (f) KPMG LLP, as accountants and auditors for the Debtors [Docket No. 629]; and (g) Grant Thornton LLP, as tax accountants for the Debtors [Docket No. 523].

### 3.5. **Bankruptcy Schedules and Statements of Financial Affairs.**

On May 6, 2009, the Debtors each timely filed their Bankruptcy Schedules. The Bankruptcy Schedules set forth the detailed listing of the Debtors' assets and liabilities as of the commencement of these Cases. On May 30, 2009 and September 21, 2009, the Debtors each filed a limited amendment to the Bankruptcy Schedules.

### 3.6. **Meeting of Creditors**

On April 14, 2009, the United States Trustee conducted the meeting of creditors pursuant to section 341 of the Bankruptcy Code for the Debtors' Cases.

### 3.7. **Operating Reports**

As required by the United States Trustee, Monthly Operating Reports for the months of April 2009 through August 2009 have been timely filed with the Clerk of the Bankruptcy Court. These Monthly Operating Reports are incorporated herein by reference.

### 3.8. **Claims Process**

(a)    Last Date to File Proofs of Claims

The deadline by which non-governmental entities were required to submit their Proofs of Claim was set as July 28, 2009 and by which governmental entities are required to submit their Proofs of Claim was set as September 28, 2009.

(b)    Claims Reconciliation

As of July 28, 2009, approximately 900 Proofs of Claims had been Filed. After removing duplicate Claims and giving effect to substantive consolidation, _____ have been asserted against the Debtors ($_____ secured, $_____ administrative, $_____ priority and $_____ general unsecured). The Debtors are in the process

of reviewing and objecting to certain claims. The Debtors expect that the claims pool will be reduced based on their review and reconciliation.

### 3.9.    Exclusivity

Pursuant to section 1121 of the Bankruptcy Code, a chapter 11 debtor has an exclusive right to file a plan for the first 120 days of a bankruptcy case and the exclusive right to solicit acceptances of such plan during the first 180 days of such case unless extended for cause. The Debtors' exclusive period within which they could file a plan initially was set to expire on July 28, 2009 and the exclusive period within which they could solicit acceptances of the plan was set to expire on September 26, 2009. By various Orders [Docket Nos. 521 and 630], the Bankruptcy Court extended the Debtors' exclusive period within which they could file a plan through and including September 8, 2009 and to solicit acceptances of such plan through and including November 13, 2009. The exclusive periods were further extended by stipulation [Docket No. 615] among the parties until September 28, 2009 and November 27, 2009, respectively.

### 3.10.    Unexpired Nonresidential Real Property Leases

Pursuant to section 365(d) of the Bankruptcy Code, a chapter 11 debtor must assume or reject unexpired leases of nonresidential real property within 120 days of the commencement of the case, unless such deadline is extended by the Bankruptcy Court. In the Debtors' Cases, this deadline was set to expire on July 28, 2009. By its Order, the Bankruptcy Court extended the deadline until October 26, 2009. Pursuant to an *Order Regarding Assumption of Executory Contracts / Unexpired Leases (Kansas and Louisiana Oil and Gas Leases and Other Leases)* [Docket No. ___] entered on _____, 2009, the Bankruptcy Court authorized the Debtors to assume certain oil and gas leases in the State of Kansas and certain other leases of nonresidential real property. In addition, the Bankruptcy Court determined that _____ [INSERT DISCUSSION OF LOUISIANA LEASES UPON ENTRY OF ORDER]

### 3.11.    Retention & Incentive Plans

#### (a)    Key Employee Retention Plan

On March 31, 2009, the Debtors filed the *Motion for an Order Approving and Authorizing the Implementation of the Key Employee Retention Program* [Docket No. 26] by which they sought approval to implement a plan to retain the Debtors' employees (the "Retention Program") given the disruption created by the filing of the Cases. The Retention Program was approved by Order [Docket No. 200] of the Bankruptcy Court entered on May 7, 2009.

Under the Retention Program, the Debtors were authorized to make fixed retention payments (the "Retention Payments") to up to 23 employees (the "Employees").[5] The first installment payment under the Retention Program was made on September 30, 2009. The second installment under the Retention Program will be made on one of various alternative dates,

---

[5] The Employees do not include the MIP Participants (as defined below).

including the Effective Date of the Plan. The maximum amount of the Retention Payments to be made under the Retention Program aggregates to no more than $1,190,750.

(b) Management Incentive Plan

On May 29, 2009, the Debtors filed their *Motion to Approve and Authorize Implementation of Management Incentive Program* [Docket No. 277] by which they sought to establish an incentive plan (the "MIP") for their key management personnel. The Bankruptcy Court entered an Order [Docket No. 395] approving the MIP on July 14, 2009.

The key management personnel that may participate in the MIP are David D. Le Norman, the Chief Executive Officer of Crusader; Charles L. Mullens, Jr., the General Counsel of Crusader; Roy A. Fletcher, the Vice President & Controller of Crusader; and Charles A. Paulson, the Vice President of Engineering of Crusader (collectively, the "MIP Participants").

Under the MIP, if the aggregate value of any transaction involving the assets of the Debtors or the outstanding capital stock of any of the Debtors exceeds $200,000,000, then each MIP Participant will be eligible to participate in a MIP pool, which shall be funded from the proceeds of such transaction in an amount equal to 1% of the aggregate transaction value minus $160,000,000, subject to a cap of 156% of the MIP Participants' base salary (the "Incentive Payout"). It is currently contemplated that each MIP Participant will be paid the following respective percentages of the Incentive Payout that has not previously been paid to them: (i) David D. Le Norman – 40%; (ii) Charles L. Mullens – 20%; (iii) Roy A. Fletcher – 20%; and (iv) Charles A. Paulson – 20%. The Incentive Payout is subject to approval by the CRO Committee in consultation with the CRO. This incentive payment shall be an allowed administrative expense claim, pursuant to section 503 of the Bankruptcy Code, for purposes of the Cases.

### 3.12. **Motion to Restrict Stock Trading**

The Debtors have incurred and expect to continue to incur significant net operating losses ("NOLs"). The Debtors' NOLs are estimated to be approximately $137,000,000 as of December 31, 2008.[6] The NOLs are an extremely valuable asset of the Debtors' estates because the Internal Revenue Code[7] allows the Debtors to carry forward NOLs to offset future taxable income for up to twenty (20) taxable years, thereby reducing future aggregate tax obligations.[8] The Debtors' NOLs may be worth as much as $42,000,000 in potential future tax savings.[9]

Because the use of those NOLs could be negatively affected by a change of control, the Debtors filed their *Expedited Motion to Establish Procedures and Approve Restrictions on Certain Transfers of Interest in the Debtors' Estates* [Docket No. 460] (the "Trading Restrictions Motion") on July 28, 2009. Under the Trading Restrictions Motion, the Debtors sought certain restrictions on the trading of Crusader common stock to insure an Ownership Change did not

---

[6] This NOL estimate assumes that Crusader deducts (instead of capitalizes) approximately $80,000,000 of intangible drilling costs incurred during the last six months of 2008.

[7] All references to the "Internal Revenue Code" and "I.R.C." are to the Internal Revenue Code of 1986, as amended.

[8] *See* I.R.C. § 172.

[9] This projection is based upon a federal corporate income tax rate of 35%.

occur prior to the confirmation of the Plan so that the Debtors' NOLs could be preserved and the special provisions of Section 382 could be utilized. After the entry of an interim order, the Bankruptcy Court entered a final Order [Docket No. 654] (the "Trading Restrictions Order") approving the Trading Restrictions Motion on September 18, 2009.

In the Trading Restrictions Order, the Bankruptcy Court implemented the following notification procedures relating to the trading of Crusader common stock, including the following:

(a)     Notice of Substantial Equity Holder Status.

Any person or entity who is or becomes a owner of at least 9.44 million shares, which represents approximately 4.75% of the issued and outstanding Crusader common stock as of the Petition Date (each a "Substantial Equity Holder"), must on or before the later of (i) fifteen days after the Bankruptcy Court's entry of an order approving these Procedures or (ii) ten days after that person or entity becomes a Substantial Equity Holder, serve on the Debtors and their attorneys a notice containing certain ownership information (a "Substantial Equity Holder Notice").

(b)     Restrictions and Procedures for Trading in Stock.

Any person or entity who after the entry of the Trading Restrictions Order,

(i)     is not a Substantial Equity Holder and wishes to purchase or otherwise acquire an amount of Crusader common stock that would cause the person or entity to become a Substantial Equity Holder;

(ii)     is a Substantial Equity Holder and wishes to purchase or otherwise acquire any additional Crusader common stock; or

(iii)     is a Substantial Equity Holder and wishes to sell or otherwise dispose of any Crusader common stock,

must, at least ten (10) days prior to the consummation of any such transaction (the "Waiting Period"), file with this Court and serve on the Debtors, their counsel and counsel for the Committee, a certain notice (the "Proposed Stock Transaction Notice"). The Debtors shall follow the procedures set forth below with respect to any Proposed Stock Transaction Notice received.

(c)     Procedures Upon Receipt of a Proposed Stock Transaction Notice.

If written approval of the proposed transaction is filed with the Bankruptcy Court by the Debtors after receipt of a Proposed Stock Transaction Notice, then the proposed transaction may proceed. If written approval of the proposed transaction is not filed by the Debtors with the Bankruptcy Court within fifteen calendar days after receipt of a Proposed Stock Termination Notice, then the transaction may not be consummated unless approved by a final and nonappealable order of the Bankruptcy Court (unless the Debtors subsequently approve the proposed transaction in writing, in which case no such Court order would be necessary). Further

transactions within the scope of this paragraph must be the subject of additional notices as set forth herein with additional Waiting Periods.

### 3.13. Recoupment

The Debtors have been faced with several motions to recoup funds filed by the operators of various wells in which the Debtors hold a working interest. For example, St. Mary's Land and Exploration Company ("St. Mary's"), Forest Oil Corporation ("Forest"), XTO Energy, Inc. ("XTO") and Aspect Energy, LLC ("Aspect") have each sought authority to exercise rights of recoupment. The Debtors have consensually resolved St. Mary's recoupment request, and an agreed order regarding the same was entered on July 14, 2009 [Docket No. 394]. The Debtors have also consensually resolved XTO's recoupment request, and an agreed order regarding the same was entered on _____, 2009 [Docket No. ___]. The Debtors are negotiating with Forest Oil and Aspect in an attempt to also work out an agreed order on those recoupment motions.

### 3.14. Royalty Payments

On the Petition Date, the Debtors requested authority to make certain payments to royalty and working interest owners on account of pre-petition sales of oil and gas (the "Royalty and Working Interest Payments") pursuant to its *Motion for an Order Authorizing Use of Cash Collateral, Granting Adequate Protection, and Authorizing the Debtors to Make Payments to Royalty and Working Interest Owners* [Docket No. 30]. The Bankruptcy Court initially authorized the Debtors to make the Royalty and Working Interest Payments in the *Agreed Order Authorizing Use of Cash Collateral, Granting Adequate Protection, and Authorizing the Debtors to Make Payments to Royalty and Working Interest Owners* [Docket No. 45], but it reserved the right to re-visit the matter if a creditor objected to the making of those payments. The Bankruptcy Court, on April 28, 2009, denied the Debtors' authority to continue to make such payments as a result of an objection raised by certain of the Debtors' creditors. As such, the Debtors have not made certain payments for royalties that are owed on account of prepetition production of oil and gas; however, the Debtors have continued to make the royalty payments that are owed on account of postpetition production.

### 3.15. Joint Interest Billings

In their capacity as operators under joint operating agreements and similar arrangements, one or more of the Debtors collect joint interest billings (collectively, "JIBs") from non-operators under those agreements and arrangements. The JIBs are the non-operator's share of the costs of, among other things, exploration, drilling and production. The Debtors have created an accounting reserve of all the identifiable, prepetition JIB amounts that were on hand as of the Petition Date and that were subsequently collected. As of _____, 2009, the Debtors have approximately $_____ in the accounting reserve. Additionally, the Debtors have approximately $2,000,000 in the accounting reserve for prepetition well prepayments received from working interest owners related to anticipated well drilling costs. The Debtors will utilize those JIBs and prepayments as necessary to cure arrearages and defaults under joint operating agreements and similar arrangements.

### 3.16. **Limited Substantive Consolidation**.

On _____, 2009, the Bankruptcy Court entered its [*Order Approving Substantive Consolidation of the Debtors*] [Docket No. ___] (the "Sub Con Order") pursuant to which, solely for the purpose of the Cases and the Plan, and without affecting any Reorganized Debtor in any manner, (a) each Claim against any of the Debtors will be deemed to be a Claim against a consolidated entity consisting of all of the Debtors, (b) any Proof of Claim Filed against one or more of the Debtors will be deemed to have been Filed against the consolidated entity; (c) all Intercompany Claims by and among the Debtors will be eliminated; (d) all guarantees by one of the Debtors in favor of any of the other Debtors will be eliminated, and all guarantees executed by any of the Debtors in favor of a Creditor will be deemed to be a single obligation. Pursuant to the Sub Con Order, substantive consolidation will have no effect on valid, enforceable, and unavoidable Liens except for Liens that secure an Intercompany Claim that is eliminated by virtue of substantive consolidation and related Liens against Collateral that cease to exist by virtue of substantive consolidation. Further, substantive consolidation will not (u) create a Claim in a Class different from the Class in which a Claim would have been placed in the absence of substantive consolidation; (v) change the priority or nature of a Claim in a manner different from the priority or nature of such Claim in the absence of substantive consolidation; or (w) affect any preserved Causes of Action, including Avoidance Actions, of each of the Debtors; (x) affect the legal or organizational structure of the Debtors or the Reorganized Debtors or their respective ownership of any property or asset; (y) affect the defenses, other than proper-party defenses, to any Causes of Action; or (z) affect distributions out of any insurance policies or proceeds of such policies.

### 3.17. **Settlement Between the Second Lien Holders and the Committee**

Pursuant to the Final Cash Collateral Order, the Committee has a right to challenge the liens and claims of the Second Lien Holders. In contemplation of this deadline, the Committee and Second Lien Holders commenced active negotiations to resolve any and all outstanding issues. As a result of such discussions, the Committee and the Second Lien Holders agreed to resolve the dispute regarding the liens and claims of the Second Lien Holders on the following terms:

- A Carveout Reserve in the amount of $42,500,000 shall be established from the Consideration from any Transaction to pay Allowed M&M Secured Claims, Allowed Non-Second Lien General Unsecured Claims and Cure Claims.

- From the Carveout Reserve, holders of Allowed Non-Second Lien General Unsecured Claims shall receive a 32.5 percent Distribution, up to an aggregate maximum of $8,750,000.

- Each holder of M&M Claims may receive 60 percent of the aggregate amount of such holder's Claims if:

  o such holder is listed on **Exhibit D**, and the holder elects such treatment by so indicating on its ballot; or

- o    such holder is not listed on <u>Exhibit D</u> but elects on its ballot to receive such treatment and the Debtors and Second Lien Holders consent to such election.

- To assist each holder of M&M Claims in determining whether to elect to receive the 60 percent settlement, the Committee has prepared a well-by-well analysis, which is attached hereto as Exhibit E. Exhibit E contains:

  - o    the Debtors' estimates of its accounts payable;

  - o    the total liens asserted;

  - o    the total liens reconciled by the Debtors to their accounts payable;

  - o    monies held in reserve on account of Joint Interest Billings collected from non-Debtor third party working interest owners;

  - o    the Debtors' reserve engineer's December 31, 2008, reserve value, as adjusted;

  - o    the Debtors' aggregate net revenue interest; and

  - o    the Committee's analysis on the existence and validity of liens asserted by the First Lien Holders and Second Lien Holders. The Committee did not conduct an analysis of recorded mechanic's and materialmen's liens to determine the priority of such liens to the liens recorded by the First Lien Holders and Second Lien Holders. Each creditor asserting a lien should conduct its own analysis as to the priority and extent of its lien. The information provided in Exhibit E is the result of lien analyses conducted by the Committee and do not reflect the opinions or conclusions of the Debtors, First Lien Holders, or Second Lien Holders.

- The Debtors, the Second Lien Holders and the Committee shall jointly select the Liquidating Trustee.

- The Second Lien Holders and the Committee shall each select one member of the Liquidating Trust Committee. The two selected members will then select the third member of the Liquidating Trust Committee. Disputes as to selection of Liquidating Trustee and/or third Liquidating Trust Committee member shall be determined by the Bankruptcy Court.

- M&M Claim disputes shall be subject to mandatory mediation, the cost of which shall be paid out of the Liquidating Trust Expense Reserve up to a maximum of $150,000 in the aggregate. In the event mediation is unsuccessful, the Liquidating Trustee consents to binding arbitration if the creditor so selects.

- The Committee consents to Second Lien Holders' determining what constitutes a higher or better bid (for purposes of determining, in accordance with the Bid

Procedures, which bids are "Qualified Bids" and which bid is the "Successful Bid"). Any such bids must provide for the above terms.

ANY HOLDER OF M&M SECURED CLAIMS (A) LISTED ON THE M&M CLAIM SCHEDULE (EXHIBIT D HERETO) WHICH DOES NOT ELECT TO ACCEPT THE 60% SETTLEMENT, OR (B) NOT LISTED ON THE M&M CLAIM SCHEDULE WHICH ELECTS THE 60% SETTLEMENT BUT DOES NOT OBTAIN THE CONSENT OF THE DEBTORS AND SECOND LIEN HOLDERS TO RECEIVE SUCH TREATMENT, SHALL COMPLY WITH THE PROCEDURES AND APPLICABLE DEADLINES SET FORTH IN SECTION 6.17(a) OF THE PLAN (AS DESCRIBED IN SECTION 7.1(e) OF THIS DISCLOSURE STATEMENT) OR BE FOREVER BARRED FROM ASSERTING ITS CLAIMS AGAINST THE DEBTORS OR THEIR PROPERTY.

PLEASE SEE SECTION 5.3 OF THIS DISCLOSURE STATEMENT FOR A DETAILED EXPLANATION OF THE TREATMENT OF M&M SECURED CLAIMS (INCLUDING THE SETTLEMENT OPTION DISCUSSED ABOVE).

The terms of this resolution have been incorporated into and are otherwise reflected in the Plan and this Disclosure Statement.

### 3.18. The CRO and the CRO Committee

As discussed in Section 3.4 of this Disclosure Statement, James R. Latimer, III serves as the Chief Restructuring Officer for the Debtors. In addition, a "CRO Committee" made up of two Crusader board members, James C. Crain and Phil D. Kramer, was established on May 11, 2009, by vote of Crusader's board members. The CRO and CRO Committee are independent from the Debtors and thus have been tasked with overseeing, among other things, the sales, marketing, and reorganization process that could result in the reorganization of the Debtors and/or effectuate a sale of 100% of the equity interests in Reorganized Crusader or substantially all of the Debtors' assets (the "Restructuring")

### 3.19. Sale and Reorganization Efforts – Plan Transaction

(a)    Marketing Efforts

The marketing process for the Debtors' assets and/or equity began in earnest in early March of 2009. Since that time, Jefferies has contacted approximately 121 parties who it thought might be interested in engaging in a transaction with the Debtors. Among the parties contacted by Jefferies were other oil and gas companies, hedge funds, private equity funds and other investors. Fifty-three parties signed confidentiality agreements in order to obtain access to the diligence materials assembled by the Debtors. Jefferies continued discussions with prospective buyers through September of 2009. The Debtors received at least fourteen bids or bona fide indications of interest from third parties. Ultimately, the Debtors engaged in substantial negotiation of agreements with at least four parties. After considerable negotiations, the Debtors selected the SandRidge Parties as the stalking horse bidder.

(b)     Selection of the Stock Purchase Agreement as the Stalking Horse Bid

Under the Plan, the Debtors propose to effectuate the transactions contemplated by the Stock Purchase Agreement dated as of September 22, 2009, as amended from time to time in accordance with the terms thereof (the "Transaction"), by and among the Debtors, SandRidge Exploration and Production, LLC (the "Potential Buyer"), and SandRidge Energy, Inc. ("SandRidge Energy" and together with the Potential Buyer, the "SandRidge Parties"), subject to receipt of a higher or better offer and consummation of the Plan. A copy of the Stock Purchase Agreement and any amendments thereto is attached hereto as **Exhibit F.** The CRO and CRO Committee evaluated any and all proposed transactions to facilitate the Restructuring and engaged in discussions and negotiations with potential bidders, including the SandRidge Parties, over the period from Mach through September 2009. Based on these activities, the CRO and CRO Committee recommended the SandRidge Parties as the stalking horse bidder to the Board of Directors of Crusader (the "Board"). The Board approved the Stock Purchase Agreement, the Plan and related documents on September 21, 2009. The CRO and CRO Committee, in consultation with the Debtors' financial and legal advisors, will be actively involved in facilitating the Restructuring and advising the Debtors as to the Transaction and alternatives that will maximize the value to the Debtors' estates and their creditors.

Under the Stock Purchase Agreement all outstanding Equity Interests of Crusader will be cancelled and new stock in Reorganized Crusader will be issued to the Potential Buyer. As consideration for the New Crusader Shares to be issued to the Potential Buyer, the Potential Buyer agrees to pay cash in the amount of $55,000,000 and issue 13,015,797 shares (the "SandRidge Energy Shares") of common stock, par value $0.001 per share ("SandRidge Energy Stock"), with an agreed valued in the aggregate of $175,000,000 by the Second Lien Holders. SandRidge Energy will also issue warrants (the "SandRidge Energy Warrants") to purchase an additional two million shares of SandRidge Energy Stock, with an agreed value of $11,000,000 as of the date of the Stock Purchase Agreement by the Second Lien Holders. The SandRidge Warrants will be exercisable at a price of $15.00 per share for five years after the closing of the transaction. Recipients of the SandRidge Energy Shares and SandRidge Energy Warrants will not be permitted to dispose of such SandRidge Energy Shares and SandRidge Energy Warrants (or shares of SandRidge Energy Stock acquired upon execution of the SandRidge Energy Warrants) for 180 days after the closing of the Transaction.

The Stock Purchase Agreement provides for, among other things, the vesting of substantially all of the Debtors' property in the Reorganized Debtors, Free and Clear of any and all Liens, Claims, and other interests except as otherwise set forth in the Plan, the cancellation of the Debtors' existing equity interests, and the issuance of new equity interests in Reorganized Crusader to SandRidge Exploration. Under the Stock Purchase Agreement, SandRidge Exploration also agreed to make a Closing Loan to the Liquidating Trust in an amount not to exceed $30,000,000 to the extent required by and in the amount and on the terms set forth in the Stock Purchase Agreement and the Closing Loan Agreement. Further, Exhibit F to the Stock Purchase Agreement, is a "Summary of Terms of Proposed Noncompetition and Cooperation Agreement" setting forth the terms of a Noncompetition and Cooperation Agreement proposed to be entered into by Reorganized Crusader, the SandRidge Parties, and David D. Le Norman if the Transaction is consummated. The terms of the Stock Purchase Agreement are summarized in further detail in Article VI of this Disclosure Statement.

(c)     Plan Support Agreement

The Debtors, First Lien Holders, certain of the Second Lien Holders, Committee, SandRidge Energy, and SandRidge Exploration executed that certain Plan Support Agreement dated as of September 22, 2009 (the "Plan Support Agreement") under which those parties agreed to, among other things, support the Transaction and confirmation of the Plan.

(d)     Bid Procedures

The Transaction is subject to higher or better offers as more particularly set forth in the *Order (A) Approving the Procedures for the Solicitation of Higher or Better Offers; (B) Approving the Form and Manner of Notice; (C) Approving Procedures for Determining Cure Amounts for Executory Contracts and Unexpired Leases; (D) Approving the Stock Purchase Agreement and Authorizing the Debtors to Enter Into the Stock Purchase Agreement and Comply with their obligations Thereunder; (E) Approving a Break-Up Fee in Connection with the Transaction Contemplated by the Stock Purchase Agreement; and (F) Granting Related Relief* [Docket No. ___] entered by the Bankruptcy Court on October __, 2009.  Pursuant to the Bid Protections Order, the Bid Deadline (as defined pursuant to the Bid Protections Order) is _____, 2009 at __:00 _.m., prevailing Central time.  If an auction is appropriate pursuant to the Bid Protections Order, it will be held on _____, 2009.  The Debtors will seek approval of the Successful Bid (as defined pursuant to the Bid Protections Order) at the Confirmation Hearing (except as otherwise provided pursuant to the Bid Protections Order).

## 3.20.   Sale and Reorganization Efforts – Gunn Oil Company Transaction

(a)     Relationship with Gunn Oil Group

In July 2008, Crusader, as buyer, and Gunn Oil Company, Cogent Exploration, Ltd. Co., and Apollo Exploration, LLC, as sellers (collectively, the "Gunn Oil Group"), entered into that certain Purchase and Sale Agreement dated as of July 15, 2008 (the "July 2008 Agreement") pursuant to which Crusader acquired a 75% working interest in various oil and gas leases located in Oldham, Potter, Hartley, and Moore Counties, Texas and covering approximately 130,619 net acres (collectively and as more fully defined in the July 2008 Agreement, the "Gunn Oil Properties").

In connection with the July 2008 Agreement and as consideration for the Gunn Oil Properties, Crusader (i) paid the Gunn Oil Group $12,000,000 on or about August 12, 2008, and (ii) agreed to pay an additional $10,000,000 in August 2011, subject to certain credits, adjustments and other conditions as set forth in the July 2008 Agreement (the "Deferred Payment"). To date, approximately $9,700,000 of the Deferred Payment remains outstanding. The Gunn Oil Group asserts that the Deferred Payment is secured by an equitable vendors' lien under Texas law on the Gunn Oil Properties.

On or about August 12, 2008, and in connection with the July 2008 Agreement, Crusader and the Gunn Oil Group also entered into that certain Operating Agreement dated August 12, 2008 (the "Operating Agreement"), pursuant to which Crusader agreed to act as operator of the Gunn Oil Properties. To date, the Operating Agreement remains in full force and effect.

The Gunn Oil Properties and the Operating Agreement are not assets to be vested in any of the Reorganized Debtors under the Stock Purchase Agreement with the SandRidge Parties.

(b)     Marketing Efforts

Jefferies has extensively marketed the Gunn Oil Properties in conjunction with the marketing of all of the Debtors' assets and equity interests for sale to effectuate the Restructuring, which process is discussed in Section 3.19(a) of this Disclosure Statement.

(c)     Selection of the Gunn Oil Group as the Stalking Horse Bidders

The Debtors have determined that they should enter into a transaction with the Gunn Oil Group in connection with the Gunn Oil Properties and the Operating Agreement. Under that transaction, the Gunn Oil Group has agreed to pay Crusader Cash in the amount of $400,000, terminate the July 2008 Agreement and the Operating Agreement, and enter into mutual releases with the Debtors (including a full release of the Deferred Payment).

(d)     Sale Motion and Bid Procedures

The proposed transaction with the Gunn Oil Group is subject to higher or better offers as more particularly set forth in the *Order (A) Approving Bid Procedures in Connection with Proposed Sale of Certain Oil and Gas Lease; (B) Approving the Form and Manner of Notice; and (C) Granting Related Relief* [Docket No. ___] (the "Gunn Oil Bid Procedures Order"). On September 25, 2009, the Debtors filed their *Motion for an Order Authorizing (A) the Sale of Certain Oil and Gas Leases of the Debtors Free and Clear; (B) the Assumption and Assignment of Executory Contracts and Unexpired Leases, if Necessary, and (C) Granting Related Relief* [Docket No. 683] (the "Gunn Oil Sale Motion") in which they seek approval of the transaction with the Gunn Oil Group.

Pursuant to the Bid Protections Order, the bid deadline with respect to the proposed transaction with the Gunn Oil Group is _____, 2009 at __:00 _.m., prevailing Central time. If an auction is appropriate pursuant to the Gunn Oil Bid Protections Order, it will be held on _____, 2009.

**3.21.  Litigation**

(a)     Post-Petition Litigation

(i)     *Gunn Oil Co., et al. v. Crusader Energy Group Inc.*, Adv. Proc. No. 09-03226

On July 16, 2009, Gunn Oil Company, Cogent Exploration, Ltd. Co. and Apollo Exploration, LLC (collectively, the "Gunn Oil Group") filed a complaint against Crusader Energy Group Inc. in the Bankruptcy Court initiating adversary proceeding no. 09-03226. In the complaint, the Gunn Oil Group seek a declaratory judgment that (A) Crusader's interest in the subject leases is subject to a valid and enforceable implied vendor's lien in favor of the Gunn Oil Group to secure the unpaid purchase price, and (B) the subject leases cannot be sold free and

clear under section 363 of the Bankruptcy Code, and (C) if they are sold free and clear, then the implied vendor's lien must attach to proceeds received for these leases.

The Debtors anticipate that Adversary Proceeding No. 09-03226 and other contested matters involving the Gunn Oil Group will be resolved by the Debtors' efforts to sell the oil and gas leases discussed in <u>Section 3.20</u> of this Disclosure Statement.

      (ii)      *Earthwise Energy Inc., et al. v. Crusader Energy Group Inc.*, Adv. Proc. No. 09-03141

On May 22, 2009, Earthwise Energy Inc., et al. ("<u>Earthwise</u>") filed a complaint against Crusader initiating Adversary Proceeding No. 09-03141, which Crusader moved to dismiss on July 10, 2009. Earthwise then filed an amended complaint on August 7, 2009 [Docket No. 13]. In the amended complaint, Earthwise asserts, based on a May 14, 2007 and January 2008 assignment from Gulftex Operating Inc. ("<u>Gulftex</u>"), that it has superior title to the following wells and/or leases covering these wells: Alfred Kennon #1-H, Alfred Kennon #2-H , Schmidt Unit #3-H, Schmidt Unit #4-H, Nelson #1-H, McClendon #1-H well, McClendon #2-H. Earthwise seeks a declaratory judgment quieting and vesting title to these wells in Earthwise. On August 24, 2009, the Bankruptcy Court entered an agreed scheduling order [Docket No. 18] for the adversary proceeding, which contemplates a trial setting in early April 2010. On September 11, 2009, Crusader filed a motion to dismiss the Amended Complaint [Docket No. 22]. Earthwise filed a response to such motion to dismiss on October __, 2009.

      (iii)      *Warren Drilling, Inc. v. Crusader Energy Group Inc., et al.*, Adv. Proc. No. 09-03242.

In June 2006, Warren Drilling, Inc. ("<u>Warren Drilling</u>") entered into a contract whereby it agreed to drill a well on property in which Crusader[10] holds a mineral interest. Disputes arose between Crusader and Warren Drilling regarding the parties' respective rights under the contract. Ultimately, on February 23, 2007, Warren Drilling filed suit against Crusader and others in litigation styled *Warren Drilling, Inc. v. Crusader Energy Group, Inc., et al.*, Cause No. 45245, in the 66th Judicial District Court of Hill County, Texas (the "<u>Hill County Litigation</u>"). In the Hill County Litigation, Warren Drilling seeks damages for breach of contract and seeks to foreclose its statutory liens. On June 23, 2009, Warren Drilling removed the Hill County Litigation to the Western District of Texas, Waco Division. On July 13, 2009, the removed Hill County Litigation was transferred by order to this Court, which commenced adversary proceeding 09-03242.

On July 15, 2009, Crusader filed its *Expedited Motion to (I) Enforce the Automatic Stay of Bankruptcy Code § 362; and (II) For Order Under Bankruptcy Code § 105(a) to Carry Out the Provisions of Title 11* [Docket No. 406] (the "<u>Motion to Enforce</u>"), wherein Crusader asserted the removal of the Hill County Litigation violated the automatic stay as it is, among other things, an act to (a) continue a judicial proceeding that was commenced prior to the Petition Date; (b) enforce an alleged lien against property of Crusader's bankruptcy estate; and (c) collect, assess, or recover an alleged pre-petition claim against Crusader's bankruptcy estate.

---

[10] The original contracting parties were Warren Drilling and Westside Energy Corporation. In or about June of 2008, Westside Energy Corporation changed its name to Crusader Energy Group Inc.

On July 16, 2009, Warren Drilling filed the *Conditional Motion of Warren Drilling, Inc. for Relief from Automatic Stay* [Docket No. 412] (the "Motion for Relief") in which it requested relief from the automatic stay of section 362 of the Bankruptcy Code in order to "permit Warren Drilling to remove the Hill County Litigation to this Court" so that it may be litigated. On July 31, 2009, the Debtors filed their *Objection to the Conditional Motion of Warren Drilling, Inc. for Relief from Automatic Stay* [Docket No. 497].

Both the Motion to Enforce and the Motion for Relief were set for hearing on August 31, 2009. An Agreed Order [Docket No. 614] has been entered under which the parties agree that the litigation will be abated unless and until the Debtors object to the proof of claim(s) filed by Warren Drilling, at which time the Warren Drilling adversary proceeding will be consolidated with the claim objection.

(b)     Motions to Transfer Venue

Shortly after the filing of the Cases, the Debtors were confronted with efforts to transfer venue of the Cases from the Northern District of Texas to the Western District of Oklahoma. The Debtors responded to these motions and participated in a two-day hearing on the same. Ultimately, the Debtors prevailed in the venue matter and the Cases have remained in the Northern District of Texas.

(c)     Motions to Lift the Automatic Stay

During the pendency of these Cases, the Debtors have encountered motions to lift the automatic stay filed by various creditors, including Warren Drilling, the Gunn Oil Group, Baker Hughes Oilfield Operations, Inc. ("Baker Hughes") and Alpine [Docket Nos. 412, 372, 388, 549 and 658, respectively]. The Debtors have opposed such requests, participated in preliminary hearings on the motions (when applicable), and are preparing for final hearings on the same. As discussed herein, the final hearing on Warren Drilling's motion for relief from stay has been abated. A final hearing on the Gunn Oil Group's motion for relief from stay is scheduled for October 26, 2009. The final hearing on Baker Hughes' motion for relief from stay is scheduled for [October 26, 2009]. The hearing on Alpine's motion for relief from stay [Docket No. 549] has been continued by agreement. A preliminary hearing on Alpine's motion for relief from stay [Docket No. 658] is scheduled for October 6, 2009.

(d)     Pooling Litigation

Various parties have filed administrative proceedings against the property interests of the Debtors in the Oklahoma Corporation Commission seeking (i) forced pooling orders of the Debtors' working interests, (ii) location exceptions, and (iii) change of operator designations on certain wells that the Debtors operate. Such parties include but are not limited to Noble Energy, Inc. and Legado Midcon, LLC. The proceedings filed by Noble Energy, Inc. and Legado Midcon, LLC have been dismissed without prejudice to re-filing.

(e)     Pre-Petition Stayed Litigation

The following chart summarizes state court litigation that has been stayed by the filing of these Cases:

| Case Name | Cause No. | Court | Date Filed | Claims Alleged |
|---|---|---|---|---|
| Crusader Energy III, LLC v. Sundance Energy Corporation; Sundance Acquisition Corporation; S&T, Inc.; Three Sands Investment Company; and Agent Oil Corp., | CJ-06-424-02 | District Court of Garfield County, Oklahoma | 2006 | -quiet title |
| Crusader Energy II, LLC, *et al*. v. Spess Oil Company, Inc., *et al*. | CJ-2006-55 | County District Court, Oklahoma | August 28, 2006 | -quiet title<br>-trespass<br>-conversion |
| Christopher Knowles and Mina Mann v. Jimmy Wright | | 61st Judicial District Court, Harris County, Texas | January 16, 2007 | -breach of contract<br>-indemnity from Crusader |
| Llano Royalty Ltd. and Llano Operating Corp. v. Commonwealth Investment Corp. and Westside Energy Corp. | | 271st Judicial District Court, Wise County, Texas | August 16, 2007 | -breach of contract<br>-fraud in the inducement |
| Westside Energy Operating Co., LP and Westside Energy Corp. v. Double C Contracting Inc. | 45673 | County Court at Law, Hill County, Texas | September 26, 2007 | Westside Claims:<br>-declaratory relief<br>-quiet title<br><br>Double C Counterclaims:<br>-breach of contract<br>-quantum meruit<br>-promissory estoppel |
| John M. and Cindi Lou Marsden, et al v. EBS Oil and Gas Partners, LLC and Westside Energy Corp. and Westside Energy Production Co., LP | 2008-30025-211 | 211th Judicial District Court, Denton County, Texas | January 25, 2008 | -breach of implied covenants<br>-breach of express lease provisions<br>-fraud<br>-promissory estoppel<br>-underpayment of royalties<br>-declaratory judgment that lease has been cancelled |
| Virgil Lane v. Westside Energy Corp. and Westside Energy Production Co., LP | 08-5021 | 298th Judicial District Court, Dallas County, Texas | July 1, 2008 | -breach of fiduciary duty<br>-fraud<br>-accounting |
| Robert R. Williams v. Chesapeake Exploration, LLC and Knight Energy Group, LLC, successor by merger to Crusader Energy III, L.L.C. | CV-2008-282 | District Court of Kingfisher County, Oklahoma | October 24, 2008 | -breach of implied covenant to develop oil and gas lands<br>-cancellation of all leases except those covering the wellbore area of the King #1-26 well |

| Case Name | Cause No. | Court | Date Filed | Claims Alleged |
|---|---|---|---|---|
| Alpine Energy, Inc., et al v. Crusader Energy Group Inc. | CJ-2009-1692 | District Court of Oklahoma County, Oklahoma | February 24, 2009 | -lack of consideration/rescission of an agreement<br>-fraud in the inducement<br>-breach of contract<br>-breach of fiduciary duty<br>-principal liability<br>-quantum meruit/unjust enrichment/promissory estoppel |
| Champion Drilling Fluids v. Crusader Energy Group Inc. | CJ-2009-2407 | District Court of Oklahoma County, Oklahoma | March 12, 2009 | -breach of contract |
| Forest Oil Corporation v. Crusader Energy Group Inc. | 2009-18675 | 215th Judicial District, Harris County, Texas | March 25, 2009 | -breach of contract<br>-promissory estoppel<br>-fraudulent inducement<br>-negligent misrepresentation<br>-sworn account<br>-foreclosure on its liens<br>-specific performance |
| McGuire Industries, Inc. v. Crusader Energy Group, LLC | B-127,627 | 161st Judicial District Court of Ector County, Texas | May 12, 2009 | -breach of contract<br>-foreclosure of judicial lien |
| Gerloff Ranch, Inc. v. Russell D. Meloy Oil & Gas, et al. (includes Knight Energy Group, L.L.C.) | CV-2007-75 | Woods County District Court, Oklahoma | Unknown – Amended Petition filed June 23, 2009 | -breach of implied covenants to develop oil and gas lands<br>-lease cancellation sought |

Since the filing of these Cases, no activity has occurred in the above state litigation matters.

(f)    Post-Petition Issues Involving Alpine Energy, Inc., et al.

Several issues since the Petition Date have arisen involving the Debtors' relationships with Alpine Energy, Inc. and other related entities ("Alpine"). Crusader has served Alpine with notice of certain claims based on the July 11, 2007 Joint Venture Agreement ("JVA") between Crusader and Alpine and the Revolving Note and Note Modification Agreement (together the "Revolving Note") that were made a part of the JVA. More particularly, on July 9, 2009, Crusader served Alpine with a Notice of Default for having failed to pay interest on amounts outstanding under the Revolving Note and, in accordance with the Revolving Note, provided Alpine with five days to cure the Default. Alpine failed to cure. Accordingly, on July 21, 2009, Crusader accelerated all amounts due under the Revolving Note, which at that time, stood at $10,205,829.00, including principal and interest. The JVA contains specific dispute resolution terms and, on July 23, 2009, pursuant to those terms, Crusader served Alpine with a Notice of Dispute under the JVA. Crusader's Notice of Dispute specified claims based on: (i) amounts due under the Revolving Note; (ii) approximately $450,000 in unpaid production revenues collected

by Alpine (as first purchaser on certain wells subject to the JVA) that Alpine had failed to turn over to Crusader; and (iii) a demand for Alpine to relinquish first purchaser rights in the Daytona 1H-138 well. Additionally, the Debtors have taken action to recover $11,103,271.97 on account of Alpine's current outstanding JIBs due and owing to Crusader. Following the Notice of Dispute, Alpine relinquished its first purchaser rights in the Daytona 1H-138 well. Alpine and Crusader have mediated the remaining disputes in Oklahoma City on August 26, 2009. Such mediation also addressed the lawsuit filed by Alpine on February 24, 2009 in the District Court of Oklahoma County, Oklahoma styled *Alpine, Inc., et al v. Crusader Energy Group, LLC, et al.,* CJ-2009-1692. In that action, Alpine alleged various state-law causes of action, including but not limited to, those for lack of consideration, fraud in the inducement, breach of contract, unjust enrichment and breach of fiduciary duty. Crusader filed a motion to dismiss that suit, and alternatively, a motion to compel arbitration on March 11, 2009, to which Alpine responded on March 30, 2009. The Oklahoma state court litigation is subject to the automatic stay. The parties continue to engage in settlement discussions and the Debtors reserve their rights with respect to the disputes.

(g)    Post-Petition Issues Involving Forest Oil Corporation

On April 24, 2009, Forest Oil Corporation ("Forest") filed their *Motion for Leave to Recoup* [Docket No. 142] by which Forest sought to recoup $3,967,785, plus interest, related to monies Forest alleges were owed pursuant to an alleged Joint Exploration Agreement and an alleged Joint Operating Agreement, between Forest and Crusader. Forest's position is based on the assertion that Crusader elected to participate in various acreage at a 50 percent ownership interest. Crusader asserts, however that it only elected into an approximate 26.09 percent ownership interest. Forest and Crusader are engaged in discovery with respect to this matter, and they anticipate that a hearing will be set in this matter for late November 2009.

(h)    Potential Litigation

The Plan preserves all Excluded Causes of Action, unless expressly provided otherwise, and provides for them to be transferred to the Liquidating Trust on the Effective Date of the Plan. The Excluded Causes of Action include certain Avoidance Actions and other Causes of Action, but the Stock Purchase Agreement prohibits, and an Alternative Transaction Agreement may prohibit, the Liquidating Trustee from pursuing certain Avoidance Actions and other Causes of Action. In accordance with section 1123(b)(3) of the Bankruptcy Code, the Plan further provides that the Liquidating Trustee will have standing, on and after the Effective Date of the Plan, to pursue the Excluded Causes of Action and will be deemed appointed as the representative of the Estate for the purpose of enforcing, prosecuting and settling them. The Estates do or may hold the following Excluded Causes of Action, among others:

(i)    Preferences, Fraudulent Transfers and Other Avoidance Actions.

Pursuant to section 547 of the Bankruptcy Code, a debtor may recover certain preferential transfers of property, including Cash, made while insolvent during the ninety days immediately prior to the filing of its bankruptcy petition with respect to preexisting debts to the extent the transferee received more than it would have in respect of the preexisting debt had the transferee

not received the payment and had the debtor been liquidated under chapter 7 of the Bankruptcy Code. In the case of "insiders," the Bankruptcy Code provides for a one-year preference period.

Transfers made in the ordinary course of the debtor's and the transferee's business according to the ordinary business terms are not recoverable. Furthermore, if the transferee extended credit subsequent to the transfer (and prior to the commencement of the bankruptcy case), such extension may constitute a defense, to the extent of any new value, against any otherwise recoverable transfer of property. If a preferential transfer were recovered by the debtor, the transferee would have a general unsecured claim against the debtor to the extent of the debtor's recovery.

The Debtors estimate that they made payments in the approximate amount of $58,984,881.69 to various creditors within the ninety-day period preceding the Petition Date and payments of $1,578,036.80 to insiders within the one-year period preceding the Petition Date. These payments by amount and payee are listed in the Bankruptcy Schedules and/or Statements of Financial Affairs. The Debtors have not yet analyzed whether any of these payments are preferences (within the meaning of the Bankruptcy Code) or whether the recipients of such payments would have a defense to a preference action, if commenced.

Under section 548 of the Bankruptcy Code and various state laws, a debtor may recover certain prepetition transfers of property, including the grant of a security interest in property, made while insolvent to the extent the debtor receives less than fair value for such property. In addition, avoidance actions exist under sections 544, 545, 549 and 553(b) of the Bankruptcy Code that allow a debtor to avoid and/or recover certain property. As of the date of the distribution of this Disclosure Statement, the Debtors have not yet estimated the potential recovery from the prosecution of their Avoidance Actions. Under the Plan, the Liquidating Trustee will have the authority as a representative of the Estates to investigate and prosecute all such Avoidance Actions in accordance with section 1123(b)(3) of the Bankruptcy Code.

(ii)    Other Causes of Action

(A)    Investigation of Causes of Action

The Liquidating Trustee will investigate Excluded Causes of Action against a number of persons, relating to, among other things, the following:

- Any lawsuits for, or in any way involving, the collection of accounts receivable or any matter related to the Plan;
- Any actions against landlords, lessees, sublessees, or assignees arising from various leases, subleases, and assignment agreements relating thereto, including, but not limited to, actions for overcharges relating to taxes, common area maintenance and other similar charges;
- Any litigation or lawsuit initiated by any of the Debtors that is currently pending, whether in the Bankruptcy Court, before the American Arbitration Association or any other court or tribunal;

- Any and all Excluded Causes of Action, as applicable, against any customer or vendor who has improperly asserted or taken action through setoff or recoupment; and
- Any and all actions, whether legal, equitable, or statutory in nature, arising out of, or in connection with, the Debtors' business operations.

In addition, there may be numerous other Excluded Causes of Action which currently exist or may subsequently arise that are not set forth in the Plan or Disclosure Statement, because the facts upon which such Excluded Causes of Action are based are not fully or currently known by the Debtors and as a result, cannot be raised during the pendency of the Cases (collectively, "Unknown Causes of Action"). The failure to list any such Unknown Cause of Action in the Plan or the Disclosure Statement is not intended to limit the rights of the Liquidating Trust to pursue any Unknown Cause of Action to the extent the facts underlying such Unknown Cause of Action become fully known to the Debtors or the Liquidating Trustee.

(B)     Preservation of All Causes of Action Not Expressly Settled or Released

The Debtors have attempted to disclose herein certain material Excluded Causes of Action including Avoidance Actions and other actions that they may hold against third parties. However, the Debtors have not performed an exhaustive investigation or analysis of potential claims and Causes of Action against third parties. It is the contemplation of the Plan, that such investigation and analysis will occur post-Confirmation by the Liquidating Trustee. You should not rely on the omission of the disclosure of a claim or Excluded Cause of Action to assume that the Debtors hold no claim or Excluded Cause of Action against any third-party, including any Creditor that may be reading this Disclosure Statement and/or casting a Ballot.

**Unless expressly released by the Plan or by an order of the Bankruptcy Court, any and all such claims or Causes of Action and/or Excluded Causes of Action, as applicable, against third parties are specifically reserved and will vest in or be transferred to the Reorganized Debtors and the Liquidating Trust, as applicable, including but not limited to any such claims or Causes of Action and/or Excluded Causes of Action relating to any counterclaims, demands, controversies, costs, debts, sums of money, accounts, reckonings, bonds, bills, damages, obligations, liabilities, objections, legal proceedings, equitable proceedings, and executions of any nature, type, or description, avoidance actions, preference actions, fraudulent transfer actions, strong-arm power actions, state law fraudulent transfer actions, improper assignments of interest, negligence, gross negligence, willful misconduct, usury, fraud, deceit, misrepresentation, conspiracy, unconscionability, duress, economic duress, defamation, control, interference with contractual and business relationships, conflicts of interest, misuse of insider information, concealment, disclosure, secrecy, misuse of collateral, wrongful release of collateral, failure to inspect, environmental due diligence, negligent loan processing and administration, wrongful recoupment, wrongful setoff, violations of statutes and regulations of governmental entities, instrumentalities and agencies, equitable subordination, debt recharacterization, substantive consolidation, securities and antitrust laws violations, tying arrangements, deceptive trade practices, breach or abuse of any alleged fiduciary duty, breach of any special relationship, course of conduct or dealing, obligation of fair dealing, obligation of**

good faith, at law or in equity, in contract, in tort, or otherwise, known or unknown, suspected or unsuspected.

Unless expressly released by the Plan or by an order of the Bankruptcy Court, the Debtors may hold claims against a holder of a Claim or Equity Interest and the Liquidating Trustee may pursue such claims (to the extent not prohibited by the Stock Purchase Agreement or Alternative Transaction Agreement, as applicable), including but not limited to, the following:

- Preference claims

- Fraudulent transfer claims

- Unauthorized post-petition transfer claims

- Claims asserted in current litigation, whether commenced pre- or post-petition

- Counterclaims asserted in current litigation

- Claims against Earthwise

- Claims against Gulf-Tex

- Claims against Alpine

- Claims against Warren Drilling

- Claims against Forest Oil

- Claims related to the improper assignments of property and interests

The Reorganized Debtors or the Buyer, as applicable, shall be appointed the representative of the Estates pursuant to section 1123(b)(3)(B) of the Bankruptcy Code with respect to the Causes of Action except for the Excluded Causes of Action, and on the Effective Date, all Causes of Action with the exception of the Excluded Causes of Action shall vest in the Reorganized Debtors or the Buyer, as applicable, who may enforce, sue on, settle or compromise (or decline to do any of the foregoing) any or all of the Causes of Action except for the Excluded Causes of Action. The Liquidating Trustee shall be appointed representative of the Estates pursuant to section 1123(b)(3)(B) of the Bankruptcy Code with respect to the Excluded Causes of Action and, except as otherwise ordered by the Bankruptcy Court and subject to any releases in the Plan, on the Effective Date, the Liquidating Trust shall be transferred all Excluded Causes of Action, and may enforce, sue on, settle or compromise (or decline to do any of the foregoing) any or all of the Excluded Causes of Action. Except as otherwise ordered by the Bankruptcy Court, the Reorganized Debtors or the Buyer, as applicable, shall be vested with authority and standing to prosecute any Causes of Action except for the Excluded Causes of Action, and the Liquidating Trustee shall be vested with authority and standing to prosecute any Excluded Causes of Action. The Debtors, their existing and former directors and/or managers, existing

and former officers, attorneys and other professional advisors shall have no liability for pursuing or failing to pursue any such Causes of Action or Excluded Causes of Action.

The Debtors' failure to identify a claim or Cause of Action herein is specifically not a waiver of any claim or Cause of Action. The Debtors will not ask the Bankruptcy Court to rule or make findings with respect to the existence of any Cause of Action or the value of the entirety of the Estates at the Confirmation Hearing; accordingly, except claims or Causes of Action which are expressly released by the Plan or by an Order of the Bankruptcy Court, the Debtors' failure to identify a claim or Cause of Action herein shall not give rise to any defense of any preclusion doctrine, including, but not limited to, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable, or otherwise), or laches with respect to claims or Causes of Action which could be asserted against third parties, including Creditors of the Debtors which may be reading this Disclosure Statement and/or casting a Ballot except where such claims or Causes of Action have been released in the Plan or the Confirmation Order.

In addition, the Debtors, Reorganized Debtors, the Buyer, and the Liquidating Trust, as applicable, expressly reserve the right to pursue or adopt any claim alleged in any lawsuit in which the Debtors are a party.

(iii)    Subordination Causes of Action

Pursuant to section 510(c) of the Bankruptcy Code, after notice and a hearing, a bankruptcy court may, under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim. Causes of Action under section 510(c) of the Bankruptcy Code are referred to as "Subordination Causes of Action." The Debtors do or may hold Subordination Causes of Action related to Intercompany Claims, which are specifically reserved and will vest in or be transferred to Liquidating Trust.

**PLEASE TAKE NOTICE THAT WITH THE EXCEPTION OF THOSE CAUSES OF ACTION THAT ARE EXPRESSLY RELEASED OR WAIVED UNDER THE TERMS OF THE PLAN, ALL CAUSES OF ACTION OF THE DEBTORS AND THEIR ESTATES THAT ARE NOT EXCLUDED CAUSES OF ACTION, WHETHER OR NOT SPECIFIED HEREIN, WILL BE PRESERVED AND VESTED IN THE REORGANIZED DEBTORS OR BUYER, AS APPLICABLE, PURSUANT TO THE PLAN. THE LACK OF DISCLOSURE OF ANY PARTICULAR CAUSE OF ACTION SHALL NOT CONSTITUTE, NOR BE DEEMED TO CONSTITUTE, A RELEASE OR WAIVER OF SUCH CAUSE OF ACTION, AS THE DEBTORS INTEND FOR THE PLAN TO PRESERVE AND VEST IN THE REORGANIZED DEBTORS OR BUYER, AS APPLICABLE, ANY AND ALL CAUSES OF ACTION HELD BY THE DEBTORS AND THEIR ESTATES THAT ARE NOT EXCLUDED CAUSES OF ACTION AS OF THE EFFECTIVE DATE OF THE PLAN.**

**PLEASE TAKE NOTICE THAT WITH THE EXCEPTION OF THOSE EXCLUDED CAUSES OF ACTION THAT ARE EXPRESSLY RELEASED OR WAIVED UNDER THE TERMS OF THE PLAN, ALL EXCLUDED CAUSES OF ACTION OF THE DEBTORS AND THEIR ESTATES, WHETHER OR NOT**

SPECIFIED HEREIN, WILL BE PRESERVED AND TRANSFERRED TO THE LIQUIDATING TRUST PURSUANT TO THE PLAN. THE LACK OF DISCLOSURE OF ANY PARTICULAR EXCLUDED CAUSE OF ACTION SHALL NOT CONSTITUTE, NOR BE DEEMED TO CONSTITUTE, A RELEASE OR WAIVER OF SUCH EXCLUDED CAUSE OF ACTION, AS THE DEBTORS INTEND FOR THE PLAN TO PRESERVE AND TRANSFER TO THE LIQUIDATING TRUST ANY AND ALL EXCLUDED CAUSES OF ACTION HELD BY THE DEBTORS AND THEIR ESTATES AS OF THE EFFECTIVE DATE OF THE PLAN.

## ARTICLE IV

## FINANCIAL INFORMATION

### 4.1. Assets

The Debtors' assets as of the Petition Date are set forth in the Bankruptcy Schedules and reference should be made thereto for information concerning such assets as of the Petition Date.

### 4.2. Liabilities

(a) Prepetition

(i) Secured Claims

The Debtors Bankruptcy Schedules, on a collective basis, disclose Secured Claims of up to an aggregated amount of $279,750,000 as of the Petition Date. Of those Secured Claims, the First Lien Holders' Secured Claim was $30,000,000 and the Second Lien Holders' Secured Claim was $249,750,000. Based on the termination of the Master Agreement, the First Lien Holders' Secured Claim was reduced to $28,488,225. Additionally, the Debtors made an adequate protection payment to the First Lien Holders in the amount of $488,225 on _____, 2009, pursuant to an Order [Docket No. __] entered by the Bankruptcy Court on _____, 2009. That adequate protection payment reduced the First Lien Holders' Secured Claim to $28,000,000.

Additionally, various parties have asserted M&M Lien Claims (as defined herein) totaling $_____ against the Debtors.

(ii) Priority Tax Claims

The Debtors' Bankruptcy Schedules, on a collective basis, disclose Priority Tax Claims of up to $237,099.25 in the aggregate as of the Petition Date. These Priority Tax Claims relate to claims asserted by the Debtors' tax authorities. Pursuant to various Orders entered by the Bankruptcy Court, including the First Day Order allowing payment of prepetition taxes [Docket Nos. 43 and 203] and resolutions reached with certain taxing authorities, the Debtors believe that the Priority Tax Claims have been reduced to $135,811.10.

(iii) Priority Claims

The Debtors' Bankruptcy Schedules disclose Priority Claims related to claims asserted by the Debtors' current and former employees and independent contractors. Pursuant to various Orders entered by the Bankruptcy Court, including the "First Day Order" allowing payment of prepetition employee obligations [Docket No. 39], the Debtors believe that the Priority Claims have been reduced to $0. However, proofs of Claims related to Priority Claims have been filed against the Debtors in the amount of $_____.

        (iv)     M&M Claims, Non-Second Lien General Unsecured Claims and Cure Claims

The Debtors' Bankruptcy Schedules disclose Non-Second Lien General Unsecured Claims of up to $58,687,500.38 in the aggregate as of the Petition Date. This amount includes, among other things, General Unsecured Claims of the Debtors' trade vendors, royalty and working interest owners, and various other general and administrative claimants, and it excludes any prepetition claims resulting from post-petition events, such as rejections of executory contracts and unexpired leases.

Based on the settlement between the Second Lien Holders and the Committee, as set forth more fully herein, a Carveout Reserve in the amount of $42,500,000 will be established by the Liquidating Trust and shall be used to satisfy Allowed M&M Secured Claims, Allowed Non-Second Lien General Unsecured Claims and Cure Claims. Allowed Non-Second Lien General Unsecured Creditors shall receive a 32.5 percent distribution up to an aggregate maximum of $8,750,000. Additionally, certain holders of M&M Claims shall have an opportunity to receive a Cash Distribution in an amount equal to 60% of their asserted M&M Claims on account of and in full satisfaction and discharge of their Claims. The Debtors and the Liquidating Trustee reserve all rights with respect to Carveout Reserve, and the information contained herein shall not be construed as a waiver of any such rights.

        (v)     Filed Claims

As of July 28, 2009, at least 900 Proofs of Claim have been filed. The aggregate Face Amount of these Proofs of Claim substantially exceeds the amount of Claims set forth in the Bankruptcy Schedules. Although the Debtors believe that many Proofs of Claim are overstated or filed in duplicate, the Debtors are only in the initial stage of the Claims reconciliation process and they expect that a significant portion of that process will occur after the Effective Date of the Plan.

        (b)     <u>Post-Petition</u>

Since the Petition Date, the Debtors generally have paid undisputed Administrative Claims as they have become due and owing in the ordinary course of their businesses and they have paid fees and expenses of professionals pursuant to the *Order Granting Expedited Motion to Establish Procedures for Monthly and Interim Compensation and Reimbursement of Expenses for Case Professionals* [Docket No. 240] and various interim orders approving professional fees and expenses. As of _____, 2009, the Debtors may have incurred fees and expenses on account of undisputed Administrative Claims and Professional Fees that have not been paid. The

Debtors estimate that those post-petition liabilities aggregate to $_____ as of _____, 2009.

**4.3.    Other**

For a more detailed discussion and analysis of the Debtors' assets and liabilities, reference should be made to the exhibits attached hereto, the Debtors' Bankruptcy Schedules, the Proofs of Claims, and the Debtors' Monthly Operating Reports on filed in these Cases.

## ARTICLE V

## PLAN OVERVIEW

**5.1.    Introduction**

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11, a debtor is authorized to reorganize its business for the benefit of itself, its creditors and shareholders.  In addition to permitting rehabilitation of the debtor, chapter 11 promotes equality of treatment of creditors and equity security holders who hold substantially similar claims against or interests in the debtor and its assets.  In furtherance of these two goals, upon the filing of a petition for relief under chapter 11, section 362 of the Bankruptcy Code provides for an automatic stay of substantially all acts and proceedings against the debtor and its property, including all attempts to collect claims or enforce liens that arose prior to the commencement of the chapter 11 case.

The consummation of a plan of reorganization is typically the principal objective of a chapter 11 case.  A plan of reorganization sets forth the means for satisfying claims against and equity interests in a debtor.  Confirmation of a plan of reorganization by the bankruptcy court makes the plan binding upon the debtor, any issuer of securities under the plan, any entity acquiring property under the plan, and any creditor of or equity security holder in the debtor, whether or not such creditor or equity security holder (i) is impaired under or has accepted the plan or (ii) receives or retains any property under the plan.  Subject to certain limited exceptions and other than as provided in the plan itself or the confirmation order, the confirmation order discharges the debtor from any debt that arose prior to the date of confirmation of the plan and substitutes therefor the obligations specified under the confirmed plan, and terminates all rights and interests of equity security holders.

This Disclosure Statement sets forth certain detailed information regarding the Debtors' history and significant events expected to occur during the Cases.  This Disclosure Statement also describes the Plan, alternatives to the Plan, effects of Confirmation of the Plan, and the manner in which distributions will be made under the Plan.  In addition, this Disclosure Statement discusses the Confirmation process and the voting procedures that holders of Claims must follow for their votes to be counted.

**THE REMAINDER OF THIS SECTION PROVIDES A SUMMARY OF THE PLAN, AND OF THE CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS UNDER THE PLAN.  IT IS QUALIFIED IN ITS ENTIRETY BY**

REFERENCE TO THE PLAN (AS WELL AS THE EXHIBITS ATTACHED THERETO AND DEFINITIONS THEREIN), WHICH IS ATTACHED HERETO AS **EXHIBIT A.**

THE PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN CONTROL THE ACTUAL TREATMENT OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS UNDER THE PLAN AND WILL, UPON OCCURRENCE OF THE EFFECTIVE DATE, BE BINDING UPON ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS, THEIR ESTATES, THE REORGANIZED DEBTORS, ALL PARTIES RECEIVING PROPERTY UNDER THE PLAN, AND OTHER PARTIES IN INTEREST. IN THE EVENT OF ANY CONFLICT BETWEEN THIS DISCLOSURE STATEMENT, ON THE ONE HAND, AND THE PLAN OR ANY OTHER OPERATIVE DOCUMENT, ON THE OTHER HAND, THE TERMS OF THE PLAN AND/OR SUCH OTHER OPERATIVE DOCUMENT WILL CONTROL.

### 5.2. Summary of the Plan

The primary purpose of the Plan is to facilitate the Restructuring of the Debtors under the Stock Purchase Agreement or an Alternative Transaction Agreement (as applicable). The Debtors have determined in the exercise of their business judgment that the effectuation of the Stock Purchase Agreement or an Alternative Transaction Agreement is the best course of action for facilitating the Restructuring. A reorganization of the Debtors, rather than a sale, is not possible given the position taken by various creditors of the Debtors, the lack of availability in the credit markets, and the Debtors' inability to sustain operations given its current cash balances. The Plan is structured to enable the Debtors to effectuate various forms of transactions, including a potential reorganization should that possibility so arise, and is expressly subject to a process to solicit higher or better offers for the Debtors' assets and equity interests. In addition, the Plan contemplates the creation of a Liquidating Trust to liquidate certain Liquidating Trust Assets and distribute any remaining funds (after the payment of certain Allowed Claims), in accordance with the Plan, to holders of Allowed Second Lien Deficiency Claims. Under the Plan, Claims against the Debtors' Estates are classified as follows:

| Class | Class Description | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| Class 1 | Allowed Ad Valorem Tax Claims | Unimpaired | Not Entitled to Vote |
| Class 2 | Allowed Priority Claims | Unimpaired | Not Entitled to Vote |
| Class 3 | Allowed First Lien Secured Claims | Unimpaired | Not Entitled to Vote |
| Class 4 | Allowed Second Lien Secured Claims | Impaired | Entitled to Vote |
| Class 5 | Allowed M&M Secured Claims | Impaired | Entitled to Vote |
| Class 6 | Allowed Other Secured Claims | Impaired | Entitled to Vote |
| Class 7A | Allowed Non-Second Lien General Unsecured Claims | Impaired | Entitled to Vote |
| Class 7B | Allowed Second Lien Deficiency Claims | Impaired | Entitled to Vote |
| Class 8 | Allowed Subordinated Claims | Impaired | Not Entitled to Vote |
| Class 9 | Allowed Equity Interests | Impaired | Not Entitled to Vote |

Under the Plan, the First Lien Holders will be paid in full by the Buyer. The treatment of Allowed Second Lien Secured Claims is dependent upon the Transaction effectuated pursuant to

the Plan. Those alternative treatments are summarized in <u>Section 5.3</u> and <u>7.3</u> of this Disclosure Statement.

If the total cash necessary (i) to pay Allowed First Lien Secured Claims, in full, and (ii) to fund the Distribution Reserve Accounts held by the Liquidating Trust, as set forth more fully in the Plan (which generally will be utilized to fund the operation of the Liquidating Trust and to satisfy Allowed Priority Tax Claims, Allowed Administrative Claims, Allowed Ad Valorem Tax Claims, Allowed Priority Claims, Allowed M&M Secured Claims, Allowed Other Secured Claims, Allowed Non-Second Lien General Unsecured Claims, Cure Claims and U.S. Trustee Fees payable or to be paid, as provided under the Plan), exceeds the Cash Consideration plus any Cash held by the Debtors as of the Closing Date, the Buyer will make a loan to the Liquidating Trust in the amount of the shortfall, up to $30,000,000.

The Plan sets forth a settlement option for eligible holders of M&M Claims whereby such claimants may receive 60 percent of their aggregate Claims and a release by the estates of such claimant, in full satisfaction of all Claims held by such claimant against the Estates, Debtors, Reorganized Debtors, Buyer, and the Liquidating Trust as described in <u>Section 5.3</u> of this Disclosure Statement. A Carveout Reserve will be established to address and resolve the M&M Secured Claims as part of the Liquidating Trust. The Carveout Reserve will be funded with Cash in the amount of $42,500,000, of which up to $8,750,000 shall be used to make Distributions to holders of Allowed Non-Second Lien General Unsecured Claims. Holders of Allowed Non-Second Lien General Unsecured Claims will receive a Distribution of 32.5 percent of their Claim, subject to a maximum aggregate distribution on account of all Allowed Non-Second Lien General Unsecured Claims of $8,750,000.00.

Holders of Allowed Ad Valorem Tax Claims, Allowed Priority Claims, and Allowed Other Secured Claims will be paid in full or pursuant to the alternative treatment set forth.

Pursuant to the Stock Purchase Agreement, the Debtors will provide notice to certain counterparties to executory contracts and unexpired leases advising them that their respective executory contracts and unexpired leases may be assumed and, if applicable, assigned. Those notices, among other things, will advise the counterparties that the Debtors propose to make payments in the amount of "up to" a specified dollar amount to the counterparties or to third parties as required under the respective executory contracts and unexpired leases in order to cure all defaults under the respective executory contracts and unexpired leases. As discussed in Article VII below, the Liquidating Trustee will pay those Cure Claims in full in Cash on the Effective Date (or as soon as reasonably practicable after the Effective Date), or the Cure Claims will be paid in full from Cash in the Carveout Reserve upon the entry of a Final Order liquidating the amount of the Cure Claims.

Under the Plan, all existing Equity Interests in or of the Debtors will be cancelled, terminated and extinguished and will have no rights or entitlements and all Subordinated Claims will be discharged and extinguished.

### 5.3. Summary Of Proposed Distributions Under The Plan

Under the Plan, Claims against and Equity Interests in the Debtors are placed into Classes. Certain Claims, including Priority Tax Claims and Administrative Claims, are not classified and, if not paid prior to Confirmation, will receive payment in full in Cash on the distribution date set forth in the Plan and as described below.

The table below summarizes the classification and treatment of the prepetition Claims and Equity Interests under the Plan. This summary is qualified in its entirety by reference to the provisions of the Plan.

| Class | Treatment of Claim/Equity Interest | Estimated Aggregate Amount of Allowed Claims or Equity Interests | Proposed Treatment of Allowed Claims or Equity Interests |
|---|---|---|---|
| Class 1: Allowed Ad Valorem Tax Claims | Unimpaired | $_____ | Each holder of an Allowed Ad Valorem Tax Claim against the Debtors' Estates shall either (i) be paid by the Liquidating Trustee from Liquidating Trust Assets, as set forth in <u>Section 13.3</u> of the Plan, the amount of such holder's Allowed Ad Valorem Tax Claim in one Cash payment on the later of (A) the Effective Date (or as soon as reasonably practicable thereafter), and (B) fifteen Business Days following the date such Claim is Allowed by Non-Appealable Order, or (ii) receive such other less favorable treatment from the Liquidating Trust Assets that may be agreed upon in writing by the Liquidating Trustee and such holder. The Cash payment shall be in exchange for and in full satisfaction and discharge of the holder's Allowed Ad Valorem Tax Claim; provided, however, that any Lien upon, property, or the net proceeds from the sale of such property, related to such Claim, shall attach to the Cash held in the Senior Claim Distribution Reserve with the same force, validity, priority, and effect, if any of such security interest and Lien.<br><br>Estimated Recovery – 100% |
| Class 2: Allowed Priority Claims | Unimpaired | $_____ | Each holder of an Allowed Priority Claim against the Debtors' Estates shall either (i) be paid by the Liquidating Trustee from the Liquidating Trust Assets, as set forth in <u>Section 13.4</u> of the Plan, the amount of such holder's Allowed Priority Claim in one Cash payment on the later of (A) the Effective Date (or as soon as reasonably practicable thereafter), and (B) fifteen Business Days following the date such Claim is Allowed by Non-Appealable Order, or (ii) receive such other less favorable treatment from the Liquidating Trust Assets that may be agreed upon in writing by the Liquidating Trustee and such holder. The Cash payment shall be in exchange for and in full satisfaction and discharge of the holder's Allowed Priority Claim.<br><br>Estimated Recovery – 100% |

| Class | Treatment of Claim/Equity Interest | Estimated Aggregate Amount of Allowed Claims or Equity Interests | Proposed Treatment of Allowed Claims or Equity Interests |
|---|---|---|---|
| Class 3: Allowed First Lien Secured Claims | Unimpaired | $28,000,000.00 | On the Effective Date, the First Lien Secured Claims shall be Allowed in the aggregate amount of $28,000,000, subject to upward adjustment based on, among other things, any and all interest, fees, and other expenses to which the First Lien Holders may be entitled under the First Lien Credit Agreement and Orders of the Bankruptcy Court. On the Effective Date (or as soon as reasonably practicable thereafter), each holder of an Allowed First Lien Secured Claim shall be paid by wire transfer to an account designated by the First Lien Agent in writing by the Buyer the amount of such holder's Allowed First Lien Secured Claim in one Cash payment. The Cash payment shall be in exchange for and in full satisfaction and discharge of the holder's Allowed First Lien Secured Claim.<br><br>Estimated Recovery: 100% |

| Class | Treatment of Claim/Equity Interest | Estimated Aggregate Amount of Allowed Claims or Equity Interests | Proposed Treatment of Allowed Claims or Equity Interests |
|---|---|---|---|
| Class 4: Allowed Second Lien Secured Claims | Impaired | $249,750,000.00 | On the Effective Date (or as soon as reasonably practicable thereafter), each of the Second Lien Secured Claims shall be Allowed. Each holder of an Allowed Second Lien Secured Claim against any of the Debtors' Estates shall receive the following Distributions in exchange for and in full satisfaction and discharge of the holders' Allowed Second Lien Secured Claims:<br><br>a. If SandRidge Exploration is the Buyer, then each holder of an Allowed Second Lien Secured Claim shall receive the holder's Pro Rata share of the Other Consideration subject to (A) the terms of Section 11.4 of the Plan and (B) any adjustment under Sections 2.01 or 2.03 of the Stock Purchase Agreement.<br><br>b. If SandRidge Exploration is not the Buyer and the Buyer provides only Cash Consideration, then each holder of an Allowed Second Lien Secured Claim shall be paid by the Liquidating Trustee from the Liquidating Trust Assets the holder's Pro Rata share of the Initial Second Lien Cash Availability.<br><br>c. If SandRidge Exploration is not the Buyer and the Buyer provides Cash Consideration and Other Consideration, then each holder of an Allowed Second Lien Secured Claim shall (A) receive the holder's Pro Rata share of the Other Consideration subject to (I) the terms of Section 11.4 of the Plan and (II) adjustment as provided in the Alternative Transaction Agreement, and (B) be paid by the Liquidating Trustee from the Liquidating Trust Assets the holder's Pro Rata share of the Initial Second Lien Cash Availability.<br><br>Each holder of an Allowed Second Lien Secured Claim shall have an Allowed Second Lien Deficiency Claim equal to its Pro Rata share of the aggregate amount of (i) $249,750,000 minus (A) the amount of its Allowed Second Lien Secured Claim and (B) the amount of any adequate protection payments, or (ii) such lesser amount as agreed by holders of Second Lien Secured Claims, and shall receive such treatment as set forth in Section 4.2(h) of the Plan.<br><br>Estimated Recovery – at least 68%[11] (subject to certain adjustments and reserves) |

---

[11] Based upon the volume average weighted price (VWAP) as of September 22, 2009.

| Class | Treatment of Claim/Equity Interest | Estimated Aggregate Amount of Allowed Claims or Equity Interests | Proposed Treatment of Allowed Claims or Equity Interests |
|---|---|---|---|
| Class 5: Allowed M&M Secured Claims | Impaired | $_____ | Each holder of an Allowed M&M Secured Claim against any of the Debtors' Estates shall either (i) be paid by the Liquidating Trustee from the Carveout Reserve, as set forth in Section 13.5 of the Plan, the amount of such holder's Allowed M&M Secured Claim in one Cash payment on the later of (A) the Effective Date (or as soon as reasonably practicable thereafter) or (B) fifteen Business Days following the date such Claim is Allowed by Non-Appealable Order, or (ii) receive such other less favorable treatment from the Carveout Reserve that may be agreed upon in writing by the Liquidating Trustee and such holder, in exchange for and in full satisfaction and discharge of the holders' Allowed M&M Secured Claim; provided, however, any security interest in or Lien upon, property, or the net proceeds from the sale of such property, related to such Claim, shall attach to the Cash held in the Carveout Reserve with the same force, validity, priority, and effect, if any of such security interest and Lien.<br><br>    a.    Notwithstanding the foregoing and without regard to the priority, validity, or enforceability of an M&M Secured Claim, each holder of an M&M Claim against any of the Debtors' Estates that is identified in **Exhibit D** to this Disclosure Statement (the "M&M Claim Schedule") shall be paid, on the Effective Date (or as soon as reasonably practicable thereafter), 60% of the aggregate amount of such holder's M&M Claims set forth on the M&M Claim Schedule in exchange for and in full satisfaction and discharge of the holder's M&M Claims provided that the holder of such M&M Claims elects on a timely cast Ballot to receive such treatment with respect thereto. Any election shall constitute a waiver of the right to collect, and a release of all M&M Claims held by such electing holder, and the holder of such M&M Claims shall be deemed to have released the Released Parties, the Buyer and its subsidiaries, SandRidge Energy (if SandRidge Exploration is the Buyer) and all third party working interest owners and other Persons from: (i) its M&M Claims, and (ii) any and all liability for, or enforcement of, any potential liens, Liens or Claims with respect to the property to which such M&M Claims, potential liens, Liens or Claims relate. The Debtors shall release such holder of M&M Claims making the election set forth herein from any and all Excluded Causes of Action, which include certain Avoidance Actions arising under chapter 5 of the Bankruptcy Code. Any holder of M&M Claims making the election shall be deemed to assign its M&M Liens to the Liquidating Trust; provided, however, notwithstanding any assignment of such M&M Liens: (i) the M&M Liens are assigned solely for the purpose of avoiding dilution of the priority of Liens against the property affected thereby, (ii) any such M&M Liens assigned to the Liquidating Trust or Newco shall not be enforced or enforceable against Reorganized Debtors or any other Person, the Vested |

| Class | Treatment of Claim/Equity Interest | Estimated Aggregate Amount of Allowed Claims or Equity Interests | Proposed Treatment of Allowed Claims or Equity Interests |
|---|---|---|---|
| | | | Assets, or any property of the Reorganized Debtors or any other Person, and (iii) any such M&M Liens shall be, and are, released, including of record, pursuant to the Plan (including Sections 6.6 and 6.18 of the Plan). |

        b.     A holder of M&M Claims not identified on the M&M Claim Schedule also may opt to receive 60% of such holder's aggregate M&M Claims in exchange for and in full satisfaction and discharge of the holder's M&M Claims without regard to the priority, validity or enforceability of the M&M Liens provided that (y) the holder of such M&M Claims elects on a timely cast Ballot to receive such treatment, and (z) the Debtors and the Second Lien Holders consent to the holder of such M&M Claims making such election. Any such election that is consented to by the Debtors and the Second Lien Holders, shall constitute a waiver of the right to collect, and a release of, all M&M Claims of such electing holder, and the holder of such M&M Claims shall be deemed to have released the Released Parties, the Buyer, SandRidge Energy (if SandRidge Exploration is the Buyer) and all third party working interest owners and other Persons: (i) its M&M Claims, and (ii) any and all liability for, or enforcement of, any potential liens, Liens or Claims with respect to the property to which such M&M Claims, potential liens, Liens or Claims relate. The Debtors shall also release such holder of M&M Claims making the election set forth herein from any and all Excluded Causes of Action, which include certain Avoidance Actions arising under chapter 5 of the Bankruptcy Code, provided such election is consented to by the Debtors and the Second Lien Holders. The holder of such M&M Claims that timely elects to reduce the amount of its M&M Claims, and such election is consented to by the Debtors and the Second Lien Holders, shall be deemed to be the holder of an Allowed M&M Secured Claim for classification, voting, and all other purposes under the Plan. Any holder of an M&M Claim making the election, and provided such election is consented to by the Debtors and the Second Lien Holders, shall be deemed to assign its M&M Liens to the Liquidating Trust; provided, however, notwithstanding any assignment of such M&M Liens: (i) the M&M Liens are assigned solely for the purpose of avoiding dilution of the priority of Liens against the property affected thereby, (ii) any such M&M Liens assigned to the Liquidating Trust or Newco shall not be enforced or enforceable against Reorganized Debtors or any other Person, the Vested Assets, or any property of the Reorganized Debtors or any other Person, and (iii) any such M&M Liens shall be, and are, released, including of record, pursuant to the Plan (including Sections 6.6 and 6.18 of the Plan).

        c.     The Debtors may modify the M&M Claim

| Class | Treatment of Claim/Equity Interest | Estimated Aggregate Amount of Allowed Claims or Equity Interests | Proposed Treatment of Allowed Claims or Equity Interests |
|---|---|---|---|
| | | | Schedule up to any time prior to the Effective Date, solely for the purpose of adding any holders of M&M Claims or increasing the amounts owed to any holders of M&M Claims. |
| | | | **ANY HOLDER OF M&M SECURED CLAIMS (A) LISTED ON THE M&M CLAIM SCHEDULE (EXHIBIT G HERETO) WHICH DOES NOT ELECT TO ACCEPT THE 60% SETTLEMENT, OR (B) NOT LISTED ON THE M&M CLAIM SCHEDULE WHICH ELECTS THE 60% SETTLEMENT BUT DOES NOT OBTAIN THE CONSENT OF THE DEBTORS AND SECOND LIEN HOLDERS TO RECEIVE SUCH TREATMENT, SHALL COMPLY WITH THE PROCEDURES AND APPLICABLE DEADLINES SET FORTH IN SECTION 6.17(a) OF THE PLAN (AS DESCRIBED IN SECTION 7.1(e) OF THIS DISCLOSURE STATEMENT) OR BE FOREVER BARRED FROM ASSERTING ITS CLAIMS AGAINST THE DEBTORS OR THEIR PROPERTY.** |
| | | | Estimated Recovery – 60% (if settlement elected, otherwise subject to the M&M Claim resolution process) |
| Class 6: Allowed Other Secured Claims | Impaired | $_____ | Each holder of an Allowed Other Secured Claim against any of the Debtors' Estates shall either (i) as set forth in Section 13.3 of the Plan, be paid by the Liquidating Trustee from the Senior Claim Distribution Reserve the amount of such holder's Allowed Other Secured Claim in one Cash payment on the later of (A) the Effective Date (or as soon as reasonably practicable thereafter) and (B) fifteen Business Days following the date such Claim is Allowed by Non-Appealable Order, or (ii) receive such other less favorable treatment from the Senior Claim Distribution Reserve that may be agreed upon in writing by the Liquidating Trustee and such holder, in exchange for and in full satisfaction and discharge of the holders' Allowed Other Secured Claim; provided, however, any security interest in or Lien upon, property, or the net proceeds from the sale of such property, related to such Claim, shall attach to the Cash held in the Senior Claim Distribution Reserve with the same force, validity, priority, and effect, if any of such security interest and Lien. |
| | | | Estimated Recovery – 100% |
| Class 7A: Allowed Non-Second Lien General Unsecured Claims | Impaired | $_____ (per the Debtors' accounts payable records, subject to reduction based on allowance or settlement of M&M Lien Claims and payment of Cure | Each holder of an Allowed Non-Second Lien General Unsecured Claim against any of the Debtors' Estates shall be paid by the Liquidating Trustee from the Carveout Reserve, as set forth in Section 13.5 of the Plan, in exchange for and in full satisfaction and discharge of such Claim, the lesser of (i) 32.5% of such holder's Allowed Non-Second Lien General Unsecured Claim and (ii) the Pro Rata share of $8,750,000. |
| | | | Estimated Recovery – 32.5% (subject to cap of $8,750,000.00) |

| Class | Treatment of Claim/Equity Interest | Estimated Aggregate Amount of Allowed Claims or Equity Interests | Proposed Treatment of Allowed Claims or Equity Interests |
|---|---|---|---|
| | | Claims) | |
| Class 7B: Allowed Second Lien Deficiency Claims | Impaired | Undetermined | Each holder of a Second Lien Deficiency Claim against any of the Debtors' Estates shall receive in exchange for and in full satisfaction and discharge of such Claim its Pro Rata share of (i) the Liquidating Trust Interests on the Effective Date (or as soon as reasonably practicable thereafter), and (ii) Distributions of Available Cash on account of such Liquidating Trust Interest as provided in Sections 12.1 and 12.2 of the Plan, subject to other applicable terms of the Plan and the Liquidating Trust Agreement.<br><br>Estimated Recovery – undetermined |
| Class 8: Allowed Subordinated Claims | Impaired | Unknown | Holders of Subordinated Claims against any of the Debtors' Estates shall not be entitled to receive any Distributions or retain any property under the Plan or from the Liquidating Trust, Buyer or its subsidiaries on account of such Claims.<br><br>Estimated Recovery – 0% |
| Class 9: Allowed Equity Interests | Impaired | Unknown | Holders of Equity Interests in any of the Debtors shall not be entitled to receive any Distributions or retain any property under the Plan or from the Liquidating Trust, Buyer or its subsidiaries on account of such Equity Interests. Upon confirmation, all Equity Interests shall be cancelled, terminated and extinguished.<br><br>Estimated Recovery – 0% |

## ARTICLE VI

## INFORMATION REGARDING THE SANDRIDGE TRANSACTION
## AND THE SANDRIDGE PARTIES

### 6.1. The SandRidge Transaction

Set forth below is a summary of the material terms of the Stock Purchase Agreement. The description of the Stock Purchase Agreement herein is intended as a summary and is

qualified in its entirety by reference to the Stock Purchase Agreement, a copy of which is attached hereto as <u>Exhibit F</u> and incorporated by reference herein.[12]

| | |
|---|---|
| **Purchase Consideration:** | The consideration payable by the SandRidge Parties consists of the following:<br><br>• $55,000,000 in cash, subject to certain adjustments as described below (the "<u>Cash Consideration</u>");<br>• 13,015,797 shares of SandRidge Stock, par value $0.001 per share, subject to certain adjustments as described below (the "<u>Stock Consideration</u>"); and<br>• warrants to purchase 2,000,000 shares of SandRidge Stock at an exercise price of $15.00 per share, with an exercise period ending five years after the Closing Date. |
| **Closing Loan:** | If the total cash necessary (i) to pay Cure Costs and other Allowed Administrative Claims that are due and owing on the Effective Date of the Plan and (ii) to fund the Distribution Reserve Accounts held by the Liquidating Trust, as set forth more fully in the Plan, exceeds the Cash Consideration plus any Cash held by the Debtor as of the Closing Date, the Buyer will make a loan to the Liquidating Trust in the amount of the shortfall, up to $30,000,000, and a number of shares of SandRidge Stock (the "<u>Loan Reserved Shares</u>") that has a value (at $13.4452 per share) equal to the amount of the loan will be withheld from the Stock Consideration delivered on the Closing Date. The Liquidating Trust will repay the principal and interest on the Closing Loan using any cash of the Liquidating Trust, to the extent not required to pay claims or maintain reserves during the 180 day period from and after the Closing Date, and SandRidge will also apply cash collections on the Debtors' accounts receivable (and setoff amounts) during the 180-day period from and after the Closing Date to repay the Closing Loan.<br><br>SandRidge will be required to deliver the Loan Reserved Shares 185 days after the Closing Date, but if any principal or interest on the Closing Loan is not paid in full within 180 days after the Closing Date the number of Loan Reserved Shares that SandRidge is required to deliver will be reduced by the number of shares of SandRidge Stock that has a value (at $13.4452 per share) equal to the amount of the shortfall. |
| **Other Adjustments to the Purchase Consideration** | The Cash Consideration is subject to reduction for (i) $90,322.58 per day from and after September 1, 2009, up to but excluding the Closing Date, and (ii) certain accrued non-income tax liabilities of the Debtors.<br><br>The Cash Consideration is subject to increase for (i) certain cash deposits held by the Debtors; (ii) certain capital expenditures made by the Debtors; (iii) the net value of crude oil in storage tanks of the Debtors as of the Closing Date; and (iv) certain incremental rejection damages costs that the Debtors may be required to incur as a result of rejecting known executory contracts and unexpired leases that the SandRidge Parties elect to exclude from the transaction after September 22, 2009,<br><br>If Crusader unilaterally elects to close prior to the Bid Procedures Order, the Disclosure Statement Order and the Confirmation Order becoming Final Orders, the number of shares of SandRidge Stock that has a value (at $13.4452 per share) equal to $10 million will be withheld to offset any damages that may be incurred by the SandRidge Parties in connection with any request for a stay, motion or application for reconsideration or rehearing, notice of appeal or petition for certiorari filed with respect to any such Order. These withheld shares, less shares with a value (at $13.4452 per share) equal to the damages incurred by the SandRidge Parties and estimated future damages in connection with any such matter, will be issued from time to time as SandRidge determines that |

---

[12] Capitalized terms used but not defined in this <u>Section 6.1</u> and defined in the Stock Purchase Agreement have the meaning given them in the Stock Purchase Agreement.

| | |
|---|---|
| | estimated future damages are less than the amount of the remaining reserved shares. Within 60 calendar days after the Bid Procedures Order, the Disclosure Statement Order and the Confirmation Order become Final Orders, SandRidge shall effect the issuance of any remaining withheld shares, if necessary, in accordance with <u>Section 2.03</u> of the Stock Purchase Agreement. |
| **Escrow Amount**: | SandRidge Energy has deposited $7,000,000 (the "<u>Escrow Amount</u>") in escrow as a deposit for its obligations under the Stock Purchase Agreement. Crusader will be entitled to the Escrow Amount if Crusader terminates the Stock Purchase Agreement as a result of a breach by the SandRidge Parties or the SandRidge Parties fail to close in breach of the Stock Purchase Agreement. |
| **Closing Conditions**: | The parties' obligations to consummate the Transaction are subject to certain customary closing conditions, including:<br><br>• satisfaction of conditions to the effectiveness of the Plan and effectiveness of the Plan;<br><br>• the Bid Protection Order, the Disclosure Statement Order and the Confirmation Order shall have been entered by the Bankruptcy Court, and each such order shall be a SandRidge Final Order (in the case of the SandRidge Parties) or a Crusader Final Order (in the case of the Debtors);<br><br>• Bankruptcy Court determination that the Plan is feasible;<br><br>• execution, delivery and effectiveness of the Liquidating Trust Agreement;<br><br>• receipt by SandRidge Energy of certain financial statements and financial data of Crusader;<br><br>• the Stock Consideration shall have been approved for listing on the New York Stock Exchange, subject to official notice of issuance;<br><br>• compliance in all material respects with covenants and agreements by the SandRidge Parties (in the case of Debtors) or the Debtors (in the case of the SandRidge Parties);<br><br>• accuracy of representations and warranties, generally, except as would not have a SandRidge Material Adverse Effect (as to Debtors) or Crusader Material Adverse Effect (as to the SandRidge Parties); and<br><br>• termination by Debtors of any employees requested by the SandRidge Parties. |
| **Termination**: | The Stock Purchase Agreement may be terminated by mutual written agreement of Crusader and SandRidge.<br><br>The Stock Purchase Agreement may be terminated by either Crusader or SandRidge if:<br><br>• the Closing is not consummated on or before December 30, 2009;<br><br>• consummation of the Transaction is illegal or otherwise prohibited by Applicable Law or any non-appealable final order, decree or judgment;<br><br>• the Bankruptcy Court shall not have approved the substantive consolidation of the Debtors prior to the hearing to consider approval of the Disclosure Statement; or |

| | |
|---|---|
| | • any of the conditions to such parties' obligation to close become incapable of being satisfied by December 30, 2009.<br><br>SandRidge Energy may terminate the Stock Purchase Agreement if:<br><br>• an order approving the Bid Procedures is not entered before 30 days (subject to extension in certain cases) after execution of the Stock Purchase Agreement;<br><br>• the Bid Deadline is later than 30 days after the order approving the Bid Procedures is entered;<br><br>• the Disclosure Statement is not approved by the Bankruptcy Court on or before October 30, 2009, or if the Disclosure Statement Order is not entered within seven days after approval (subject to extension in certain cases);<br><br>• the Bankruptcy Court approves any Alternative Transaction, Crusader enters into any definitive agreement for any Alternative Transaction (which agreement is approved by the Bankruptcy Court), or Crusader determines that an Alternative Transaction is the Successful Bid at the Auction but such Alternative Transaction is not approved by the Bankruptcy Court within 30 days after such Auction;<br><br>• there is intentional and material breach by any Debtors or their Representatives of the non-solicitation provisions; or<br><br>• Crusader breaches its representations, warranties, or covenants and such breach would result in a failure of a closing condition that is not cured within 10 days of notice of such breach.<br><br>Crusader may terminate the Stock Purchase Agreement if:<br><br>• the Bankruptcy Court approves any Alternative Transaction, or Crusader enters into any definitive agreement for any Alternative Transaction (which agreement is approved by the Bankruptcy Court); or<br><br>• SandRidge breaches its representations, warranties, or covenants and such breach would result in a failure of a closing condition that is not cured within 10 days of notice of such breach. |
| **Break-Up Fee**: | Debtors must pay SandRidge Energy a $7 million Break-Up Fee upon consummation of an Alternative Transaction if any Debtors consummate an Alternative Transaction within 12 months after the date of the Stock Purchase Agreement and the Stock Purchase Agreement has been terminated by:<br><br>• Crusader because the Closing does not occur on or before December 30, 2009, and the Bankruptcy Court approves an Alternative Transaction or Crusader enters into a definitive agreement for an Alternative Transaction (which agreement is approved by the Bankruptcy Court) prior to February 1, 2010; or<br><br>• SandRidge Energy because the Bankruptcy Court approves any Alternative Transaction, Crusader enters into a definitive agreement for an Alternative Transaction (which agreement is approved by the Bankruptcy Court), or Crusader determines that an Alternative Transaction is the Successful Bid at the Auction and the Successful Bid is not approved by the Bankruptcy Court within 30 days after the Auction; or |

| | |
|---|---|
| | • Crusader if the Bankruptcy Court approves an Alternative Transaction or Crusader enters into any definitive agreement for an Alternative Transaction (which agreement has been approved by the Bankruptcy Court) |
| **Representations and Warranties:** | The Stock Purchase Agreement contains customary representations and warranties by Crusader and by the SandRidge Parties. The representations and warranties do not survive the Closing and there is no indemnification for breaches of representations and warranties. |
| **Certain Covenants:** | • The Debtors are required to continue to conduct their business in the ordinary course and are subject to certain limitations on, among other things, capital expenditures, dispositions of properties, incurrence of indebtedness, entry into material agreements, modification of material agreements, certain employment arrangements and settlement of litigation.<br><br>• The Debtors have agreed, except as expressly permitted or required by the Stock Purchase Agreement or the Bid Protection Order (after entry of the Bid Protection Order), to limit their efforts to solicit, initiate, facilitate or encourage offers, proposals and inquiries regarding Alternative Transactions; provide non-public information to potential bidders; participate in discussions with potential bidders; or enter into agreements with potential bidders.<br><br>• Crusader has agreed to use commercially reasonable efforts to provide SandRidge with certain financial information, including audited annual financial statements for the year ended December 31, 2008, monthly financial statements and quarterly financial statements, reviewed by KPMG LLP, for the quarters ended March 31, 2009, June 30, 2009, and September 30, 2009. |

### 6.2. Information About the SandRidge Parties

The SandRidge Parties are independent natural gas and crude oil companies concentrating on exploration, development and production activities. The SandRidge Parties also own and operate natural gas gathering and treating facilities and $CO_2$ treating and transportation facilities and has marketing and tertiary oil recovery operations. In addition, Lariat Services, Inc., a wholly owned subsidiary, owns and operates drilling rigs and a related oil field services business. The SandRidge Parties' primary exploration, development and production areas are concentrated in West Texas. The SandRidge Parties also operate interests in the Mid-Continent, the Cotton Valley Trend in East Texas, the Gulf Coast and the Gulf of Mexico.

The Debtors incorporate by reference the documents listed below and any future filings made by SandRidge with the SEC under Sections 13(a), 13(c), 14, or 15(d) of the Securities Exchange Act of 1934 (excluding any information furnished pursuant to Item 2.02 or Item 7.01 on any Current Report on Form 8-K) from the date of this Disclosure Statement until the date of the Confirmation Hearing. The information contained in the SEC filings incorporated by reference herein speaks only as of the date of the applicable reports incorporated by reference herein or as of such other date as is specified in such reports.

• Annual Report on Form 10-K for the year ended December 31, 2008 as filed with the SEC on February 26, 2009;

- Amendment No. 1 to Annual Report on Form 10-K for the year ended December 31, 2008 as filed with the SEC on April 23, 2009;

- Quarterly Report on Form 10-Q for the quarter ended March 31, 2009 as filed with the SEC on May 7, 2009;

- Quarterly Report on Form 10-Q for the quarter ended June 30, 2009 as filed with the SEC on August 6, 2009;

- Current Reports on Form 8-K filed with the SEC on January 14, 2009, January 21, 2009, March 9, 2009, April 6, 2009, April 21, 2009, April 28, 2009, May 15, 2009, June 9, 2009, July 7, 2009, and September 28, 2009 (excluding any information furnished pursuant to Item 2.02 or Item 7.01 of any such Current Report on Form 8-K).

All documents referred to above that are incorporated by reference herein may be accessed at www.sec.gov and at the SandRidge Parties' website, www.sandridgeenergy.com.

### 6.3. **SandRidge Energy Stock**

The authorized capital stock of SandRidge consists of 400,000,000 shares of SandRidge Energy Stock and 50,000,000 shares of preferred stock, $0.001 per share. As of September 30, 2009, there were outstanding 183,502,555 shares of SandRidge Energy Stock, 2,650,000 shares of preferred stock and no employee options to purchase shares of SandRidge Energy Stock. The trading range of SandRidge Energy Stock was between $4.85 per share and $69.41 per share during the period from January 1, 2008 through December 31, 2008 and between $4.49 per share and $15.00 per share during the period from January 1, 2009 through September 30, 2009. SandRidge Energy Stock trades on the New York Stock Exchange under the ticker symbol "SD." The last reported trading price for a share of SandRidge Energy Stock on the New York Stock Exchange on September 22, 2009, was $13.01 and on October __, 2009, was $_____.

## ARTICLE VII

## SUMMARY OF CERTAIN PLAN PROVISIONS

### 7.1. **Means For Implementation Of The Plan – Transaction Involving Issuance of New Crusader Shares to the Buyer or Transfer of Transferred Assets to the Buyer**

(a) _Formation of Newco_. In accordance with the Plan, the Liquidating Trustee may establish Newco. If formed, Newco will be a wholly owned subsidiary of the Liquidating Trust and will exist for the purpose of holding and disposing of Liquidating Trust Assets that are Oil and Gas Interests.

(b) _Issuance of Newco Equity Interests_. On the Effective Date, if Newco is formed by the Liquidating Trustee, the Newco Equity Interests will be issued to the Liquidating Trust.

(c)     Termination of Directors, Officers, and/or Managers of the Debtors. Effective as of the Effective Date, all of the directors, officers, and/or managers of any of the Debtors will be terminated, and the Persons identified in the Plan Supplement will be elected and appointed as the directors, officers, and/or managers of the Reorganized Debtors.  In addition, the Liquidating Trustee will be elected and appointed as the sole director, officer and/or manager of Newco.

(d)     Amendment of Debtors' Certificates and Agreements.  On the Effective Date, each of the Reorganized Debtor's certificates of incorporation or formation, the articles of incorporation or organization, the operating agreements, bylaws, and limited liability company agreements will be amended to include among other provisions prohibitions on the issuance of non-voting equity securities to the extent required by section 1123 of the Bankruptcy Code, and filed with the appropriate secretary of state's office, and no Reorganized Debtor will have any indemnification or other obligation under any such documents in effect prior to the Effective Date.  Copies of the proposed form of the amendments to the Reorganized Debtor's certificates of incorporation or formation, the articles of incorporation or organization, the operating agreements, and limited liability company agreements will be included in the Plan Supplement.

(e)     Procedures regarding M&M Secured Claims.

(i)     **Lien Affidavits and Related Information**.  On or before the M&M Secured Claim Bar Date, each holder of an M&M Secured Claim that **does not make the settlement election as described in <u>Section 5.3</u>** of this Disclosure Statement must File with The BMC Group, Inc. (or such other claims agent employed by the Liquidating Trustee), and serve on the Debtors (if before the Effective Date) or the Liquidating Trustee (if on or after the Effective Date), a notice which (i) includes any affidavit or other document that evidences the perfection of its Lien on the property of any of the Debtors or their Estates, (ii) includes copies of any invoices and billing statements relating to the M&M Secured Claim, (iii) identifies the wells or other property to which the M&M Secured Claims attach, (iv) identifies the first and last date of goods or service relating to the M&M Secured Claims, (v) identifies the location and date of the filing of the affidavit or other document that evidences the perfection of its Lien on the property of any of the Debtors or their Estates, and (vi) sets forth the amount of the M&M Secured Claim, alleged priority date (relative to the First Lien Holders and the Second Lien Holders) and legal and factual basis for the alleged priority date.  Nothing set forth in the Plan or in this Disclosure Statement shall extend any deadline for filing such affidavit or other document under the Texas Property Code Chapter 56; Oklahoma Statutes Title 42, Chapter 3; Title 71, Chapter 3 of the Montana Code Annotated; or other similar laws of another state giving rise to an M&M Secured Claim.  **If a holder of an M&M Secured Claim does not make the settlement election as described in Section 5.3 of this Disclosure Statement (and in the case of an election by a holder of an M&M Secured Claim not listed on the M&M Claim Schedule (Exhibit "D") which election is not consented to by the Debtors and Second Lien Holders) and fails to File and serve the notice described in this paragraph on or before the M&M Secured Claim Bar Date, then such holder will not be entitled to receive any Cash or other Distribution from the Debtors, the Reorganized Debtors, the Buyer, any of its subsidiaries, the Liquidating Trust, or the Liquidating Trustee.**

(ii) **Liquidating Trustee Objections**. On or before sixty days after the M&M Secured Claim Bar Date, the Liquidating Trustee will provide the holder of an M&M Secured Claim that does not make the settlement election as described in Section 5.3 of this Disclosure Statement a written notice advising such holder of the Liquidating Trustee's position with respect to such holder's M&M Secured Claim (the "M&M Objection Notice"). If such holder and the Liquidating Trustee are able to resolve the Liquidating Trustee's objection to such holder's M&M Secured Claim or if the Liquidating Trustee does not object to such holder's M&M Secured Claim, the Liquidating Trustee will file a motion with the Bankruptcy Court to allow the entire or the agreed upon portion (as appropriate) of the M&M Secured Claim. If such holder and the Liquidating Trustee are unable to resolve the Liquidating Trustee's objection to such holder's M&M Secured Claim within thirty days after the Liquidating Trustee's service of the M&M Objection Notice, then such holder or the Liquidating Trustee may File a motion with the Bankruptcy Court to determine the allowance of such holder's M&M Secured Claim no later than 150 days after the Effective Date.

(iii) **Mediation and Arbitration**. After a motion to determine the allowance of a holder's M&M Secured Claim is Filed, disputes concerning the allowance of the applicable holder's M&M Secured Claim will be subject to mandatory mediation, the cost of which will be paid out of the Liquidating Trust Expense Reserve up to a maximum of $150,000 in the aggregate. To the extent such costs exceed $150,000 they will be split by the Liquidating Trustee and the holder of the M&M Secured Claim. In the event mediation is unsuccessful in resolving any such disputes, the Liquidating Trustee will consent to binding arbitration if the holder of the M&M Secured Claim so selects. The costs of such binding arbitration will be split evenly between the holder of the M&M Secured Claim and the Liquidating Trustee. If the holder of the M&M Secured Claim decides not to participate in the mediation or arbitration, then such holder's M&M Secured Claim will be disallowed.

(f) <u>Release of Liens.</u>

(i) On the Effective Date, all Liens on any property of any Debtors or any Reorganized Debtors will automatically terminate, all Collateral subject to such Liens will be automatically released, and all guarantees of any Debtors or any Reorganized Debtors will be automatically discharged and released; provided, however, that such Liens will attach to Cash in the applicable Distribution Reserve Accounts in the Liquidating Trust, as provided in the Plan or the Confirmation Order.

(ii) Without limiting the effect of the foregoing, on the Effective Date, all M&M Liens will be released, discharged and of no further force or effect against the Vested Assets or Transferred Assets (as applicable). The holders of M&M Liens will, within 10 days of the Effective Date, release their respective M&M Liens with respect to the Reorganized Debtors, the Vested Assets, and the Transferred Assets; provided, however that such Liens will attach to Cash in the Carveout Reserve, as provided in the Plan or the Confirmation Order.

(g) <u>Preservation of Rights of Action</u>. The Liquidating Trustee will be appointed representative of the Estates pursuant to section 1123(b)(3)(B) of the Bankruptcy Code with respect to the Excluded Causes of Action and, except as otherwise ordered by the Bankruptcy Court and subject to any releases in the Plan, on the Effective Date, the Liquidating

Trust will be transferred all Excluded Causes of Action, and may enforce, sue on, and, subject to Bankruptcy Court approval (except as otherwise provided herein) settle or compromise (or decline to do any of the foregoing) any or all of the Excluded Causes of Action. Except as otherwise ordered by the Bankruptcy Court, the Liquidating Trustee will be vested with authority and standing to prosecute any Excluded Causes of Action. The Liquidating Trustee and his or her attorneys and other professional advisors will have no liability for pursuing or failing to pursue any such Excluded Causes of Action.

**7.2. Means for Implementation of the Plan – Transaction Involving Issuance Of New Crusader Shares To The Buyer**

(a) <u>Preservation of Causes of Action</u>. All Causes of Action, rights of setoff and other legal and equitable defenses of any Debtor or any Estate are preserved for the benefit of the Reorganized Debtors unless expressly released, waived, or relinquished under the Plan or Confirmation Order, or, as to Excluded Causes of Action, vested in the Liquidating Trust. No Person may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against them as an indication that Reorganized Debtors will not pursue a Cause of Action against them.

**7.3. Provisions Governing Distributions Generally**

(a) <u>Distributions on Account of Claims Allowed</u>. Except as described below in this <u>Section 7.3(a)</u>, the Liquidating Trustee will make all Distributions required under the Plan, except with respect to a Claim whose Distribution is governed by an agreement and is administered by an agent or servicer, which Distributions will be deposited with the appropriate agent or servicer, who will deliver such Distributions to the holders of Claims in accordance with the provisions of the Plan.

(i) Distributions of Cash will be made by the Liquidating Trustee on or as soon as practicable after the Effective Date (or 15 Business Days after the date of allowance of such Claims), to holders of Allowed Claims in Classes 1, 2, 5, and 6 in accordance with the Plan.

(ii) An initial Cash Distribution will be made by the Liquidating Trustee Pro Rata to holders of Allowed Claims in Classes 7A on or before the first anniversary of the Effective Date; provided, however, an initial Cash Distribution will be made on the first anniversary of the Effective Date only if the Liquidating Trustee determines that sufficient Available Cash exists. Subsequent Cash Distributions will be made by the Liquidating Trustee Pro Rata to holders of Allowed Claims in Classes 7A on each anniversary of the Effective Date; provided, however, each annual Distribution will be made only if the Liquidating Trustee determines that sufficient Available Cash exists; provided, further, if the Liquidating Trustee intends to make its final Cash Distribution, such Cash distribution will be made regardless of the amount of Available Cash.

(iii) If SandRidge Exploration is the Buyer, (A) the SandRidge Parties will deliver to the First Lien Agent on account of holders of Allowed Claims in Class 3 (Allowed First Lien Secured Claims), at Closing, Cash in an amount equal to the Allowed First Lien

Secured Claim and (B) SandRidge Energy will issue and deliver the SandRidge Energy Shares and SandRidge Energy Warrants to be issued pursuant to the Stock Purchase Agreement to the Second Lien Agent on account of the holders of Allowed Claims in Class 4 (Allowed Second Lien Secured Claims) in accordance with and at the times as provided in Sections 2.02(e) and 2.03 of the Stock Purchase Agreement; provided that certain Second Lien Holders may be required to provide the Required Representations (as defined below) to SandRidge Energy as described in Section 7.3(c)(c)(iii) below.

(iv)     If SandRidge Exploration is not the Buyer, the Debtors would attempt to structure an Alternative Transaction involving Buyer Equity in a manner such that (A) the Buyer would deliver to the First Lien Agent on account of holders of Allowed Claims in Class 3 (Allowed First Lien Secured Claims), at Closing, Cash in an amount equal to the Allowed First Lien Secured Claim and (B) the Buyer would issue and deliver Buyer Equity, if any, to be issued pursuant to the Alternative Transaction Agreement to the Second Lien Agent on account of the holders of Allowed Claims in Class 4 (Allowed Second Lien Secured Claims).

(v)     Distributions of the Liquidating Trust Interests will be made by the Liquidating Trustee on or as soon as practicable after the Effective Date Pro Rata to holders of Allowed Claims in Class 7B (Allowed Second Lien Deficiency Claims).  The Confirmation Order will include provisions directing the Second Lien Agent to provide to the Liquidating Trustee the names and addresses of the Second Lien Holders, and the principal amount of Second Lien Notes owned by each Second Lien Holder as of the close of business on the Effective Date, which information will be used by the Liquidating Trustee to allocate the Liquidating Trust Interests among the holders of Allowed Claims in Class 7B.

(vi)     The Liquidating Trustee will make all Distributions of Available Cash on account of Liquidating Trust Interests, subject to other applicable terms of the Plan and the Liquidating Trust Agreement.

The Liquidating Trust (and, in the case of the Class 3 Allowed First Lien Secured Claims, the First Lien Agent or in the case of the Class 4 Allowed Second Lien Secured Claims, the Second Lien Agent) will be the sole source of payments and Distributions to holders of Claims, Liens and Liquidating Trust Interests under the Plan.

(b)     Record Date for Distributions.  At the close of business on the Effective Date, the transfer ledgers for the First Lien Notes (maintained by the First Lien Agent) and Second Lien Notes (maintained by the Second Lien Agent) will be closed, and there will be no further changes in the record holders of such notes or the indebtedness evidenced thereby.  The Debtors, Reorganized Debtors, and Liquidating Trustee will have no obligation to recognize any transfer of any First Lien Notes or Second Lien Notes, or any indebtedness evidenced thereby, occurring after the Effective Date and will be entitled instead to recognize and deal for all purposes hereunder with only those record holders listed on the transfer ledgers as of the close of business on the Effective Date.

(c)     Distribution of Buyer Equity; Requirements of Certain Second Lien Holders.

(i)        If Buyer Equity is issued as all or a portion of any Other Consideration, then such Buyer Equity will be issued and delivered to the Second Lien Agent as described in Section 7.3(c)(ii) or (iii) of this Disclosure Statement, as applicable, and, upon delivery of such Buyer Equity to the Second Lien Agent in accordance with Section 7.3(c)(ii) or (iii) of this Disclosure Statement, as applicable, neither the Buyer, any Reorganized Debtor nor the Liquidating Trust will have any further obligation with respect to the issuance or distribution of any such Buyer Equity.

(ii)        Upon receipt of Buyer Equity, the Second Lien Agent will deliver to each holder of an Allowed Second Lien Secured Claim such holder's Pro Rata share of the Buyer Equity in accordance with the Plan and the Second Lien Credit Agreement.

(iii)        If SandRidge Exploration is the Buyer, any Second Lien Holder that did not sign the Plan Support Agreement may be required to provide to SandRidge Energy certain representations, certifications or other information (collectively, the "Required Representations") reasonably requested by SandRidge Energy or its transfer agent to ensure that the issuance and delivery of such SandRidge Energy Shares, the SandRidge Energy Warrants and the SandRidge Energy Stock issuable upon the exercise of the SandRidge Energy Warrants to each such holder qualifies for exemption from registration under the 1933 Act pursuant to Section 4(2) of the 1933 Act or section 1145 of the Bankruptcy Code and any other applicable federal, state or foreign securities laws.  The SandRidge Energy Shares, the SandRidge Energy Warrants and the SandRidge Energy Stock issuable upon the exercise of the SandRidge Energy Warrants will be subject to certain restrictions on transfer as set forth in Article 5 of the Plan Support Agreement (the "Lock-Up Restrictions"), and may contain legends evidencing (A) the Lock-Up Restrictions and (B) to the extent that such certificate is being issued to a Second Lien Holder that has not signed the Plan Support Agreement or has not otherwise provided to SandRidge Energy the Required Representations, such other restrictions to ensure that the offering and issuance of the SandRidge Energy Shares, the SandRidge Energy Warrants and the SandRidge Energy Stock issuable upon exercise of the SandRidge Energy Warrants will be exempt from registration under the 1933 Act pursuant to Section 4(2) of the 1933 Act or section 1145 of the Bankruptcy Code and any other applicable federal, state or foreign securities laws.

(d)        Delivery of Distribution.  Distributions to holders of Allowed Claims will be made (a) at the addresses set forth on the Proofs of Claim Filed by such holders (or at the last known address of such holders if no Proof of Claim is Filed or if the Debtors have been notified of a change of address), (b) at the addresses set forth in any written notices of address changes delivered to the Debtors and the Liquidating Trustee (as applicable) after the date of any related Proof of Claim, or (c) if no Proof of Claim has been Filed and the Debtor and the Liquidating Trustee (as applicable) have not received a written notice of a change of address, at the addresses reflected in the Bankruptcy Schedules, if any.  Distributions to holders of Liquidating Trust Interests will be made at the address provided by the Second Lien Agent for such holder or at the addresses set forth in any written notices of address changes delivered to the Liquidating Trustee after the Effective Date.

## 7.4.    Treatment of Executory Contracts and Unexpired Leases – Transaction Involving Issuance of New Crusader Shares to the Buyer

Except to the extent (a) the Debtors previously have assumed or rejected an executory contract or unexpired lease, (b) prior to the Effective Date, the Bankruptcy Court has entered an Order assuming an executory contract or unexpired lease, (c) at the Confirmation Hearing, the Bankruptcy Court approves the assumption of any executory contracts or unexpired leases, or (d) the executory contract or unexpired lease is set forth on Exhibit 2 or 3 to the Plan, the Debtors' executory contracts and unexpired leases will be deemed rejected on the Effective Date, pursuant to sections 365 and 1123 of the Bankruptcy Code. The executory contracts and unexpired leases identified on Exhibit 2 to the Plan, which are the Desired 365 Contracts, will be assumed by the Reorganized Debtors pursuant to the terms of the Stock Purchase Agreement or the Alternative Transaction Agreement (as applicable) and the Plan. The executory contracts and unexpired leases identified on Exhibit 3 to the Plan will be assumed and assigned to the Liquidating Trust or at the election of the Debtors, the Second Lien Holders and the Committee, to Newco (as applicable) pursuant to the terms of the Liquidating Trust Agreement and the Plan.

Any Cure Claims relating to the assumption and vesting of an executory contract or unexpired lease and ordered to be paid by the Bankruptcy Court will be paid by the Liquidating Trustee from the Carveout Reserve on or as soon as reasonably practicable after the Effective Date. In the event of a dispute concerning the assumption of an executory contract or unexpired lease, the dispute will be resolved by the Bankruptcy Court. Nothing herein will require the Liquidating Trustee to pay any cure amount that is a Disputed Claim, but an amount of Cash necessary to pay the entire cure amount will be deposited and maintained in the Carveout Reserve pending the entry of an Order of the Bankruptcy Court determining the amount of the Cure Claim to which such cure amount relates. As soon as practicable after any cure amount that is a Disputed Claim becomes a Cure Claim, the Liquidating Trustee will distribute to the holder of such Cure Claim, out of the Carveout Reserve, Cash in the full amount of such Cure Claim, including the interest which has accrued on said amount while on deposit in the Carveout Reserve. The Liquidating Trust will be solely responsible for paying all Cure Claims. Reorganized Debtors and Buyer will not be obligated to pay any Cure Claims.

**7.5.    Treatment of Executory Contracts and Unexpired Leases – Transaction Not Involving Issuance of New Crusader Shares to the Buyer**

Except to the extent (a) the Debtors previously have assumed or rejected an executory contract or unexpired lease, (b) prior to the Effective Date, the Bankruptcy Court has entered an Order assuming an executory contract or unexpired lease, (c) at the Confirmation Hearing, the Bankruptcy Court approves the assumption of any executory contracts or unexpired leases, or (d) the executory contract or unexpired lease is set forth on Exhibit 2 or 3 to the Plan, the Debtors' executory contracts and unexpired leases will be deemed rejected on the Effective Date, pursuant to sections 365 and 1123 of the Bankruptcy Code. The executory contracts and unexpired leases identified on Exhibit 2 to the Plan, which will be the Desired 365 Contracts, will be assumed by the Reorganized Debtors and assigned to the Buyer (as applicable) pursuant to the terms of the Alternative Transaction Agreement (as applicable), and the Plan. The executory contracts and unexpired leases identified on Exhibit 3 to the Plan will be assumed and assigned to the Liquidating Trust or Newco (as applicable) pursuant to the terms of the Liquidating Trust Agreement and the Plan.

Any Cure Claims relating to the assumption and vesting of an executory contract or unexpired lease and ordered to be paid by the Bankruptcy Court will be paid by the Liquidating Trustee from the Carveout Reserve on or as soon as reasonably practicable after the Effective Date.  In the event of a dispute concerning the assumption of an executory contract or unexpired lease, the dispute will be resolved by the Bankruptcy Court.  Nothing herein will require the Liquidating Trustee to pay any cure amount that is a Disputed Claim, but an amount of Cash necessary to pay the entire cure amount will be deposited and maintained in the Carveout Reserve pending the entry of an Order of the Bankruptcy Court determining the amount of the Cure Claim to which such cure amount relates.  As soon as practicable, after any cure amount that is a Disputed Claim becomes a Cure Claim, the Liquidating Trustee will distribute to the holder of such Cure Claim, out of the Carveout Reserve, Cash in the full amount of such Cure Claim, including the interest which has accrued on said amount while on deposit in the Carveout Reserve.

The assumption by the Debtors or the agreement of the Debtors to assume any Employee Agreement will not entitle any Person to any contractual right to any benefit or alleged entitlement under any of the Debtors' policies, programs or plans, except as to such individual and as expressly set forth in such Employee Agreement.

**7.6.    Treatment of Executory Contracts and Unexpired Leases: Employment and Benefit Issues**

(a)    Employee Agreements.    Pursuant to sections 365 and 1123 of the Bankruptcy Code, each Employee Agreement entered into prior to the Effective Date will be deemed rejected effective as of the Effective Date, except for any Employee Agreement (i) that has been assumed or rejected with the consent of Buyer pursuant to an Order entered prior to the Effective Date, (ii) that is the subject of a motion to assume pending on the Confirmation Date, or (iii) that has been agreed to be assumed as part of the Stock Purchase Agreement or Alternative Transaction Agreement (as applicable).  The assumption by the Debtors or the Reorganized Debtors or the agreement of the Debtors or the Reorganized Debtors to assume any Employee Agreement will not entitle any Person to any contractual right to any benefit or alleged entitlement under any of the Debtors' policies, programs or plans, except as to such individual and as expressly set forth in such Employee Agreement.

**7.7.    Effects of Confirmation**

(a)    Discharge.    On the Effective Date, the Debtors, their Estates, the Reorganized Debtors and their respective assets and properties are automatically and forever discharged and released from all Claims and vested Free and Clear of all Liens to the fullest extent permitted under section 1141 of the Bankruptcy Code.  Except as otherwise set forth in the Plan or the Confirmation Order, the rights afforded under the Plan and the treatment of Claims and Equity Interests under the Plan are in exchange for and in complete satisfaction, discharge, and release of, all Claims including any interest accrued on any Claims from the Petition Date against the Debtors, the Estates and the Reorganized Debtors, and the termination and cancellation of all Equity Interests.  Except as set forth in the Plan or the Confirmation Order, Confirmation will (a) discharge the Debtors, the Reorganized Debtors, and the Liquidating Trust from all Claims or other debts that arose before the Effective Date, and all

debts of a kind specified in section 502(g), (h), or (i) of the Bankruptcy Code, whether or not (i) a Proof of Claim based on such debt is Filed or deemed Filed under section 501 of the Bankruptcy Code, (ii) a Claim based on such debt is Allowed, or (iii) the holder of a Claim based on such debt has accepted the Plan, and (b) terminate all Equity Interests and other rights of Equity Interests in the Debtors, other than the New Crusader Shares and the New Subsidiaries Equity Interests.

(b)     <u>Legal Binding Effect</u>.  The provisions of the Plan will bind all holders of Claims and Equity Interests and their respective successors and assigns, whether or not they accept the Plan.  On and after the Effective Date, except as expressly provided in the Plan, all holders of Claims, Liens and Equity Interests will be precluded from asserting any Claim, Cause of Action or Liens against the Debtors, the Estates, the Reorganized Debtors, Buyer, any of its subsidiaries, the Liquidating Trust, or the Liquidating Trustee or their respective property and assets based on any act, omission, event, transaction or other activity of any kind that occurred or came into existence prior to the Effective Date.

(c)     <u>Moratorium, Injunction and Limitation of Recourse For Payment; Exculpation and Limitation of Liability; Releases</u>.  **The Plan provides for certain moratoriums, injunctions, limitations of recourse and liability, exculpations, and releases that may affect your rights.  Certain of the relevant provisions can be found in <u>Article XVIII</u> of the Plan.  It is important that you carefully review the whole Plan, including <u>Article XVIII</u>.**

### 7.8.  Retention of Jurisdiction

Under the Plan, notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date of the Plan, the Bankruptcy Court shall retain jurisdiction, to the fullest extent legally permitted, over the Bankruptcy Case, all proceedings arising under, arising in or related to the Bankruptcy Case, the Confirmation Order, the Plan and administration of the Liquidating Trust.  Some specific types of disputes and proceedings that the Bankruptcy Court shall retain jurisdiction over are identified in <u>Article XIX</u> of the Plan.

### 7.9.  <u>The Liquidating Trust</u>

On the Effective Date, the Liquidating Trust will be formed, the Liquidating Trust Agreement will be executed, and the Liquidating Trust will be established and become effective. The Liquidating Trustee will (a) pay or provide for payments of all Allowed Priority Tax Claims, Allowed Administrative Claims (including but not limited to Professional Fee Claims), Allowed Ad Valorem Tax Claims, Allowed Priority Claims, Allowed Second Lien Deficiency Claims, Allowed M&M Secured Claims, Allowed Other Secured Claims, Allowed Non-Second Lien General Unsecured Claims, and Cure Claims, (b) establish and fund the Distribution Reserve Accounts, and (c) distribute any remaining Liquidating Trust Assets to the holders of Liquidating Trust Interests.  The beneficiaries of the Liquidating Trust will be the holders of Allowed Second Lien Deficiency Claims in Class 7B.  The Liquidating Trustee will file federal income tax returns for the Liquidating Trust as a grantor trust pursuant to § 671 of the Internal Revenue Code of 1986, as amended, and the Treasury Tax Regulations promulgated thereunder.  On and after the Effective Date, the Liquidating Trust will perform and pay when due liabilities related to

ownership or operation the Liquidating Trust Assets, and neither the Reorganized Debtors nor the Buyer, nor any of its subsidiaries will be responsible for any such Claims or liabilities.

### 7.10.    **Funding of Res of Trust**.

To fund the Liquidating Trust, all of the Liquidating Trust Assets will be transferred and assigned to the Liquidating Trust and/or Newco, and the Liquidating Trust and/or Newco will be in possession of, and have title to, all the Liquidating Trust Assets, as of the Effective Date.  In the case of an Alternative Transaction, any other assets which are not Vested Assets or Transferred Assets (as applicable) may be deemed to be Liquidating Trust Assets and transferred and assigned to, the Liquidating Trust and/or Newco on the Effective Date; provided, that the Debtors must identify those assets to be deemed to be Liquidating Trust Assets in the Plan Supplement.  The Liquidating Trust will be substituted as the plaintiff, defendant, or other party in all lawsuits regarding Excluded Causes of Action pending in which any of the Debtors or the Committee is the plaintiff as of the Effective Date. The conveyances of all Liquidating Trust Assets will be accomplished pursuant to the Plan and the Confirmation Order and will be effective upon the Effective Date.  The Debtors will convey, transfer, assign and deliver the Liquidating Trust Assets Free and Clear of all Liens that are not Liquidating Trust Permitted Liens or released pursuant to the terms of the Plan.  Upon the Effective Date, the Liquidating Trust will also be deemed to have taken (a) an assignment of all Excluded Causes of Action against third parties for obligations or claims existing on or created by virtue of the Effective Date, unless expressly released in the Plan, and (b) an assignment, bill of sale, deed and/or release covering all other Liquidating Trust Assets.  The Liquidating Trustee may present such Orders to the Bankruptcy Court as may be necessary to require third parties to accept and acknowledge such conveyance to the Liquidating Trust.  Such Orders may be presented without further notice other than as has been given in the Plan.

For all federal income tax purposes, all Persons (including, without limitation, the Debtors, the Liquidating Trustee and the Liquidating Trust Beneficiaries) will treat the transfer and assignment of the Liquidating Trust Assets to the Liquidating Trust and/or Newco for the benefit of the Liquidating Trust Beneficiaries as (a) a transfer of the Liquidating Trust Assets directly to the Liquidating Trust Beneficiaries followed by (b) the transfer by the Liquidating Trust Beneficiaries to the Liquidating Trust and/or Newco of the Liquidating Trust Assets.  The Liquidating Trust will be treated as a grantor trust for federal tax purposes and, to the extent permitted under applicable law, for state and local income tax purposes.  The Liquidating Trust Beneficiaries will be treated as the grantors and owners of their Pro Rata portion of the Liquidating Trust Assets for federal income tax purposes.

### 7.11.    **The Liquidating Trustee.**

The Liquidating Trustee will be appointed by mutual consent of the Debtors, the Second Lien Holders and the Committee.  The Liquidating Trustee will retain and have all the rights, powers and duties necessary to carry out his or her responsibilities under the Plan, the Closing Loan Agreement, and the Liquidating Trust Agreement, and as otherwise provided in the Confirmation Order. The Liquidating Trustee will be the exclusive trustee of the Liquidating Trust Assets for the purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estates appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy

Code. Subject to the Bankruptcy Court's approval and appointment of the selection of the Liquidating Trustee at the Confirmation Hearing, a Person to be designated by the Second Lien Holders in the Plan Supplement will initially serve as the Liquidating Trustee. The Liquidating Trust Committee may remove the Liquidating Trustee at any time in its sole discretion.

**7.12.  Compensation of the Liquidating Trustee.**

The Liquidating Trustee's compensation, on a post-Effective Date basis, will be determined by the Second Lien Holders and disclosed in the Plan Supplement. The Liquidating Trustee may pay from the Liquidating Trust Assets reasonable salaries, fees and expenses of the Liquidating Trustee.

**7.13.  Termination.**

The duties, responsibilities and powers of the Liquidating Trustee will terminate after all Liquidating Trust Assets are fully resolved, abandoned or liquidated and the Available Cash has been distributed in accordance with the Plan, the Liquidating Trust Agreement and the Closing Loan Agreement. The Liquidating Trust will terminate no later than three years after the Effective Date unless extended, one or more times (generally not to exceed a total of four extensions), for a finite period, not to exceed six months. Upon the occurrence of the termination of the Liquidating Trust, the Liquidating Trustee will File with the Bankruptcy Court a report thereof, seeking an order discharging the Liquidating Trustee.

**7.14.  Committee and Liquidating Trust Committee**

(a)  _Dissolution of Committees._  The Committee will continue in existence through the Effective Date to exercise those powers and perform those duties specified in section 1103 of the Bankruptcy Code. Unless otherwise ordered by the Bankruptcy Court, on the Effective Date, (a) the Committee will be dissolved and their members will be released of all their duties, responsibilities and obligations in connection with the Cases, the Plan and the implementation of the same and (b) the retention or employment of the Committee's Professionals and other agents will terminate.

(b)  _Creation of Liquidating Trust Committee._

(i)  On the Effective Date, the Liquidating Trust Committee will be formed and constituted of Persons, numbering no more than three, and approved by the Bankruptcy Court, prior to the conclusion of the Confirmation Hearing. One member of the Liquidating Trust Committee will be selected by the Second Lien Holders, one member of the Liquidating Trust Committee will be appointed by the Committee, and one member of the Liquidating Trust Committee will be selected jointly by the two individuals selected by the Second Lien Holders and the Committee. If the two individuals selected by the Second Lien Holders and the Committee are unable to agree upon the third member of the Liquidating Trust Committee, then such selection will be made by the Bankruptcy Court.

(ii)  If a member of the Liquidating Trust Committee (i) sells, transfers or assigns all of its Liquidating Trust Interests or (ii) resigns or is otherwise removed, such

member immediately will be removed from the Liquidating Trust Committee. A replacement Liquidating Trust Committee member, as identified in the Plan Supplement, will be appointed.

### 7.15. Reserves Administered by the Liquidating Trust

(a) Establishment of Reserve Accounts. On the Effective Date, the Liquidating Trustee will establish and fund four Distribution Reserve Accounts: the Undeliverable Distribution Reserve, the Senior Claim Distribution Reserve, the Liquidating Expense Reserve and the Carveout Reserve. The Undeliverable Distribution Reserve will hold any returned, undeliverable or unclaimed Distributions made to holders of Allowed Claims in accordance with the Plan. Such amounts in the Undeliverable Distribution Reserve will be forfeited one year after the first Distribution is made by the Liquidating Trust. The Liquidating Trustee will use the Senior Claim Distribution Reserve to pay Allowed Priority Tax Claims, Allowed Administrative Claims, Allowed Ad Valorem Tax Claims, Allowed Priority Claims, Allowed Other Secured Claims and the U.S. Trustee Fees payable or to be paid. The Liquidating Expense Reserve will be funded with $2,000,000 and such funds will be used by the Liquidating Trustee solely to satisfy the expenses of the Liquidating Trust, the Liquidating Trustee, the Liquidating Trust Beneficiaries and Newco as set forth in the Plan. The Carveout Reserve will be used to pay Allowed M&M Claims, Allowed Non-Second Lien General Unsecured Claims and Cure Claims. Of the Carveout Reserve Amount, up to $8,750,000 will be used to make Distributions to holders of Allowed Non-Second Lien General Unsecured Claims.

(b) Reserve Account Adjustments. The funds in the Senior Claim Distribution Reserve and the Carveout Reserve may be adjusted from time to time so that the Liquidating Trustee can adequately maintain the Cash required by each of the Senior Claim Distribution Reserve and the Carveout Reserve.

### 7.16. Procedures for Resolving Disputed, Contingent, and Unliquidated Claims

(a) Objection Deadline; Prosecution of Objections. As soon as reasonably practicable, but in no event later than 120 days after the Effective Date (unless extended with or without notice by an Order of the Bankruptcy Court), the Liquidating Trustee will File objections to Claims and serve such objections upon the holders of each of the Claims to which objections are made. Subject to the limitations set forth in the Plan, the Liquidating Trustee will be authorized to resolve all Disputed Claims by withdrawing or settling such objections thereto, or by litigating to judgment in the Bankruptcy Court or such other court having competent jurisdiction the validity, nature, and/or amount thereof. If the Liquidating Trustee and the holder of a Disputed Claim agree to compromise, settle, and/or resolve a Disputed Claim by granting such holder an Allowed Claim in the amount of $50,000 or less, then the Liquidating Trustee may compromise, settle, and/or resolve such Disputed Claim without further Bankruptcy Court approval; provided, however, that the Liquidating Trustee will File a notice with the Bankruptcy Court advising that the Allowed Claim has been compromised, settled, and/or resolved. If the Liquidating Trustee and the holder of a Disputed Claim agree to compromise, settle, and/or resolve a Disputed Claim by granting such holder an Allowed Claim in an amount between $50,000 and $100,000, then the Liquidating Trustee may compromise, settle, and/or resolve such Disputed Claim with the consent of the Liquidating Trust Committee without further Bankruptcy Court approval; provided, however, that the Liquidating Trustee will File a notice with the

Bankruptcy Court advising that the Allowed Claim has been compromised, settled, and/or resolved. Otherwise, the Liquidating Trustee may only compromise, settle, and/or resolve such Disputed Claim with Bankruptcy Court approval.

Any Proofs of Claim that are Filed after the applicable Bar Date, including amendments to existing Proofs of Claim, or applications for the allowance of an Administrative Claim that are Filed after the Post-Confirmation Bar Date will be deemed invalid and Disallowed unless consented to by the Liquidating Trustee or authorized by Order of the Bankruptcy Court.

Notwithstanding the foregoing, objections to, and compromises, settlements, and resolutions of, M&M Secured Claims will be governed by the provisions set forth above concerning M&M Secured Claims.

(b)     No Distributions Pending Allowance.    Notwithstanding any other provision of the Plan, no payments or Distribution by the Liquidating Trustee will be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by Non-Appealable Order, and the Disputed Claim, or some portion thereof, has become an Allowed Claim.

(c)     Buyer Standing to Participate.  The Buyer (or its designees, successors and assigns) and Reorganized Debtors will be able to participate in, but not commence, any proceeding related to the allowance or amount of any M&M Liens or Cure Claims, with standing to object to such Liens or Claims being reserved solely as to the Liquidating Trustee.

## ARTICLE VIII

## CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND SECURITIES LAW CONSIDERATIONS

### 8.1.    General

The following discussion summarizes certain United States federal income tax consequences of the implementation of the Plan to the Debtors and certain holders of Claims or Equity Interests. This summary is for general information purposes only, and should not be relied upon for purposes of determining the specific tax consequences of the Plan with respect to any particular holder of a Claim or Equity Interest. This discussion does not purport to be a complete analysis or listing of all potential tax considerations.

The discussion is based upon the Internal Revenue Code, Treasury Regulations promulgated thereunder, judicial decisions, and published administrative rules and pronouncements of the Internal Revenue Service ("IRS") as in effect on the date hereof. Legislative, judicial or administrative changes or new interpretations enacted or promulgated after the date hereof could alter or modify the analyses set forth below with respect to the United States federal income tax consequences of the Plan. Any such changes or new interpretations may have retroactive effect and could significantly affect the federal income tax consequences of the Plan.

The federal income tax consequences of the Plan are complex and are subject to significant uncertainties. The Debtors have not requested a ruling from the IRS or an opinion of counsel with respect to any of the tax aspects of the Plan. Thus, no assurance can be given as to the interpretation that the IRS will adopt. In addition, this discussion does not address foreign, state or local tax consequences of the Plan, nor does it purport to address the federal income tax consequences of the Plan to (i) special classes of taxpayers (such as Persons who are related to the Debtors within the meaning of the Internal Revenue Code, foreign taxpayers, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax-exempt organizations, and investors in pass-through entities and holders of Claims or Equity Interests who are themselves in bankruptcy) or (ii) holders not entitled to vote on the Plan, including holders whose Claims or Equity Interests are entitled to reinstatement or payment in full in cash under the Plan or holders whose Claims or Equity Interests are to be extinguished without any Distribution.

This discussion assumes that holders of Claims or Equity Interests hold only Claims or Equity Interests in a single Class. Holders of multiple Classes of Claims or Equity Interests should consult their own tax advisors as to the effect such ownership may have on the federal income tax consequences described below.

ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR EQUITY INTEREST. ALL HOLDERS OF CLAIMS OR EQUITY INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

TO ENSURE COMPLIANCE WITH TREASURY DEPARTMENT CIRCULAR 230, HOLDERS OF CLAIMS OR EQUITY INTERESTS ARE HEREBY NOTIFIED THAT: (1) ANY DISCUSSION OF FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON, BY ANY HOLDER OF A CLAIM OR EQUITY INTERESTS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON HOLDERS OF CLAIMS OR EQUITY INTERESTS UNDER THE TAX CODE, (2) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE CONFIRMATION OF THE PLAN TO WHICH THE TRANSACTIONS DESCRIBED IN THIS DISCLOSURE STATEMENT ARE ANCILLARY, AND (3) HOLDERS OF CLAIMS OR EQUITY INTERESTS SHOULD SEEK ADVICE BASED UPON THEIR PARTICULAR CIRCUMSTANCES FROM THEIR OWN TAX ADVISOR.

### 8.2. Consequences to the Debtors

The Debtors have reported consolidated NOLs for federal income tax purposes of approximately $137,000,000 as of December 31, 2008.

As discussed below, the amount of the Debtors' NOL carryforwards, and possibly certain other tax attributes, may be significantly reduced upon implementation of the Plan. In addition,

the Reorganized Debtors' subsequent utilization of any net built-in losses with respect to their assets and NOLs remaining, and possibly certain other tax attributes, may be restricted as a result of and upon the implementation of the Plan.

(a) <u>Cancellation Of Indebtedness Income</u>

Under the Internal Revenue Code, a taxpayer generally must recognize income from the cancellation of debt ("<u>COD Income</u>") to the extent that its indebtedness is discharged during the taxable year. COD Income generally equals the excess of the adjusted issue price of the indebtedness discharged over the sum of (i) the amount of cash, (ii) the issue price of any new debt, and (iii) the fair market value of any other property (including stock) transferred by the debtor in satisfaction of such discharged indebtedness. COD Income also includes any interest that has been previously accrued and deducted but remains unpaid at the time the indebtedness is discharged.

Section 108(a)(l)(A) of the Internal Revenue Code provides an exception to this rule, however, where a taxpayer is in bankruptcy and where the discharge is granted, or is effected, pursuant to a plan approved by the bankruptcy court. In that case, instead of recognizing income, the taxpayer is required, under § 108(b) of the Internal Revenue Code, to reduce certain of its tax attributes by the amount of COD Income. The attributes of the taxpayer are to be reduced in the following order: NOLs, general business and minimum tax credit carryforwards, capital loss carryforwards, the basis of the taxpayer's assets, and finally, foreign tax credit carryforwards (collectively, "<u>Tax Attributes</u>"). Section 108(b)(5) of the Internal Revenue Code permits a taxpayer to elect to first apply the reduction to the basis of the taxpayer's depreciable assets, with any remaining balance applied to the taxpayer's other Tax Attributes in the order stated above. In addition to the foregoing, § 108(e)(2) of the Internal Revenue Code provides a further exception to the realization of COD Income upon the discharge of debt to the extent that the taxpayer's satisfaction of the debt would have given rise to a deduction for federal income tax purposes.

The Debtors expect to realize a significant amount of COD Income as a result of the Plan. The ultimate amount of COD income realized by the Debtors is uncertain. Regardless of the amount of the Debtors' COD Income, the Debtors will not be required to include COD Income in gross income because the indebtedness will be discharged while the Debtors are under the jurisdiction of a court in a Title 11 case. Accordingly, the Debtors expect that there will be no United States federal income taxes payable by the Debtors in respect of the COD Income. However, certain Tax Attributes of the Debtors will be reduced or eliminated. The Debtors do not currently anticipate that they will make the election under § 108(b)(5) of the Internal Revenue Code to apply any required attribute reduction first to the basis of the Debtors' depreciable property. The Debtors will avoid recognition of COD Income and reduction of Tax Attributes pursuant to § 108(e)(2) of the Internal Revenue Code only to the extent that the discharge is of amounts that the Debtors would have been entitled to deduct if the Debtors had paid such amounts.

A recently enacted amendment to the COD Income rules, in § 108(i) of the Internal Revenue Code, provides that taxpayers, including taxpayers operating under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code, that recognize COD Income in 2009 or

2010 may elect to forgo the COD Income exclusion and attribute reduction rules described above and instead take the COD Income into taxable income in equal installments in 2014 through 2018 (i.e., the taxpayer would report 20% of the COD Income in each such year). The election to defer the taxable income, which may be made on an instrument-by-instrument basis, must be made on the taxpayer's tax return for the year which includes the transaction that creates the COD Income (in this case, the year in which the Effective Date occurs). The Debtors have not yet determined if they will elect to defer COD Income, in whole or in part, under this new provision or instead have the exclusion and attribute reduction rules apply.

(b)     Net Operating Losses And Other Attributes

The Debtors currently have NOLs that will carry forward to the extent that they are not offset by income and/or gain and are not reduced by the attribute reduction rules of § 108(b) of the Internal Revenue Code discussed above. In addition, the Debtors may generate NOLs in future taxable years to the extent they generate deductions that exceed their income and gain in those years.

(c)     Annual Section 382 Limitation on Use of NOLs

With respect to any NOLs of the Debtors remaining after confirmation of the Plan and any required attribute reduction, § 382 of the Internal Revenue Code contains certain rules limiting the amount of NOLs a corporate taxpayer can utilize in the years following an "ownership change" (the "Annual Section 382 Limitation"). An "ownership change" generally is defined as a more than 50 percentage point change in ownership of the stock of a "loss corporation" (a corporation with NOLs or net unrealized built-in losses) that takes place during a testing period (generally three years) ending on the date on which such change in ownership is tested. The Debtors will undergo an ownership change on the Effective Date.

(i)     General Annual Section 382 Limitation

As a general rule, a loss corporation's Annual Section 382 Limitation equals the product of the value of the stock of the corporation (with certain adjustments) immediately before the ownership change and the applicable "long-term tax-exempt rate," a rate published monthly by the Treasury Department (for example, 4.48% for ownership changes that occur during October, 2009). Any unused portion of the Annual Section 382 Limitation generally is available for use in subsequent years. If a loss corporation does not continue its historic business or use a significant portion of its assets in a new business for two years after the ownership change, the corporation's Annual Section 382 Limitation is zero. The Annual Section 382 Limitation is increased if the loss corporation has net unrealized built-in gains, i.e., gains economically accrued but unrecognized at the time of the ownership change, in excess of a threshold amount. A loss corporation can use NOLs in excess of its Annual Section 382 Limitation to the extent that it realizes those net unrealized built-in gains for federal income tax purposes in the five years following the ownership change. A correlative rule applies to a corporation that has net unrealized built in losses, i.e., losses economically accrued but unrecognized as of the date of the ownership change in excess of a threshold amount. Such a corporation's ability to deduct its built-in losses (in addition to its NOLs) following an ownership change is limited. It is not

certain whether the Debtors will have either a net unrealized built-in gain or a net unrealized built-in loss as of the Effective Date.

(ii)     Special Bankruptcy Exceptions

Section 382(1)(5) of the Internal Revenue Code provides an exception to the application of the Annual Section 382 Limitation when a corporation is under the jurisdiction of a court in a Title 11 case (the "382(1)(5) Exception").  The 382(1)(5) Exception provides that where an ownership change occurs pursuant to a bankruptcy reorganization or similar proceeding, the Annual Section 382 Limitation will not apply if the pre-change shareholders and/or "qualified creditors" (as defined by applicable Treasury Regulations) own at least 50 percent of the stock of the reorganized corporation immediately after the ownership change.  However, under the 382(1)(5) Exception, a corporation's pre-change Tax Attributes that may be carried over to a post-change year must be reduced to the extent attributable to any interest paid or accrued on certain debt converted to stock in the reorganization during the three taxable years preceding the effective date of the reorganization, and during the part of the taxable year prior to and including the date of the reorganization.  In addition, if the 382(l)(5) Exception applies, a second ownership change of the corporation within a two-year period following the effective date of the reorganization will cause the corporation to forfeit all of its unused NOLs that were incurred prior to the date of the second ownership change.

If a corporation qualifies for the 382(1)(5) Exception, the use of its NOLs will be governed by that exception unless the corporation affirmatively elects for the provisions not to apply.  If a corporation that is eligible for the 382(1)(5) Exception elects out of that provision, a special rule under § 382(1)(6) of the Internal Revenue Code will apply in calculating the Annual Section 382 Limitation.  Under this special rule, the Annual Section 382 Limitation will be calculated by reference to the lesser of the value of the corporation's stock (with certain adjustments, including any increase in value resulting from any surrender or cancellation of any Claims in the Cases) immediately after the ownership change (as opposed to immediately before the ownership change, as discussed above) or the value of the Debtors' assets (determined without regard to liabilities) immediately before the ownership change.

In light of the certain restrictions with the 382(1)(5) Exception, as well as uncertainties concerning whether the Plan, as effected, would meet the statutory requirements, the Debtors are currently analyzing whether to affirmatively elect out of the 382(1)(5) Exception and instead rely on the special rule described above under § 382(1)(6) of the Internal Revenue Code.  If the Debtors choose to elect out of the 382(l)(5) Exception, Reorganized Crusader's or a Buyer's use of its NOLs will be subject to the Annual Section 382 Limitation following confirmation of the Plan, calculated under the special rule of § 382(1)(6) of the Internal Revenue Code described above.  However, any NOLs generated after the Effective Date should not be subject to this limitation.

(d)     Exchange of Liquidating Trust Assets.

The Debtors will transfer the Liquidating Trust Assets to the Liquidating Trust and will transfer the Liquidating Trust Interests to the holders of Allowed General Unsecured Claims in Class 7.  For federal income tax purposes, these transfers will be treated as a taxable

disposition by the Debtors of the Liquidating Trust Assets to the holders of Allowed General Unsecured Claims in satisfaction of their Claims. The Debtors will recognize gain or loss measured by the difference between the fair market value of the Liquidating Trust Assets and their basis in the Liquidating Trust Assets. The character of any gain or loss as capital or ordinary, and in the case of capital gain or loss, as short term or long term, will depend upon the nature of the Liquidating Trust Assets and the Debtors' holding period for the Liquidating Trust Assets.

(e)     Accrued Interest

To the extent that the consideration issued to holders of Claims pursuant to the Plan is attributable to accrued but unpaid interest, the Debtors should be entitled to interest deductions in the amount of such accrued interest, but only to the extent the Debtors have not already deducted such amount. The Debtors should not have COD Income from the discharge of any accrued but unpaid interest pursuant to the Plan to the extent that the payment of such interest would have given rise to a deduction pursuant to § 108(e)(2) of the Internal Revenue Code, as discussed above.

(f)     Federal Alternative Minimum Tax

In general, a federal alternative minimum tax ("AMT") is imposed on a corporation's alternative minimum taxable income ("AMTI") at a 20% rate to the extent that such tax exceeds the corporation's regular federal income tax for the year. AMTI is generally equal to regular taxable income with certain adjustments. For purposes of computing AMTI, certain tax deductions and other beneficial allowances are modified or eliminated. In particular, even though a corporation might otherwise be able to offset all of its taxable income for regular federal income tax purposes by available NOL carryforwards, a corporation is generally entitled to offset no more than 90% of its AMTI with NOL carryforwards (as recomputed for AMT purposes). Accordingly, usage of the Debtors' NOLs by the Reorganized Debtors or Buyer may be subject to limitations for AMT purposes in addition to any other limitations that may apply.

In addition, if a corporation (or a consolidated group) undergoes an ownership change and is in a net unrealized built-in loss position on the date of the ownership change, the corporation's (or group's) aggregate tax basis in its assets may be reduced for certain AMT purposes to reflect the fair market value of such assets as of the change date. Accordingly, if the Debtors are in a net unrealized built-in loss position on the Effective Date, for AMT purposes the tax benefits attributable to basis in assets may be reduced.

Any AMT that a corporation pays generally will be allowed as a nonrefundable credit against its regular federal income tax liability in future taxable years when the corporation is no longer subject to AMT.

**8.3.    Federal Income Tax Consequences to Holders of Allowed Second Lien Secured Claims**

The tax consequences of the implementation of the Plan to a holder of an Allowed Second Lien Secured Claim will depend, in part, on whether SandRidge is the Buyer and the mix of consideration received by such holder pursuant to the Plan. The holder of an Allowed Second

Lien Secured Claim may receive cash, Buyer Equity and/or new debt securities of the Reorganized Debtors ("Reorganized Debtor Notes").

(a)      Receipt of Buyer Equity and Cash

The exchange of all or a portion of Allowed Second Lien Secured Claims for Buyer Equity and cash will be a taxable transaction to the holders of Allowed Second Lien Secured Claims. A holder of an Allowed Second Lien Secured Claim will recognize gain or loss measured by the difference between (i) the amount of cash and the fair market value of the Buyer Equity received, and its basis in the Allowed Second Lien Secured Claims exchanged therefor (other than any claims for accrued interest as discussed below). The character of any gain or loss as capital or ordinary and, in the case of capital gain or loss, as short-term or long-term, will depend on a number of factors, including: (i) the tax status of the holder of the Claim; (ii) whether the Claim is a capital asset in the hands of the holder; (iii) whether the Claim has been held by the holder for more than one year; (iv) the extent to which the holder previously claimed a loss or a bad debt deduction with respect to the Claim; and (v) the extent to which the holder acquired the Claim at a market discount.

(b)      Receipt of Reorganized Debtors Notes

Pursuant to the Plan, each holder of an Allowed Second Lien Secured Claim could receive Reorganized Debtor Notes in exchange for a portion of its Allowed Second Lien Secured Claim. The federal income tax consequences to holders of Allowed Second Lien Secured Claims on the receipt of Reorganized Debtor Notes will depend, in part, on whether the Second Lien Notes and the Reorganized Debtor Notes both constitute a "security" for federal income tax purposes.

(i)      Definition of Securities

The term "security" is not defined in the Tax Code or in the Treasury Regulations and has not been clearly defined by judicial decisions. Whether an instrument constitutes a "security" for federal income tax purposes is determined based upon all the facts and circumstances. Certain authorities have held that the length of the initial term of a debt instrument is an important factor in determining whether such instrument is a security for federal income tax purposes. These authorities generally have indicated that an initial term of less than five years is evidence that the instrument is not a security, whereas an initial term of ten years or more is evidence that it is a security. There are numerous other factors that may be taken into account in determining whether a debt instrument is a security, including, but not limited to, the security for payment, the creditworthiness of the obligor, the subordination or lack thereof to other creditors, the right to vote or otherwise participate in the management of the obligor, the convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable, or contingent, and whether such payments are made on a current basis or accrued.

(ii)      Consequences if Notes are Securities

If both the Second Lien Notes and the Reorganized Debtor Notes are treated as "securities," the exchange of a portion of Allowed Second Lien Secured Claims for Reorganized Debtor Notes should be treated as a recapitalization and therefore a tax free reorganization under § 368(a)(1)(E) of the Internal Revenue Code. In general, this means that a holder of an Allowed Second Lien Secured Claim will not recognize gain or loss with respect to the exchange (except with respect to accrued but unpaid interest). A holder should obtain a tax basis in a Reorganized Debtor Note equal to the tax basis of the portion of the Allowed Second Lien Secured Claim exchanged therefor. The holder should have a holding period for the Reorganized Debtor Note that includes the holding period of the Allowed Second Lien Secured Claim; provided that the tax basis of any portion of Reorganized Debtor Notes treated as received in satisfaction of accrued interest should equal the amount of such accrued interest, and the holding period of such portion of the Reorganized Debtor Notes should not include the holding period of the Allowed Second Lien Secured Claim.

(iii)    Consequences if Notes are Not Securities

If the Allowed Second Lien Secured Claims or the Reorganized Debtor Notes are not both treated as "securities" for federal income tax purposes, a holder of an Allowed Second Lien Secured Claim should be treated as exchanging a portion of its Allowed Second Lien Secured Claim for Reorganized Debtor Notes in a fully taxable exchange. In that case, the holder should recognize gain or loss equal to the difference between the issue price as of the Effective Date of the Reorganized Debtor Notes that is not allocable to accrued interest, and the holder's basis in the portion of the Allowed Second Lien Secured Claim surrendered in exchange therefor. The character of any gain or loss as capital or ordinary and, in the case of capital gain or loss, as short-term or long-term, will depend on a number of factors, including: (i) the tax status of the holder of the Claim; (ii) whether the Claim is a capital asset in the hands of the holder; (iii) whether the Claim has been held by the holder for more than one year; (iv) the extent to which the holder previously claimed a loss or a bad debt deduction with respect to the Claim; and (v) the extent to which the holder acquired the Claim at a market discount. To the extent that the Second Lien Notes are construed not to be securities for federal income tax purposes, a holder who, under the Plan, receives in respect of a Second Lien Note an amount less than the holder's tax basis in the Second Lien Note may be entitled to a bad debt deduction in some amount under Section 166(a) of the Tax Code. The rules governing the character, timing, and amount of bad debt deduction place considerable emphasis on the facts and circumstances of the holder, the obligor, and the instrument with respect to which a deduction is claimed and are subject to the exchange provisions of Section 1271 of the Tax Code. Holders of Second Lien Notes, therefore, should consult their tax advisors with respect to their ability to take such a deduction.

(c)    Market Discount

Under the "market discount" provisions of Sections 1276 through 1278 of the Internal Revenue Code, some or all of any gain recognized by a holder of an Allowed Second Lien Second Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the Second Lien Notes. In general, a debt instrument is considered to have been acquired with "market discount" if its holder's adjusted tax basis in the debt instrument is less than (i) the sum of all remaining payments to be made on the debt

instrument, excluding "qualified stated interest," or (ii) in the case of a debt instrument issued with original issue discount, its adjusted issue price, by at least a *de minimis* amount (equal to 0.25 percent of the sum of all remaining payments to be made on the Second Lien Note, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a holder on the taxable disposition of Second Lien Notes that had been acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such Second Lien Notes were held by the holder (unless the holder elected to include market discount in income as it accrued). To the extent that the surrendered Second Lien Notes that had been acquired with market discount are deemed to be exchanged for Reorganized Debtor Notes in a tax-free reorganization, any market discount that accrued on such Second Lien Notes but was not recognized by the holder may cause any gain recognized on the subsequent sale, exchange, redemption or other disposition of the Reorganized Debtor Notes to be treated as ordinary income to the extent of the accrued but unrecognized market discount with respect to the exchanged Second Lien Note.

(d)    Accrued Interest

The extent to which the consideration received by a holder of an Allowed Second Lien Secured Claim will be attributable to accrued interest is unclear. Under the Plan all distributions in respect of Allowed Second Lien Secured Claims will be allocated first to the principal amount of the Second Lien Notes and thereafter to the amount of any unpaid but accrued interest with respect to such Second Lien Notes. However, there is no assurance that such allocation will be respected by the IRS. To the extent that a portion of the Reorganized Debtor Notes, Buyer Equity or Cash received in exchange for Allowed Second Lien Secured Claims is allocable to accrued interest, the holder may recognize ordinary income. In that case, a holder's tax basis in the Reorganized Debtor Note received in exchange therefor should equal the issue price of such Reorganized Debtor Notes as of the Effective Date or in the case of Buyer Equity should equal the fair market value of such Buyer Equity as of the Effective Date, and the holder's holding period for the Reorganized Debtor Notes or Buyer Equity received in exchange for accrued interest should begin on the date following the Effective Date. A holder of an Allowed Second Lien Secured Claim may be able to recognize a deductible loss to the extent that any accrued interest on the Allowed Second Lien Secured Claim was previously included in the holder's gross income but was not paid in full by the debtors.

**8.4.    Federal Income Tax Consequences to Holders of Allowed Second Lien Deficiency Claims**

(a)    Receipt of Liquidating Trust Interests by Holders of Allowed Second Lien Deficiency Claims.

The Debtors will transfer the Liquidating Trust Assets to the Liquidating Trust or Newco, as applicable, and will transfer the Liquidating Trust Interests to the holders of Allowed Second Lien Deficiency Claims in Class 7B. For federal income tax purposes, these transfers will be treated as the transfer by the Debtors of the Liquidating Trust Assets to the holders of Allowed Second Lien Deficiency Claims in satisfaction of their Claims, followed by the transfer by such

holders of the Liquidating Trust Assets to the Liquidating Trust or Newco, as applicable. As noted below, it is anticipated that the Liquidating Trust will be treated as a grantor trust for federal income tax purposes.

The exchange of Allowed Second Lien Deficiency Claims for Liquidating Trust Assets will be a taxable transaction to holders of Allowed Second Lien Deficiency Claims. A holder of an Allowed Second Lien Deficiency Claim will recognize gain or loss measured by the difference between the amount of cash and the fair market value of its Pro Rata share of the Liquidating Trust Assets it is treated as receiving (net of any liabilities it is treated as assuming), and its basis in the Claims exchanged (other than for any claims for accrued interest as discussed below). The character of any gain or loss as capital or ordinary and, in the case of capital gain or loss, as short-term or long-term, will depend on a number of factors, including: (i) the tax status of the holder of the Claim; (ii) whether the Claim is a capital asset in the hands of the holder; (iii) whether the Claim has been held by the holder for more than one year; (iv) the extent to which the holder previously claimed a loss or a bad debt deduction with respect to the Claim; and (v) the extent to which the holder acquired the Claim at a market discount. Holders of Allowed Second Lien Deficiency Claims should consult their own tax advisors regarding the amount and character of gain or loss, if any, to be recognized by them under the Plan.

The deemed contribution by the holders of Allowed Second Lien Deficiency Claims of the Liquidating Trusts Assets to the Liquidating Trust should not be a taxable transaction.

(b)     Accrued Interest.

Consideration received by a holder of an Allowed Second Lien Deficiency Claims that is attributable to accrued but unpaid interest will be treated as ordinary income, regardless of whether the holder's existing Claims are capital assets in its hands.

The manner in which consideration is to be allocated between accrued and unpaid interest and principal of the Claims of the Creditors for federal income tax purposes is unclear under present law. Although there can be no assurance with respect to this issue, the consideration paid pursuant to the Plan with respect to an Allowed Second Lien Deficiency Claim shall be allocated, pursuant to the Plan, first to the principal amount of such Allowed Second Lien Deficiency Claim as determined for federal income tax purposes and then to accrued and unpaid interest, if any, with respect to such Allowed Second Lien Deficiency Claim. Accordingly, in cases where a holder of an Allowed Second Lien Deficiency Claims receives distributions under the Plan having a value less than the principal amount of its Allowed Second Lien Deficiency Claim, the Debtors allocate the full amount of consideration transferred to such holder to the principal amount of such claim and do not treat any amount of the consideration to be received by such holder as attributable to accrued and unpaid interest. Holders should be aware, however, that the IRS may take a different position with respect to the proper allocation.

(c)     Valuation.

The fair market value of the Liquidating Trust Assets as of the Effective Date will be agreed to by the Debtors and the Liquidating Trustee. As soon as practicable after the Effective Date, the Liquidating Trustee shall inform the Liquidating Trust Beneficiaries in writing of the

agreed upon value of the Liquidating Trust Assets transferred to the Liquidating Trust. Such valuation shall be used consistently by all parties, including, without limitation, the Debtors, the Liquidating Trustee and the Liquidating Trust Beneficiaries, for all federal income tax purposes.

### 8.5. Federal Income Tax Consequences of the Liquidating Trust

(a) Classification of the Liquidating Trust.

The Liquidating Trust will be organized for the primary purpose of liquidating the Liquidating Trust Assets transferred to it with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidating Trust. Thus, the Liquidating Trust is intended to be classified for federal income tax purposes as a "Liquidating Trust" within the meaning of Treasury Regulation Section 301.7701-4(d). Under the Plan, all parties are required to treat the Liquidating Trust as a "Liquidating Trust," subject to definitive guidance to the contrary from the IRS. In general, a liquidating trust is not a separate taxable entity but rather is treated as a grantor trust, pursuant to Sections 671 et seq. of the Internal Revenue Code, owned by the Persons who transfer assets to it.

No request for a ruling from the IRS will be sought on the classification of the Liquidating Trust. Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the Liquidating Trust. If the IRS were to challenge successfully the classification of the Liquidating Trust as a grantor trust, the federal income tax consequences to the Liquidating Trust and the holders of Allowed Second Lien Deficiency Claims could vary from those discussed herein (including the potential for an entity-level tax).

(b) Allocation of Liquidating Trust Taxable Income and Loss And Disposition of Trust Assets.

Each holder of a Liquidating Trust Interest must report on its federal income tax return its allocable share of income, gain, loss, deduction and credit recognized or incurred by the Liquidating Trust. None of the Debtors' NOLs (if any) will be available to reduce any income or gain of the Liquidating Trust. Moreover, upon the sale or other disposition of any Liquidating Trust Asset, each holder of a Liquidating Trust Interest must report on its federal income tax return its share of any gain or loss measured by the difference between (i) its Pro Rata share of the amount of cash and/or the fair market value of any property received by the Liquidating Trust in exchange for the Liquidating Trust Asset so sold or otherwise disposed of and (ii) such holder's adjusted tax basis in its share of such Liquidating Trust Asset. The character of any such gain or loss to any such holder will be determined as if such holder itself had directly sold or otherwise disposed of the Liquidating Trust Asset. The character of items of income, gain, loss, deduction and credit to any holder of a Liquidating Trust Interest, and the ability of such holder to benefit from any deductions or losses, may depend on the particular circumstances or status of such holder.

As a grantor trust, each holder of a Liquidating Trust Interest has an obligation to report its share of the Liquidating Trust's tax items (including gain on the sale or other disposition of a Liquidating Trust Asset) that is not dependent on the distribution of any Cash or other

Liquidating Trust Assets by the Liquidating Trust. Accordingly, a holder of a Liquidating Trust Interest may incur a tax liability as a result of owning a share of the Liquidating Trust Assets, regardless of whether the Liquidating Trust distributes Cash or other Liquidating Trust Assets to the holders. Although the Liquidating Trust Agreement provides that the Liquidating Trust generally make at least semi-annual distributions of Cash, due to the Liquidating Trust's requirement to satisfy certain liabilities, and due to possible differences in the timing of income on, and the receipt of Cash from, the Liquidating Trust Assets, a holder of a Liquidating Trust Interest may, in certain years, report and pay tax on a greater amount of income than the amount of Cash received from the Liquidating Trust by such holder in such year.

### 8.6. Information Reporting and Backup Withholding

Certain payments, including the payments with respect to Claims pursuant to the Plan, may be subject to information reporting by the Debtors to the IRS. Moreover, such reportable payments may be subject to backup withholding (currently at a rate of 28%) under certain circumstances. Backup withholding is not an additional tax. Rather, amounts withheld under the backup withholding rules may be credited against a holder's federal income tax liability, and a holder may obtain a refund of any excess amounts withheld under the backup withholding rules by timely filing an appropriate claim for refund with the IRS (generally a U.S. federal income tax return). The Debtors intend to comply with all applicable reporting withholding requirements of the Tax Code.

Holders of Allowed Claims should consult their own tax advisors regarding their qualification for exemption from backup withholding and information reporting and the procedures for obtaining such an exemption.

The Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of certain thresholds. Holders of Allowed Claims should consult their own tax advisors regarding these Treasury Regulations and whether the exchanges contemplated by the Plan would be subject to these Treasury Regulations and require disclosure on the holders' tax returns.

### 8.7. Importance of Obtaining Professional Tax Assistance

THE FOREGOING SUMMARY HAS BEEN PROVIDED FOR INFORMATIONAL PURPOSES ONLY AS MANDATED BY SECTION 1125 OF THE BANKRUPTCY CODE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES. ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE URGED TO CONSULT THEIR TAX ADVISORS CONCERNING THE FEDERAL, STATE, LOCAL, AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

### 8.8. Securities Law Considerations

The Debtors intend that the offer and issuance of the SandRidge Energy Shares, SandRidge Energy Warrants and SandRidge Energy Stock to be issued upon the exercise of the

SandRidge Energy Warrants and the Liquidating Trust Interests will be issued without registration under the 1933 Act, or under any state securities laws, in reliance upon the exemption from registration afforded by sections 1125 and 1145 of the Bankruptcy Code or Section 4(2) of the 1933 Act. The Debtors would attempt to structure an Alternative Transaction involving Buyer Equity in a manner such that Buyer Equity to be issued in any such Alternative Transaction would receive the same treatment but cannot determine as of the date of this Disclosure Statement whether such exemptions would be available with respect to such Buyer Equity. The Confirmation Order will include provisions to the effect that such exemptions are applicable to the offer and issuance of the SandRidge Energy Shares, SandRidge Energy Warrants and SandRidge Energy Stock to be issued upon the exercise of the SandRidge Energy Warrants and the Liquidating Trust Interests and that each of SandRidge and the Liquidating Trust is a "successor" to Debtor within the meaning of section 1145 of the Bankruptcy Code. No indenture will be qualified under the Trust Indenture Act of 1939, as amended (the "1939 Act"), with respect to the Liquidating Trust in reliance on the exemption provided by section 304(a)(1) of the 1939 Act.

In general, subject to the restrictions on disposition imposed in Section 5.1 of the Plan Support Agreement and Section 2.01(iii) of the Stock Purchase Agreement, SandRidge Energy Shares, the SandRidge Energy Warrants and SandRidge Energy Stock issued upon the exercise of the SandRidge Energy Warrants may be resold by a holder of an Allowed Second Lien Secured Claim receiving such SandRidge Energy Shares, the SandRidge Energy Warrants and SandRidge Energy Stock to be issued upon the exercise of the SandRidge Energy Warrants under the Plan without registration under the 1933 Act or other laws, unless such person is an "underwriter" with respect to such securities, as that term is defined in section 1145(b) of the Bankruptcy Code.

Section 1145(a)(1) of the Bankruptcy Code exempts the offer or sale of securities pursuant to a plan of reorganization from the registration requirements of the 1933 Act and from registration under state securities laws if the following conditions are satisfied: (i) the securities are offered and sold by a debtor or a successor of the debtor under a plan of reorganization; (ii) the recipients of the securities hold a claim against, an interest in, or a claim for an administrative expense against, the debtor; and (iii) the securities are issued in exchange for the recipients' claims against or interests in the debtor, or principally in such exchange and partly for cash or property. Section 1145(a)(2) of the Bankruptcy Code exempts from the registration requirements of the 1933 Act and from registration under state securities laws the offer or sale of securities acquired through the exercise of a warrant, option, subscription right, or conversion privilege when that warrant, option, subscription right, or conversion privilege was issued under a plan of reorganization if the same conditions are satisfied. In general, offers and sales of securities made in reliance on the exemption afforded under section 1145(a) of the Bankruptcy Code are deemed to be made in a public offering, so that the recipients thereof, other than underwriters (as defined in section 1145(b) of the Bankruptcy Code), are free to resell such securities without registration under the 1933 Act. In addition, such securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.

The exemption from the registration requirements of the 1933 Act for resales provided by section 1145(a) is not available to a recipient of securities if such individual or entity is deemed

to be an "underwriter" with respect to such securities, as that term is defined in section 1145(b) of the Bankruptcy Code. Section 1145(b) of the Bankruptcy Code defines the term "underwriter" as one who (i) purchases a claim with a view toward distribution of any security to be received in exchange for the claim, or (ii) offers to sell securities issued under a plan for the holders of such securities, or (iii) offers to buy securities issued under a plan from persons receiving such securities, if the offer to buy is made with a view toward distribution, or (iv) is a control person of the issuer of the securities.

Persons who are underwriters (as defined in section 1145(b) of the Bankruptcy Code) will be able to resell such securities only pursuant to a registration statement effective under the 1933 Act or in limited circumstances in reliance upon an exception from the 1933 Act registration requirements. SandRidge does not propose, and has no obligation, to register the offer or resale by the recipients thereof of any of the SandRidge Energy Shares or SandRidge Energy Warrants to be distributed under the Plan. Persons who are underwriters by virtue of being in a control relationship with SandRidge ("affiliates") may resell such securities in accordance with Rule 144 under the 1933 Act or other applicable rules and regulations of the SEC and in compliance with applicable state and foreign securities laws. In addition, persons who are underwriters who (i) purchase a claim against or equity interest in a debtor with a view to the distribution of the securities received on account of such claim or equity interest, (ii) offer to sell such securities on behalf of the holders thereof (except offers to sell fractional interests), or (iii) offer to buy such securities from the holders if such offer to buy is with a view to the distribution thereof pursuant to an agreement made in connection with the Plan, the consummation of the Plan or the offer or sale of securities under the Plan may engage in "ordinary trading transactions" in SandRidge Energy Shares received under the Plan. What constitutes "ordinary trading transactions" within the meaning of section 1145 of the Bankruptcy Code is the subject of interpretive letters of the staff of the SEC. Generally, ordinary trading transactions are those which do not involve (a) concerted activity by recipients of securities under a plan of reorganization, or by distributors acting on their behalf, in connection with the sale of such securities, (b) use of informational documents in connection with the sale other than the disclosure statement relating to the plan, any amendments thereto, and reports filed by the issuer with the SEC under the Securities Exchange Act of 1934, as amended (the "1934 Act"), or (c) payment of special compensation to brokers or dealers in connection with the sale.

The Liquidating Trust Interests may not be transferred, sold, pledged or otherwise disposed of, or offered for sale, except for transfers by operation of law.

THE FOREGOING SUMMARY DISCUSSION IS GENERAL IN NATURE AND HAS BEEN INCLUDED IN THIS DISCLOSURE STATEMENT SOLELY FOR INFORMATIONAL PURPOSES PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE. THE DEBTORS MAKE NO REPRESENTATIONS CONCERNING, AND DO NOT HEREBY PROVIDE, ANY OPINIONS OR ADVICE WITH RESPECT TO THE SECURITIES AND BANKRUPTCY MATTERS DESCRIBED HEREIN. THE DEBTORS INCORPORATE BY REFERENCE ALL DISCLOSURES SET FORTH IN CRUSADER'S PUBLIC FILINGS WITH THE SECURITIES AND EXCHANGE COMMISSION. IN LIGHT OF THE UNCERTAINTY CONCERNING THE AVAILABILITY OF EXEMPTIONS FROM THE RELEVANT PROVISIONS OF FEDERAL AND STATE SECURITIES LAWS, THE DEBTORS ENCOURAGE EACH CREDITOR, EQUITY INTEREST HOLDER,

LIQUIDATING TRUST INTEREST HOLDER, AND PARTY IN INTEREST TO CONSIDER CAREFULLY AND CONSULT WITH ITS OWN LEGAL ADVISORS WITH RESPECT TO ALL SUCH MATTERS. BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR HOLDER MAY BE AN UNDERWRITER, THE DEBTORS MAKE NO REPRESENTATION CONCERNING THE ABILITY OF A PERSON TO DISPOSE OF THE SECURITIES TO BE DISTRIBUTED UNDER THE PLAN.

**ARTICLE IX**

**THE BEST INTERESTS OF CREDITORS TEST**

**9.1.**    **Best Interests Test**

The Bankruptcy Code requires that the Bankruptcy Court find that the Plan is in the best interest of all holders of Claims and Equity Interests that are Impaired by the Plan and that have not accepted the Plan as a requirement to confirm the Plan. The "best interests" test, as set forth in section 1129(a)(11) of the Bankruptcy Code, requires the Bankruptcy Court to find either that all members of an Impaired Class of Claims or Equity Interests have accepted the Plan or that the Plan will provide a member who has not accepted the Plan with a recovery of property of a value, as of the effective date of the Plan, that is not less than the amount that such holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on such date.

To calculate the probable distribution to members of each Impaired Class of Claims and Equity Interests if the Debtors were liquidated under chapter 7, the Bankruptcy Court must first determine the aggregate dollar amount that would be generated from the disposition of the Debtors' assets if liquidated in chapter 7 cases under the Bankruptcy Code. This "liquidation value" would consist primarily of the proceeds from a forced sale of the Debtors' assets by a chapter 7 trustee.

The amount of liquidation value available to holders of unsecured Claims against the Debtors would be reduced by, first, the claims of secured creditors (to the extent of the value of their collateral), and by the costs and expenses of liquidation, as well as by other administrative expenses and costs of the chapter 7 cases. Costs of a liquidation of the debtors under chapter 7 of the Bankruptcy Code would include the compensation of a chapter 7 trustee and his or her counsel and other professionals, asset disposition expenses, and litigation costs. The liquidation itself would trigger certain priority payments that otherwise would be due in the ordinary course of business. Those priority claims would be paid in full from the liquidation proceeds before the balance would be made available to pay unsecured Claims or to make any distribution in respect of Equity Interests. The liquidation would also prompt the rejection of executory contracts and unexpired leases and thereby create a significantly greater amount of unsecured Claims.

In chapter 7 liquidation, no junior class of Claims or Equity Interests may be paid unless all classes of Claims or Equity Interests senior to such junior class are paid in full. Section 510(a) of the Bankruptcy Code provides that subordination agreements are enforceable in a bankruptcy case to the same extent that such subordination is enforceable under applicable non-bankruptcy law. Therefore, no class of Claims or Equity Interests that is contractually

subordinated to another class would receive any payment on account of its Claims or Equity Interests, unless and until such senior classes were paid in full.

Once the Bankruptcy Court ascertains the recoveries in liquidation of the Debtors' secured and priority creditors, it would then determine the probable distribution to unsecured creditors from the remaining available proceeds of the liquidation. If this probable distribution has a value greater than the value of distributions to be received by the unsecured creditors under the Plan, then the Plan is not in the best interests of creditors and cannot be confirmed by the Bankruptcy Court. As shown in the Liquidation Analysis attached hereto as **Exhibit G**, the Debtors believe that each member of each Class of Impaired Claims and Equity Interests will receive at least as much, if not more, under the Plan as it would receive if the Debtors were liquidated.

### 9.2. Liquidation Analysis

The Debtors believe that under the Plan, all holders of Impaired Claims and Equity Interests will receive property with a value greater than or equal to the value each such holder would receive in a liquidation of the Debtors under chapter 7 of the Bankruptcy Code. The Debtors' belief is based primarily on:

- consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to holders of Impaired Claims and Equity Interests, including:

  - increased costs and expenses of a liquidation under chapter 7 arising from fees payable to one or more chapter 7 trustees and professional advisors to such trustee(s), who may not be familiar with the Debtors' industry and business operations;

  - erosion in value of assets in a chapter 7 case in the context of the rapid liquidation required under chapter 7 and the "forced sale" atmosphere that would prevail in today's negative environment for the sale of oil and gas production assets;

  - significant adverse effects on the Debtors' businesses as a result of the likely departure of key employees;

  - substantial increases in Claims, as well as substantially increased estimated contingent Claims, lease and contract rejection Claims;

  - substantial delay in distributions, if any, to the holders of Claims and Equity Interests that would likely ensue in a chapter 7 liquidation; and

- the liquidation analysis prepared by the Debtors.

The Debtors believe that any liquidation analysis includes some speculation as such an analysis necessarily is premised on assumptions and estimates which are inherently subject to significant uncertainties and contingencies, many of which would be beyond the control of the

Debtors. Thus, there can be no assurance as to values that would actually be realized in a chapter 7 liquidation, nor can there be any assurance that a Bankruptcy Court would accept the Debtors' conclusions or concur with such assumptions in making its determinations under section 1129(a)(11) of the Bankruptcy Code.

For example, the Liquidation Analysis necessarily contains an estimate of the amount of Claims which will ultimately become Allowed Claims. No order or finding has been entered by the Bankruptcy Court or any other court estimating or otherwise fixing the amount of Claims at the projected amounts of Allowed Claims set forth in the Liquidation Analysis. In preparing the Liquidation Analysis, the Debtors have projected an amount of Allowed Claims within a reasonable range such that, for purposes of the Liquidation Analysis, the largest possible liquidation dividend to holders of Allowed Claims can be assessed. The estimate of the amount of Allowed Claims set forth in the Liquidation Analysis should not be relied on for any other purpose, including any determination of the value of any distribution to be made on the account of Allowed Claims under the Plan.

The annexed Liquidation Analysis is provided solely to disclose to holders of Claims and Equity Interests the effects of a hypothetical chapter 7 liquidation of the Debtors, subject to the assumptions set forth therein.

**ARTICLE X**

**ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN**

The Debtors believe that the Plan affords holders of Claims and Equity Interests the potential for the greatest realization on the Debtors' assets and, therefore, is in the best interests of such holders. If, however, enough acceptances received from Classes 4, 5, 6, 7A, and 7B sufficient for the Debtors to confirm the Plan are not received, or the Plan is not subsequently confirmed and consummated, the theoretical alternatives include: (i) formulation of an alternative plan or plans of reorganization or (ii) liquidation of the Debtors under chapter 7 or 11 of the Bankruptcy Code.

## 10.1.  Alternative Plan(s)

If enough acceptances to confirm the Plan are not received or if the Plan is not confirmed, the Debtors (or, if the Debtors' exclusive periods in which to file and solicit acceptances of a reorganization plan have expired, any other party in interest) could attempt to formulate and propose a different plan or plans of reorganization. Such a plan or plans might involve either a reorganization and continuation of the Debtors' businesses, or an orderly liquidation of assets.

With respect to an alternative plan, the Debtors have explored various other alternatives in connection with the extensive negotiation process involved in the formulation and development of the Plan. The Debtors believe that the Plan, as described herein, which is the result of extensive negotiations between the Debtors and the other Plan Proponents, enables holders of Claims and Equity Interests to realize the greatest possible value under the circumstances, and that, as compared to any alternative plan of reorganization, the Plan has the greatest chance to be confirmed and consummated.

### 10.2. Liquidation Under Chapter 7

Proceeding under chapter 7 would impose significant additional monetary and time costs on the Debtors' Estates. Under chapter 7, one or more trustees would be elected or appointed to administer the Estates, to resolve pending controversies, including Disputed Claims against the Debtors and Claims of the various estates against other parties, and to make distributions to holders of Claims. A chapter 7 trustee would be entitled to compensation in accordance with the scale set forth in section 326 of the Bankruptcy Code, and the trustee would also incur significant administrative expenses.

There is a strong probability that a chapter 7 trustee in these Cases would not possess any particular knowledge about the Debtors. The Debtors assert that the value of the Debtors' assets would be greatly diminished thereby. Additionally, a trustee would probably seek the assistance of professionals who may not have any significant background or familiarity with these Cases. The trustee and any professionals retained by the trustee likely would expend significant time familiarizing themselves with these Cases. This would result in duplication of effort, increased expenses, and delay in payments to creditors.

In an analysis of liquidation under chapter 7, it must be recognized that additional costs in both time and money are inevitable. In addition to these time and monetary costs, there are other problems in a chapter 7 liquidation that would result in a substantially smaller recovery for holders of Claims and Equity Interests than under the Plan.

Further, distributions under the Plan probably would be made earlier than would distributions in a chapter 7 case. Distributions of the proceeds of a chapter 7 liquidation might not occur until one or more years after the completion of the liquidation in order to afford the trustee the opportunity to resolve claims and prepare for distributions.

THE DEBTORS BELIEVE THAT THE PLAN AFFORDS SUBSTANTIALLY GREATER RECOVERY TO HOLDERS OF CLAIMS AND EQUITY INTERESTS THAN SUCH HOLDERS WOULD RECEIVE IF THE DEBTORS WERE LIQUIDATED UNDER CHAPTER 7 OF THE BANKRUPTCY CODE.

In the Liquidation Analysis, the Debtors have taken into account the nature, status, and underlying value of their assets, the ultimate realizable value of such assets, and the extent to which the assets are subject to liens and security interests. In the opinion of the Debtors, the recoveries projected to be available in liquidation will not afford holders of Allowed Claims and Allowed Equity Interests as great a realization as does the Plan.

### ARTICLE XI

### CERTAIN RISK FACTORS TO BE CONSIDERED

PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS SET FORTH BELOW, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT. THESE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE

ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION. ADDITIONAL RISKS AND UNCERTAINTIES NOT PRESENTLY KNOWN TO THE DEBTORS OR THAT THEY CURRENTLY DEEM IMMATERIAL MAY ALSO HARM THEIR BUSINESSES.

## 11.1. General Risks

It is possible that the bankruptcy proceeding could adversely affect (i) the Debtors' relationships with their key vendors, (ii) the Debtors' relationships with their customers, (iii) the Debtors' relationships with their employees, and (iv) the legal rights and obligations of the Debtors under agreements that may be in default as a result of the Cases.

The extent to which the chapter 11 proceeding has and will continue to disrupt the Debtors' businesses will likely be directly related to the length of time it takes to complete the proceeding. If the Debtors are unable to obtain Confirmation of the Plan on a timely basis because of a challenge to the Plan or a failure to satisfy the conditions to the Plan, they may be forced to operate in chapter 11 for an extended period while they try to develop a different reorganization plan that can be confirmed. That would increase both the probability and the magnitude of the adverse effects described in this Disclosure Statement.

## 11.2. Certain Business and Industry Risks Affecting the Debtors and/or the Reorganized Debtors

(a) The Debtors' current financial condition has adversely affected their business operations and their business prospects.

The Debtors' current financial condition and its resulting uncertainty have been disruptive to its businesses. Management has devoted substantial time and attention to improving the Debtors' financial condition, thereby reducing its focus on operating the businesses. In addition, as a result of the Debtors' current financial condition and its resulting uncertainty, the Debtors have laid-off a substantial number of office employees. Although a KERP has been implemented in these Cases, these lay-offs may negatively impact employee morale and productivity and cause voluntary employee resignations. Further, the Debtors' current financial condition and the resulting uncertainty associated with the ability of the Debtors or Reorganized Debtors to continue as a going concern may cause operating partners to terminate their relationship with the Debtors and/or Reorganized Debtors or to refuse to extend credit to Debtors and/or Reorganized Debtors on acceptable terms or at all. These developments could have a material adverse effect on the Debtors' or Reorganized Debtors' business, operations, financial condition and cash flows.

(b) Properties the Debtors have acquired may not produce as projected, and the Debtors may not have fully identified liabilities associated with these properties.

In the past, the Debtors acquired producing properties from third parties, and these acquisitions required assessments of many factors, which are inherently inexact and may be inaccurate, including:

- the amount of recoverable reserves and the rates at which those reserves will be produced;

- future oil and natural gas prices;

- estimates of operating costs;

- estimates of future development costs;

- estimates of the costs and timing of plugging and abandonment activities; and

- potential environmental and other liabilities.

The Debtors' assessments may not have revealed all existing or potential problems, nor permitted them to become adequately familiar with the properties to evaluate fully their deficiencies and capabilities. In the course of their due diligence, the Debtors may not have inspected every well or lease. The Debtors' inspections may not have identified structural and environmental problems or other risks that the properties may not perform in accordance with their expectations.

(c) <u>Loss of key management and failure to attract qualified management could negatively impact the Debtors' and/or Reorganized Debtors' operations.</u>

Successfully implementing their strategies will depend, in part, on the Debtors' and/or Reorganized Debtors, management team. The loss of members of the Debtors' and/or Reorganized Debtors' management team could have an adverse effect on their business and the implementation of the Restructuring. The establishment of the MIP in these Cases may limit some of this risk, however.

(d) <u>Exploring for and producing oil and natural gas are high-risk activities with many uncertainties that could adversely affect the Reorganized Debtors' businesses, financial condition or results of operations.</u>

The Reorganized Debtors future success will depend on the success of their exploration and production activities. The Reorganized Debtors' oil and natural gas exploration and production activities will be subject to numerous risks beyond their control, including the risk that drilling will not result in commercially viable oil or natural gas production. The Reorganized Debtors' decisions to purchase, explore, develop or otherwise exploit prospects or properties will depend in part on the evaluation of data obtained through geophysical and geological analyses, production data and engineering studies, the results of which are often inconclusive or subject to varying interpretations. The cost of drilling, completing and operating wells is often uncertain before drilling commences.

Overruns in budgeted expenditures are common risks that can make a particular project uneconomical. Further, many factors may curtail, delay or cancel drilling activity, including the following:

- pressure or irregularities in geological formations;

- shortages of or delays in obtaining equipment and qualified personnel;

- equipment failures or accidents;

- reductions in oil and natural gas prices;

- title problems;

- limitations in the market for oil and natural gas; and

- cost of services to drill wells.

(e)     The continuing crisis in the financial and credit markets, and volatility in oil and natural gas prices may affect the Reorganized Debtors' ability to obtain funding or obtain funding on acceptable terms.  These impacts may hinder or prevent the Reorganized Debtors from meeting their future capital needs and/or continuing to meet their obligations and conduct their business.

Global financial markets and economic conditions have recently been, and continue to be, disrupted and volatile.  The debt and equity capital markets have become exceedingly distressed. These issues, along with significant asset write-offs in the financial services sector, the re-pricing of credit risk and the current weak economic conditions, have made, and will likely continue to make, it difficult to obtain debt or equity capital funding.

Due to these factors, there can be no assurance that funding will be available to the Reorganized Debtors if needed, and to the extent required, on acceptable terms.  If funding is not available as needed, or is available only on unfavorable terms, the Reorganized Debtors may be unable to meet their obligations as they come due, enhance their business, complete acquisitions or otherwise take advantage of business opportunities, or respond to competitive pressures, any of which could have a material adverse effect on their production, revenues, results of operations, financial position and cash flows.

(f)     A substantial or extended decline, or wide fluctuations, in oil and natural gas prices may have a material adverse effect on the Reorganized Debtors' businesses, financial condition, results of operations, cash flows and their ability to meet their debt obligations, operating cost requirements, capital expenditure requirements and other financial commitments.

The price the Reorganized Debtors will receive for their oil and natural gas production will heavily influence their revenue, profitability, financial condition, cash flow, access to capital and future rate of growth.  Oil and natural gas are commodities and, as a result, their prices are subject to wide fluctuations in response to relatively minor changes in supply and demand. Historically, the markets for oil and natural gas have been volatile.  These markets will likely continue to be volatile in the future.  The prices the Reorganized Debtors will receive for their production, and the levels of their production, depend on numerous factors beyond their control. These factors include:

- changes in the global supply, demand and inventories of oil;

- domestic natural gas supply, demand and inventories;

- the actions of the Organization of Petroleum Exporting Countries;

- the price and quantity of foreign imports of oil;

- the price and availability of liquefied natural gas imports;

- political conditions, including embargoes, in or effecting other oil-producing countries;

- economic and energy infrastructure disruptions caused by actual or threatened acts of war, or terrorist activities, or national security measures deployed to protect the United States from such actual or threatened acts or activities;

- economic stability of major oil and natural gas companies and the interdependence of oil and natural gas and energy trading companies;

- the level of worldwide oil and natural gas exploration and production activity;

- weather conditions, including energy infrastructure disruptions resulting from those conditions;

- technological advances effecting energy consumption; and

- the price and availability of alternative fuels.

In addition to decreasing the Reorganized Debtors' revenues and cash flows on a per unit basis, lower oil and natural gas prices may reduce the amount of oil and natural gas that the Reorganized Debtors could produce economically.

(g)     The Debtors and/or Reorganized Debtors may incur substantial losses and be subject to substantial liability claims as a result of their oil and natural gas operations. Their insurance coverage may not be sufficient or may not be available to cover some of these losses and claims.

Losses and liabilities arising from uninsured and underinsured events could materially and adversely effect the Debtors' and/or Reorganized Debtors' businesses, financial condition or results of operations. The Debtors' and/or Reorganized Debtors' oil and natural gas exploration and production activities are subject to all of the operating risks associated with drilling for and producing oil and natural gas, including the possibility of:

- environmental hazards, such as uncontrollable flows of oil, natural gas, well fluids, toxic gas or other pollution into the environment, including groundwater and shoreline contamination;

- abnormally pressured formations;

- mechanical difficulties;

- fires and explosions;

- personal injuries and death; and

- natural disasters.

Any of these risks could adversely affect the Debtors' and/or Reorganized Debtors' ability to conduct operations or reorganize, or could result in substantial losses. The Debtors currently maintain insurance at levels that they believe are consistent with industry practices and their particular needs, but they are not fully insured against all risks. The Debtors and/or Reorganized Debtors may elect not to obtain insurance for certain risks or to limit levels of coverage if they believe that the cost of available insurance is excessive relative to the risks involved.

(h)     Reserve estimates depend on many assumptions that may prove to be inaccurate. Any material inaccuracies in these reserve estimates or underlying assumptions will materially affect the quantities and estimated values of the Debtors' and/or Reorganized Debtors' reserves.

The process of estimating oil and natural gas reserves is complex, requiring interpretations of available technical data and many assumptions, including assumptions relating to economic factors. Any significant inaccuracies in these interpretations or assumptions could materially affect the estimated quantities and present value of reserves disclosed in Crusader's filings with the SEC.

Estimates of oil and natural gas reserves are inherently imprecise. The preparation of the Debtors' or Reorganized Debtors' reserve estimates requires, or will require, projections of production rates and timing of development expenditures, analysis of available geological, geophysical, production and engineering data, and assumptions about oil and natural gas prices, drilling and operating expenses, capital expenditures, taxes and availability of funds. The extent, quality and reliability of this data can vary. Actual future production, oil and natural gas prices, revenues, taxes, development expenditures, drilling and operating expenses and quantities of recoverable oil and natural gas reserves will vary from the Debtors' and/or Reorganized Debtors' estimates.

If the Debtors' and/or Reorganized Debtors estimates of the recoverable reserve volumes on a property are revised downward, or if development costs exceed previous estimates, or if commodity prices decrease, as discussed elsewhere in these risk factors, the Debtors and/or Reorganized Debtors may be required to record an impairment to their property and equipment, which could have a material adverse effect on their financial position and results of operations. Once recorded, an impairment of property and equipment may not be reversed at a later date. The ability to obtain financing depends in part on the estimate of the proved oil and natural gas reserves for properties that will serve as collateral. If proved reserves on a property are revised downward, the Reorganized Debtors' ability to acquire adequate funding may be significantly reduced.

(i)     If the Reorganized Debtors are unable to replace the reserves that they have produced, their reserves and revenues will decline.

The Reorganized Debtors' future success depends on their ability to find, develop and acquire additional oil and natural gas reserves that are economically recoverable. Lower commodity prices and increased costs associated with exploration and production may lower the threshold of economic recoverability. Additionally, the Debtors have substantially cut the capital expenditure budget for 2009 in order to conserve cash resources, which will likely negatively impact the ability of the Reorganized Debtors to replace existing reserves produced. Without continued successful acquisition or exploration activities, the Reorganized Debtors' reserves and revenues will decline as a result of their current reserves being depleted by production. The Reorganized Debtors may not be able to find or acquire additional reserves on an economic basis.

(j)     The Reorganized Debtors' businesses will require substantial capital investment and maintenance expenditures, and their capital resources may not be adequate to provide for all of their cash requirements.

The Reorganized Debtors' operations will be capital intensive. The Reorganized Debtors' ability to replace their oil and natural gas production and maintain their production levels and reserves requires extensive capital investment. The Reorganized Debtors' businesses will also require substantial expenditures for routine maintenance. They may not have access to the capital required to maintain their production levels and reserves.

(k)     Impediments to transporting the Reorganized Debtors' products may limit their access to oil and natural gas markets or delay their production.

The Reorganized Debtors' ability to market their oil and natural gas production will depend on a number of factors, including the proximity of their reserves to pipelines and terminal facilities, the availability and capacity of gathering systems, pipelines and processing facilities owned and operated by third parties and the availability of satisfactory oil and natural gas transportation arrangements. These facilities and systems may be shut-in due to factors outside of the Reorganized Debtors' control. If any of these third party services and arrangements become partially or fully unavailable, or if the Reorganized Debtors are unable to secure such services and arrangements on acceptable terms, the Reorganized Debtors' production could be limited or delayed and their revenues could be adversely affected.

(l)     The Reorganized Debtors will be subject to extensive governmental laws and regulations, including environmental regulations, which can adversely affect the cost, manner or feasibility of doing business and could result in restrictions on their operations or civil or criminal liability.

The Reorganized Debtors' exploration, development and production operations, their activities in connection with storage and transportation of oil and other hydrocarbons and their use of facilities for treating, processing or otherwise handling hydrocarbons and related wastes will be subject to various federal, state and local laws, orders and regulations. Failure to comply with these laws and regulations may result in the assessment of administrative, civil and criminal fines and penalties or the imposition of injunctive relief.

Future compliance with laws and regulations, including environmental, production, transportation, sales, rate and tax rules and regulations, and any changes to such laws or regulations, may reduce the Debtors' profitability and have a material adverse effect on their financial position, liquidity and cash flows. Such laws and regulations may require more stringent and costly waste handling, storage, transport, disposal or cleanup requirements.

(m)     Competition in the oil and natural gas industry is intense, which may adversely affect the Reorganized Debtors.

The Reorganized Debtors will operate in a highly competitive environment for acquiring oil and natural gas properties, marketing oil and natural gas and securing trained personnel. Many of their competitors possess and employ financial, technical and personnel resources substantially greater than theirs. Those companies may be able to pay more for productive oil and natural gas properties and exploratory prospects and to define, evaluate, bid for and purchase a greater number of properties and prospects than the Reorganized Debtors' financial or personnel resources permit. The Reorganized Debtors' ability to acquire additional prospects and to discover reserves in the future will depend on their ability to evaluate and select suitable properties and to consummate transactions in a highly competitive environment. Also, there is substantial competition for capital available for investment in the oil and natural gas industry. There can be no assurance that the Reorganized Debtors will be able to compete successfully in the future in acquiring prospective reserves, developing reserves, marketing hydrocarbons, attracting and retaining quality personnel and raising additional capital. If the Debtors are unable to compete successfully in these areas in the future, their future revenues and growth may be diminished or restricted.

(n)     Recent adverse publicity about the Debtors, including their chapter 11 filings, may harm the Reorganized Debtors' ability to compete in a highly competitive environment.

Recent adverse publicity concerning the Debtors' financial condition may harm the Reorganized Debtors' ability to attract new customers and to maintain favorable relationships with existing customers, suppliers and partners. For example, it may be more challenging for the Reorganized Debtors to engage in risk sharing transactions, and some of the Debtors' current suppliers may require cash payments rather than extending credit, which will adversely affect the Reorganized Debtors' liquidity. The Reorganized Debtors may also experience difficulty attracting and retaining key employees.

(o)     Certain U.S. federal income tax deductions currently available with respect to oil and gas exploration and development may be eliminated as a result of future legislation.

President Obama's Proposed Fiscal Year 2010 Budget includes proposed legislation that would, if enacted into law, make significant changes to United States tax laws, including the elimination of certain key U.S. federal income tax incentives currently available to oil and natural gas exploration and production companies. These changes include, but are not limited to, (i) the repeal of the percentage depletion allowance for oil and natural gas properties, (ii) the elimination of current deductions for intangible drilling and development costs, (iii) the

elimination of the deduction for certain domestic production activities, and (iv) an extension of the amortization period for certain geological and geophysical expenditures. It is unclear whether any such changes will be enacted or how soon any such changes could become effective. The passage of any legislation as a result of these proposals or any other similar changes in U.S. federal income tax laws could negatively affect our financial condition and results of operations.

(p)     Federal and state legislation and regulatory initiatives relating to hydraulic fracturing could result in increased costs and additional operating restrictions or delays.

Congress is currently considering legislation to amend the federal Safe Drinking Water Act to require the disclosure of chemicals used by the oil and gas industry in the hydraulic fracturing process. Hydraulic fracturing involves the injection of water, sand and chemicals under pressure into rock formations to stimulate natural gas production. Sponsors of bills currently pending before the Senate and House of Representatives have asserted that chemicals used in the fracturing process could adversely affect drinking water supplies. The proposed legislation would require the reporting and public disclosure of chemicals used in the fracturing process, which could make it easier for third parties opposing the hydraulic fracturing process to initiate legal proceedings based on allegations that specific chemicals used in the fracturing process could adversely affect groundwater. In addition, these bills, if adopted, could establish an additional level of regulation at the federal level that could lead to operational delays or increased operating costs and could result in additional regulatory burdens that could make it more difficult to perform hydraulic fracturing and increase our costs of compliance and doing business.

(q)     Information regarding the Debtors incorporated by reference herein speaks as to prior dates and may have changed or may change materially, and the Debtors are not currently obligated to file reports.

The information incorporated by reference herein regarding the Debtors speaks only as to the date of the reports incorporated by reference herein or as of another date specified in such reports. Such information may have changed materially from the date of such filings to the date of this Disclosure Statement, and may change materially from the date of this Disclosure Statement through the date of the Confirmation Hearing. The Debtors filed a Form 15 on May 11, 2009 suspending its obligations to file reports under Section 13 and 15(d) of the 1934 Act. The Debtors have not filed any reports with the SEC since filing a Current Report on Form 8-K on April 6, 2009. The last Annual Report filed on Form 10-K by the Debtors was filed for the quarter ended December 31, 2007, and the last Quarterly Report filed on Form 10-Q by the Debtors was filed for the quarter ended September 30, 2008.

## 11.3.   Certain Bankruptcy Law Considerations

(a)     Parties-in-Interest May Object To the Plan and Confirmation

Section 1129 of the Bankruptcy Code provides certain requirements for a chapter 11 plan to be confirmed, parties-in-interest may object to confirmation of a plan based on an alleged failure to fulfill these requirements or other reasons. The Debtors believe that the Plan complies with the requirements of the Bankruptcy Code.

    (b)  <u>Parties-in-Interest May Object To the Debtors' Classification of Claims and Equity Interests</u>

    Section 1122 of the Bankruptcy Code provides that a plan of reorganization may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class.

    The Debtors believe that the classification of Claims and Equity Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because each class of Claims and Equity Interests encompass Claims or Equity Interests that are substantially similar to the other Claims or Equity Interests in each such class.

    (c)  <u>Undue Delay In Confirmation May Disrupt the Operations of the Debtors and Have Potential Adverse Effects</u>

    The Debtors cannot accurately predict or quantify the impact on their business operations of prolonging the Cases. A lengthy time in bankruptcy could adversely affect the Debtors' relationships with their customers, oil and gas leases, and employees, which, in turn, could adversely affect the Debtors' competitive position, financial condition, results of operations and cash flows.

    Furthermore, prolonging the Cases could adversely affect the Debtors' ability to maintain their existing business and to seek out and take advantage of new business opportunities. So long as the Cases continue, the Debtors' senior management will be required to spend a significant amount of time and effort dealing with the Debtors' reorganization instead of focusing exclusively on its current business and developing future business opportunities for the Debtors.

    (d)  <u>The Debtors May Not Be Able To Obtain Confirmation of the Plan</u>

    The Debtors cannot ensure they will receive enough acceptances to confirm the Plan. But, even if the Debtors do receive enough acceptances, there can be no assurance that the Bankruptcy Court will confirm the Plan. Even if enough acceptances are received and, with respect to those Classes deemed to have rejected the Plan, the requirements for "cramdown" are met, the Bankruptcy Court, which as a court of equity may exercise substantial discretion, may choose not to confirm the Plan or may require additional solicitations or consents prior to confirming the Plan. Section 1129 of the Bankruptcy Code requires, among other things, that the value of distributions to dissenting holders of Claims and Equity Interests may not be less than the value such holders would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. Although the Debtors believe that the Plan will meet such tests, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

    The Debtors' ability to propose and confirm an alternative reorganization plan is uncertain. Confirmation of any alternative reorganization plan under chapter 11 of the Bankruptcy Code would likely take significantly more time and result in delays in the ultimate distributions to the holders of Claims. If confirmation of an alternative plan of reorganization is not possible, the Debtors would likely be liquidated. Based upon the Debtors' analysis, liquidation under chapter 7 would result in distributions of reduced value, if any, to holders of

Claims and Equity Interests.  In a liquidation under chapter 11, the Debtors' assets could be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7. However, it is unlikely that any liquidation would realize the full going concern value of their businesses.  Consequently, the Debtors believe that a liquidation under chapter 11 would also result in smaller distributions to the holders of Claims than those provided for in the Plan.

(e)     Failure to Consummate or Effectuate the Plan

Consummation of the Plan is conditioned upon, among other things, entry of the Confirmation Order and an order (which may be the Confirmation Order) approving any transactions contemplated thereunder.  As of the date of this Disclosure Statement, there can be no assurance that any or all of the foregoing conditions will be met (or waived) or that the other conditions to consummation, if any, will be satisfied.  Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Plan will be consummated and effectuated and the Restructuring completed.  For risks associated with failure to consummate the Plan, see Article XI of this Disclosure Statement.

(f)     Risk of Non-Occurrence of the Effective Date

Although the Debtors believe that the Effective Date may occur within a reasonable time following the Confirmation Date, there can be no assurance as to such timing.

(g)     Claims Estimation

There can be no assurance that the estimated amount of Claims and Equity Interests are correct, and the actual Allowed amounts of Claims and Equity Interests may differ from estimates.  The estimated amounts are subject to certain risks, uncertainties and assumptions. Should one or more of these risks or uncertainties materialize or should underlying assumptions prove incorrect, the actual Allowed amounts of Claims and Equity Interests may vary from those estimated therein.

**11.4.   Certain Tax Considerations, Risks and Uncertainties**

THERE ARE A NUMBER OF MATERIAL INCOME TAX CONSIDERATIONS, RISKS AND UNCERTAINTIES ASSOCIATED WITH CONSUMMATION OF THE PLAN. INTERESTED PARTIES SHOULD READ CAREFULLY THE DISCUSSION SET FORTH IN ARTICLE VIII OF THIS DISCLOSURE STATEMENT FOR A DISCUSSION OF CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE TRANSACTIONS CONTEMPLATED UNDER THE PLAN BOTH TO THE DEBTORS AND TO HOLDERS OF CLAIMS THAT ARE IMPAIRED UNDER THE PLAN.

**11.5.   Certain Risks Related to the SandRidge Parties**

(a)     SandRidge Risk Factors.

The risk factors disclosed by SandRidge in its Annual Report on Form 10-K for the year ended December 31, 2008 and its Quarterly Report on Form 10-Q for the quarter ended June 30, 2009 are hereby incorporated by reference and should be carefully considered by the holders of

Allowed Second Lien Secured Claims who are entitled to receive the SandRidge Energy Shares and SandRidge Energy Warrants under the Plan.

(b)    _Information regarding SandRidge incorporated by reference herein has not been independently verified by the Debtors, speaks as to prior dates and may have changed or may change materially._

The information incorporated by reference herein regarding SandRidge has not been independently verified by the Debtors for accuracy or completeness.  Such information speaks only as to the date of the reports incorporated by reference herein or as of another date specified in such reports.  Such information may have changed materially from the date of such filings to the date of this Disclosure Statement, and may change materially from the date of this Disclosure Statement through the date of the Confirmation Hearing.

(c)    _Market value of consideration to be paid under the Stock Purchase Agreement may change materially from the date of the Stock Purchase Agreement through the Closing Date, and recipients of SandRidge Energy Shares and SandRidge Energy Warrants will be subject to the Lock-Up Restrictions._

Under the Stock Purchase Agreement, SandRidge will pay a combination of cash, SandRidge Energy Shares and SandRidge Energy Warrants as consideration for the purchase of the equity of Reorganized Crusader.  The number of SandRidge Energy Shares is subject to reduction in certain circumstances as set forth in Sections 2.01(i) and 2.03 of the Stock Purchase Agreement, as summarized in Section 6.1 of this Disclosure Statement.  The number of SandRidge Energy Shares, the number of SandRidge Energy Warrants and the exercise price of such SandRidge Energy Warrants to be delivered pursuant to the Stock Purchase Agreement will not be adjusted based on any change in the stock price of SandRidge after the date of the Stock Purchase Agreement.  Therefore, the market price of the SandRidge Energy Shares and the value of the SandRidge Energy Warrants may change materially from the date of the Stock Purchase Agreement to the Closing Date.

The recipients of SandRidge Energy Shares, the SandRidge Energy Warrants and the SandRidge Energy Stock issuable upon exercise of the SandRidge Energy Warrants under the Stock Purchase Agreement are subject to the Lock-Up Restrictions, which include without limitation restrictions prohibiting the transferees from selling, or entering into any swap or other transaction that transfers the economic consequence of ownership of, such SandRidge Energy Shares and SandRidge Energy Warrants (or the SandRidge Energy Stock issuable upon exercise of the SandRidge Energy Warrants) for a period of 180 days following the Closing Date.  Therefore, the market price of the SandRidge Energy Shares and the value of the SandRidge Energy Warrants may change materially from the Closing Date through the date that such recipients are permitted to sell such SandRidge Energy Shares and SandRidge Energy Warrants.

(d)    _Certain Closing Conditions Related to the SandRidge Transaction; Termination Rights of SandRidge Energy._

The obligations of the SandRidge Parties to consummate the transactions contemplated by the Stock Purchase Agreement are subject to the satisfaction of various closing conditions,

including but not limited to, (i) satisfaction of conditions to the effectiveness of the Plan and effectiveness of the Plan, (ii) the Bid Protection Order, the Disclosure Statement Order and the Confirmation Order must have been entered into by the Bankruptcy Court and each such order being a SandRidge Final Order and in full effect, (iii) the Bankruptcy Court determining that the Plan is feasible, (iv) receipt by the SandRidge Parties of certain financial statements and financial data of Crusader, and (v) the SandRidge Energy Shares being approved for listing on the New York Stock Exchange. Therefore, if the Plan is rejected, or other conditions are not satisfied or waived, the parties will not consummate the transactions contemplated by the Stock Purchase Agreement. In addition, the failure to satisfy some of these conditions by certain specified dates will give SandRidge Energy a right to terminate the Stock Purchase Agreement. Please see the Stock Purchase Agreement for more information regarding conditions and termination rights that may effect the consummation of the transactions contemplated thereby.

## ARTICLE XII

## THE SOLICITATION; VOTING PROCEDURES

### 12.1. Voting Deadline

The period during which Ballots with respect to the Plan will be accepted by the Debtors will terminate on _____, 2009 (the "Voting Deadline"). Except to the extent permitted by the Bankruptcy Court, Ballots that are received after the Voting Deadline will not be counted or otherwise used by the Debtors in connection with the Debtors' request for Confirmation of the Plan (or any permitted modification thereof).

### 12.2. Voting Procedures

Under the Bankruptcy Code, for purposes of determining whether enough acceptances have been received, only holders of Claims who actually vote will be counted. The failure of a holder to deliver a duly executed Ballot will be deemed to constitute an abstention by such holder with respect to voting on the Plan and such abstentions, will not be counted as votes for or against the Plan.

The Debtors are providing a copy of this Disclosure Statement, the Plan, Ballot and other necessary information (the "Solicitation Package") to holders of Claims whose names appear as of _____, 2009 in the records maintained by the Debtors. Holders of Claims should provide all of the information requested by the Ballots and return all Ballots in the return envelope provided with each such Ballot. As related to holders of Claims in Class 4 (Allowed Second Lien Secured Claims), such solicitation shall be submitted to the Second Lien Agent, who shall be solely responsible for disseminating the Solicitation Package to the Second Lien Holders and soliciting the votes from the same.

### 12.3. Miscellaneous

Additional Voting and Solicitation information is contained in the Disclosure Statement Order, attached hereto as Exhibit C.

### 12.4. Fiduciaries and Other Representatives

If a Ballot is signed by a trustee, executor, administrator, guardian, attorney-in-fact, officer of a corporation, or another acting in a fiduciary or representative capacity, such Person should indicate such capacity when signing and, unless otherwise determined by the Debtors, must submit proper evidence satisfactory to the Debtors of authority to so act. Authorized signatories should submit the separate Ballot of each beneficial owner for whom they are voting.

UNLESS THE APPLICABLE BALLOT BEING FURNISHED IS TIMELY SUBMITTED TO THE SOLICITATION AGENT ON OR PRIOR TO THE VOTING DEADLINE, SUCH BALLOT WILL BE REJECTED AS INVALID AND WILL NOT BE COUNTED AS AN ACCEPTANCE OR REJECTION OF THE PLAN. IN NO CASE SHOULD A BALLOT BE DELIVERED TO ANY ENTITY OTHER THAN THE NOMINEE OR THE SOLICITATION AGENT.

### 12.5. <u>Parties Entitled to Vote</u>

Under section 1124 of the Bankruptcy Code, a class of claims or equity interests is deemed to be "Impaired" under a plan unless (i) the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or equity interest entitles the holder thereof or (ii) notwithstanding any legal right to an accelerated payment of such claim or equity interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or equity interest as it existed before the default.

In general, a holder of a claim or equity interest may vote to accept or to reject a plan if the claim or equity interest is "allowed," which means generally that no party-in-interest has objected to such claim or equity interest, and the claim or equity interest is Impaired by the plan. If, however, the holder of an Impaired claim or equity interest will not receive or retain any distribution under the plan on account of such claim or equity interest, the Bankruptcy Code deems such holder to have rejected the plan, and, accordingly, holders of such claims and equity interests do not actually vote on the plan. If a claim or equity interest is not Impaired by the plan, the Bankruptcy Code deems the holder of such claim or equity interest to have accepted the plan and, accordingly, holders of such claims and equity interests are not entitled to vote on the plan.

Classes 1, 2, and 3 of the Plan are Unimpaired. Accordingly, under section 1126(f) of the Bankruptcy Code, all such Classes of Claims are deemed to have accepted the Plan and are not entitled to vote in respect of the Plan.

Classes 4, 5, 6, 7A and 7B of the Plan are Impaired. Therefore, the holders of Claims in Classes 4, 5, 6, 7A and 7B are being solicited for votes in favor of the Plan. The Second Lien Agent is not authorized to submit a vote on behalf of any of the Second Lien Holders of Claims in Class 4 and 7B, who are entitled to vote on the Plan; rather, each Second Lien Holder must submit its own vote on the Plan.

Classes 8 and 9 of the Plan are Impaired and will not receive or retain any distribution or property under the Plan on account of their respective Claims or Equity Interests. Accordingly, under section 1126(g) of the Bankruptcy Code, such Classes 8 and 9 of Claims and Equity

Interests, respectively, are deemed to have rejected the Plan and are not entitled to vote on the Plan.

A vote may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

## 12.6.   Agreements upon Furnishing Ballots

The delivery of an accepting Ballot to the Solicitation Agent by a holder of Claims pursuant to one of the procedures set forth above will constitute the agreement of such holder to accept (i) all of the terms of, and conditions to, the Solicitation and (ii) the terms of the Plan (including the releases and injunctions thereunder); provided, however, all parties in interest retain their right to object to Confirmation of the Plan pursuant to section 1128 of the Bankruptcy Code.

## 12.7.   Waivers of Defects, Irregularities, Etc.

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawal of Ballots will be determined by the Solicitation Agent and the Debtors in their sole discretion, which determination will be final and binding.  As indicated in Section 12.8 of this Disclosure Statement, effective withdrawals of Ballots must be delivered to the Solicitation Agent prior to the Voting Deadline.  The Debtors reserve the absolute right to contest the validity of any such withdrawal.  The Debtors also reserve the right to reject any and all Ballots not in proper form, the acceptance of which would, in the opinion of the Debtors or their counsel, be unlawful.  The Debtors further reserve the right to waive any defects or irregularities or conditions of delivery as to any particular Ballot.  The interpretation (including of the Ballot and the respective instructions thereto) by the Debtors, unless otherwise directed by the Bankruptcy Court, will be final and binding on all parties.  Unless waived, any defects or irregularities in connection with deliveries of Ballots must be cured within such time as the Debtors (or the Bankruptcy Court) determine.  Neither the Debtors nor any other Person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots nor will any of them incur any liabilities for failure to provide such notification.  Unless otherwise directed by the Bankruptcy Court, delivery of such Ballots will not be deemed to have been made until such irregularities have been cured or waived.  Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) will be invalidated.

## 12.8.   Withdrawal of Ballots; Revocation

Any party who has delivered a valid Ballot for the acceptance or rejection of the Plan may withdraw such acceptance or rejection by delivering a written notice of withdrawal to the Solicitation Agent at any time prior to the Voting Deadline.  A notice of withdrawal, to be valid, must (i) contain the description of the Claim(s) to which it relates and the aggregate principal amount represented by such Claim(s), (ii) be signed by the withdrawing party in the same manner as the Ballot being withdrawn, (iii) contain a certification that the withdrawing party owns the Claim(s) and possesses the right to withdraw the vote sought to be withdrawn and

(iv) be received by the Solicitation Agent in a timely manner at the address set forth in Section 1.5 of this Disclosure Statement. The Debtors intend to consult with the Solicitation Agent to determine whether any withdrawals of Ballots were received and whether enough acceptances of the Plan have been received. As stated above, the Debtors expressly reserve the absolute right to contest the validity of any such withdrawals of Ballots.

A purported notice of withdrawal of Ballots which is not received in a timely manner by the Solicitation Agent will not be effective to withdraw a previously cast Ballot.

Any party who has previously submitted to the Solicitation Agent prior to the Voting Deadline a properly completed Ballot may revoke such Ballot and change his, her or its vote by submitting to the Solicitation Agent prior to the Voting Deadline a subsequent properly completed Ballot for acceptance or rejection of the Plan. In the case where more than one timely, properly completed Ballot is received, only the Ballot which bears the latest date will be counted for purposes of determining whether enough acceptances have been received pursuant to section 1126 of the Bankruptcy Code.

The Debtors will pay all costs, fees and expenses relating to the Solicitation.

### 12.9. Further Information; Additional Copies

If you have any questions or require further information about the voting procedure for voting your Claim or Equity Interest, or about the Solicitation Package, or if you wish to obtain an additional copy of the Plan, the Disclosure Statement, the Plan Supplement[13] or any exhibits to such documents (at your own expense, unless otherwise specifically required by Federal Rule of Bankruptcy Procedure 3017(d)), please contact the Solicitation Agent:

> Crusader Energy Group Inc.
> c/o BMC-Analytics Incorporated
> 18750 Lake Drive East
> Chanhassen, MN 55317-9384
> Telephone: 888.909.0100

---

[13] Additionally, copies of these documents may also be obtained from the Bankruptcy Courts' docket for these Cases.

## RECOMMENDATION AND CONCLUSION

For all of the reasons set forth in this Disclosure Statement, the Debtors believe that Confirmation and consummation of the Plan is preferable to all other alternatives discussed herein. Consequently, the Debtors, with the support of the First Lien Holders, the Second Lien Holders, and the Committee urge all holders of Claims to vote to accept the Plan, and to complete and return their Ballots so that they will be received by the Solicitation Agent on or before 5:00 p.m., Central time, on _____, 2009.

Dated: Dallas, Texas
        October 2, 2009

                          CRUSADER ENERGY GROUP INC.
                          AND ITS AFFILIATED DEBTORS


                          By: _____ */s/ James R. Latimer, III* _____
                              Name:  James R. Latimer, III
                              Title:   Chief Restructuring Officer

## EXHIBIT A

## Plan of Reorganization

## [See Docket No. 665]

**<u>EXHIBIT B</u>**

**Defined Terms**

**[To Come]**

## EXHIBIT C

## Disclosure Statement Order

## [To Come]

## **EXHIBIT D**

### **M&M Claim Schedule**

### **[To Come]**

## EXHIBIT E

**Well-By-Well Lien Chart**

**[To Come]**

## EXHIBIT F

**Stock Purchase Agreement**

**[See Docket No. 664]**

## EXHIBIT G

## Liquidation Analysis

## [To Come]