

U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**
TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**United States Bankruptcy Judge**

**Signed February 03, 2011**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| CRUSADER ENERGY GROUP INC., et al., | § | CASE NO. 09-31797-BJH-11 |
| | § | |
| Debtors. | § | CHAPTER 11 |

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

Before the Court is the objection to claim (the "Objection") filed by Jeffrey A. Compton, Liquidating Trustee of the KRU Liquidating Trust (the "Liquidating Trustee"). The Objection objects to the claim of Double C Contracting, Inc. ("Double C"). Double C asserted a secured claim against the debtor Crusader Energy Group, Inc. ("Crusader" or the "Debtor"). On December 16, 2009 this Court entered its Order Confirming Second Amended Joint Plan of Reorganization for the Debtor and certain of its affiliates (the "Plan"), pursuant to which the Liquidating Trustee was appointed. The Liquidating Trustee is the proper party to pursue the Objection pursuant to the Plan.

The Court tried the Objection on January 13, 2011. The Court adopts the parties' Stipulated Facts as set forth in their Joint Pretrial Statement and makes the following additional findings of fact and conclusions of law in connection with its consideration of the Objection.

**FINDINGS OF FACT**

1. In November of 2006, Double C was hired by Westside Energy ("Westside"), the Debtor's predecessor, to construct a platform or foundation for a drilling rig at a jobsite in Hill County, Texas.

2. Westside signed a work order for the job that was blank as to the cost of the job.

3. At the time the work order was signed, Westside was less concerned about the cost of the job and was more concerned about the job getting done properly and quickly. This was so because the original drilling rig at the jobsite had broken down, a new rig had been leased and transported to the jobsite, but the weight of the new rig was too much for the existing infrastructure. In short, a rig costing Westside $25,000 a day was sitting idle at the jobsite until a platform or foundation could be constructed that would support the weight of the new rig. Until that platform or foundation was constructed, the new rig would remain idle and the Primula 1-H well (the "Well") could not be completed.

4. Charlie McDonald ("McDonald"), Double C's Vice-President, testified that during his various discussions with Donald Parkhurst ("Parkhurst"), Westside's admitted agent at the jobsite, Parkhurst repeatedly reiterated that the cost of the job was of no concern to Westside but that completion of the job quickly and properly was of great concern to it. Jimmy Wright ("Wright"), Westside's President at the time, testified that Westside was concerned about the cost of the job, thereby disputing McDonald's testimony. The Court discounts Wright's

testimony, however, because Wright was not present for any of the actual conversations at the jobsite. Rather, the only knowledge that Wright had of what actually occurred at the jobsite was based upon what he was told by third parties. While Wright's testimony was admitted at the hearing without objection, the fact remains that he had no first-hand knowledge of what actually occurred at the jobsite. Those conversations were between McDonald and Parkhurst. The Liquidating Trustee did not offer Parkhurst's testimony at trial, so McDonald's testimony was not directly refuted.

5. The Court finds McDonald's testimony credible. McDonald testified, unequivocally, that (i) he had numerous conversations with Parkhurst, (ii) he told Parkhurst that he had no idea what the job would cost, but that it would be very expensive, and (iii) on each such occasion, Parkhurst reiterated that the cost of the work was not of concern to Westside but that the quality and timeliness of the work was of great concern because of the need to complete the Well.

6. Because of Westside's desire to promptly complete the Well, Westside did not ask Double C (or anyone else) to formally bid the job. Accordingly, Double C did not bid the job or estimate the cost of the work prior to performing the work. In addition to not being asked to do so, there were several reasons why Double C could not estimate the cost of the job. For example, Westside had no formal drawings of what it wanted built and had not done soil samples so that Double C could know what it would be driving piles into when trying to build the required platform or foundation, leaving all decisions to Double C with regard to what work actually needed to be done. Moreover, the preparatory work was going to have to be done right before the Thanksgiving holiday, with the actual construction done over the

holiday itself, also making the availability of materials and personnel more difficult to predict.

7. Double C began getting ready for the job on Friday, November 17, 2006, which was the week before Thanksgiving, worked throughout the Thanksgiving holiday (including the entire day of Thanksgiving and into the evening), and concluded its work on Friday December 1, 2006. *See* Double C Exhibit 4 (job reports prepared by McDonald).

8. While there was a dispute about the degree of danger associated with Double C's work at the jobsite, the Court is satisfied that there was danger associated with Double C's work because of its close proximity to a capped gas well. Double C was driving piles and using equipment that created sparks and caused sufficient vibration to shake the bolts out of the valve head on the Well. Double C's job report dated November 25, 2006, completed by McDonald, states "shaking bolts out of valve head. Well has 1950 cubic foot of gas. Very, very dangerous situation; don't like it very much." *Id*. Similarly, McDonald's job report dated three days later (November 28, 2006) states "[s]till driving on piles and building frame. Lots of driving and vibration shaking valve on well and ground for 100' in every direction. I am concerned about integrity of well. Still don't like situation, hope to finish soon." *Id*.

9. It is undisputed that Double C's work was (i) of good quality, and (ii) timely performed. The platform or foundation Double C constructed held the rig, which enable the Well to be completed in a timely fashion.

10. At the conclusion of its work, Double C delivered an invoice to Westside for $625,000, which Westside did not pay.

11. Double C filed a Mineral Contractor's Lien Affidavit in the official public records of Hill

County, Texas in the amount of $625,000. That lien affidavit does not contain as much detail about the work done by Double C as the Liquidating Trustee believes appropriate to be legally sufficient. Moreover, it is undisputed that Double C did not keep records detailing all of the costs it incurred performing its work. For example, none of the incidental costs incurred by Double C – *i.e.*, meals, lodging, gas, mileage, etc. – were documented.

12. Subsequent to the completion of Double C's work, Westside paid certain suppliers of materials for the job in the total amount of $57,422.44.

13. Westside (then known as Crusader), along with other affiliates, filed chapter 11 petitions in this Court on March 30, 2009.

14. Double C timely filed a Proof of Claim on July 28, 2009.

15. Pursuant to the terms of the Plan, Double C timely filed its Notice of Secured Claim with the Liquidating Trustee, asserting a right to payment in the amount of $625,000, together with prejudgment interest and attorney's fees. *See* Double C Exhibit 2.

16. While there was a substantial dispute about the reasonable value of the services and materials Double C provided to Westside, the Court finds, after carefully considering all of the evidence, that the reasonable value of those services and materials was $459,379.52. In finding this value, the Court has considered the expert testimony of Philip Barnard, the Liquidating Trustee's expert, as well as the testimony of McDonald, both of which are described briefly below.

17. McDonald, who has been in the pile driving business for the past 40 years, testified that he normally doubles his actual or anticipated material costs to determine the amount to be charged to his customers for such materials. Then, according to McDonald's testimony, he

normally multiples that material charge by a factor of 4 to 10, depending on the particular circumstances applicable to the job, to arrive at a total charge for the job. McDonald further testified that he has used this approach for many years and has successfully used this approach in bidding pile-driving jobs. Finally, McDonald testified that Double C is one of two firms in the North Texas area that can do this type of pile-driving work. As relevant to Double C's work (and invoice) at issue here, McDonald testified that he doubled his actual material costs of $60,000 to get the material cost invoiced to Westside – *i.e.*, $120,000. Then, McDonald testified that he multiplied the $120,000 by a factor of 5 to reach a total charge of $600,000, to which he added an additional charge of $25,000 for mobilization and demobilization. McDonald testified that he then took his total charge of $625,000 and subtracted the materials charge of $120,000, resulting in an equipment and manpower charge to Westside of $505,000 as set forth on Double C's invoice to Westside dated December 1, 2006. *See* Double C Exhibit 1 (invoice attached to proof of claim).

18. In contrast, Barnard, a senior vice president and principal consultant of Interface Consulting, stated in his expert report that McDonald's methodology of calculating a market price for Double C's work was "outrageous, unsupportable, and not consistent with construction industry standards." Defendant Exhibit 16 at p. 1. He testified similarly at the hearing on the Objection. Barnard is a registered professional engineer in the state of Texas and a certified cost engineer with the Association for the Advancement of Cost Engineering International. He has over 30 years of experience in the construction management industry. He determined a reasonable value for the work performed by Double C by utilizing a "nationally-recognized estimating standard guide entitled, "RSMeans, Heavy Construction Cost Data." *Id.* at p. 3.

In summary, Barnard calculated what he believed to be a reasonable overhead and profit margin for Double C on the various components of its work and, after applying those calculated percentages to the actual costs of materials and labor, determined that the reasonable value of Double C's work was $209,644.43, assuming Double C paid for the rental of the vibro hammer.

19. Significantly, McDonald's testimony that he has used his arguably unorthodox methodology for calculating the price to be charged by Double C for its work for many years and has successfully won bids on public projects using that methodology was not directly refuted by the Liquidating Trustee. Moreover, the Court finds that Barnard failed to take into account when performing his calculations (i) the risk associated with the work, (ii) the timing demands imposed by Westside, and (iii) the limited number of firms capable of doing the job. In short, the Court finds that Double C was entitled to a premium for these things.

20. Neither party gave the Court much help in how to attempt to reconcile the dollar disparity between their two approaches to determining a reasonable value of the work. Rather, it appears that they both hoped the Court would simply adopt their methodology wholesale. When asked about this during closing arguments, Double C's counsel suggested that the Court could multiply the materials charge by a factor of 4 instead of the factor of 5 actually used by Double C since McDonald testified that he sometimes used that as the multiple. Counsel for the Liquidating Trustee had no suggestion other than the Court should find Barnard's testimony more compelling.

21. After carefully considering the testimony concerning the reasonable value of the work performed by Double C, the Court concludes that the reasonable value of that work was

$459,379.52. The Court calculates this amount by doubling the actual third-party materials costs incurred by Double C and then multiplying that amount by 4 – *i.e.*, $35,682.40 + $14,190.75 + $7,549.29 x 2 = $114,844.88 x 4 = $459,379.52.

22. As noted previously, Westside made payments totaling $57,422.44 for materials and equipments rentals, and is due a credit in that amount.

23. Thus, Westside owes Double C $401,957.08 for its work ($459,379.52 - $57,422.44 = $401,957.08).

24. Double C claims an entitlement to a recovery of attorneys' fees pursuant to Section 53.156 of the Texas Property Code, which is made applicable here by Section 56.041(a) of that statute. Section 53.156 provides that "[i]n any proceeding to foreclose a lien . . . or in any proceeding to declare that any lien or claim is invalid or unenforceable in whole or in part, the court may award costs and reasonable attorney's fees as are equitable and just." Tex. Prop. Code Ann. § 53.156 (West 2007). Double C incurred reasonable attorney's fees in the amount of $37,448.60 in attempting to enforce its lien rights in a state court action and in the Debtor's bankruptcy case.

## CONCLUSIONS OF LAW

1. There is an enforceable contract between Westside and Double C. Under the unusual circumstances present here, the Court concludes that price was not a material term of the parties' agreement. *See T.O. Stanley Boot Co., Inc. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex. 1992) ("Each contract should be considered separately to determine its material terms"). What was material to Westside was that Double C was capable of constructing a suitable platform or foundation in a timely fashion. Implicit in Westside's decision to sign the

Proposal in blank as to cost and to proceed with the work without (i) asking Double C or any other party to bid the job, and (ii) getting a firm price or at least a cost estimate from Double C, and/or in expressly stating to Double C that price was of no concern, was an agreement by Westside to pay Double C what the work was reasonably worth, which the Court has found to be $459,379.52.

2. Double C's lien affidavit is substantially in compliance with Section 56.002 of the Texas Property Code. *See Texcalco, Inc. v. McMillan*, 524 S.W.2d 405, 407 (Tex. App.– Eastland, 1975) ("Texas is not a jurisdiction which applies a 'strict compliance' rule before a lien exists, but rather follows a 'substantial compliance' rule"); *Ready Cable, Inc. v. RJP Southern Comfort Homes, Inc.*, 295 S.W.3d 763, 765 (Tex. App.– Austin, 2009) ("It is well settled that the mechanic's and materialman's lien statutes are to be liberally construed for the purpose of protecting laborers and materialmen"). As such, it is valid and enforceable.

3. Double C has an allowed M&M Secured claim in the amount of $401,957.08, which is to be paid in full by the Liquidating Trustee pursuant to the terms of the Plan.

4. Double C is also entitled to recover prejudgment interest and its reasonable attorney's fees pursuant to Sections 53.156 and 56.041(a) of the Texas Property Code. Under Texas law, prejudgment interest and attorney's fees are not added to the amount for which a mechanic's lien secures payment. *See Palomita, Inc. v. Medley,* 747 S.W.2d 575 (Tex. App.– Corpus Christi, 1988). In *Palomita*, the court interpreted a prior version of Section 53.156 and cited "a longstanding policy in this state that in order to create, or in this case extend, a statutory lien, there must be a basis for the lien in the 'express language' of the statute." *Id*. at 577. Finding no such express basis in the statue, the court held that an award of prejudgment

interest and attorney's fees may not be included in the amount secured by a mechanic's lien. This holding has been extended to the current version of the statute. *See Import Sys. Intern., Inc. v. Houston Cent. Indus.,* 752 F.Supp. 745, 748 (S.D. Tex. 1990) (the 1989 amendment to Section 153.156 "in no way changes the *Palomita* court's holding that the attorney's fees are not secured by a mechanic's lien"); *Dossman v. Nat'l Loan Investors, L.P.*, 845 S.W.2d 384, 397 (Tex.App.-Houston, 1992) ("the 1989 amendment does not purport to extend the lien to the attorney's fees"). Thus, Double C is entitled to an allowed unsecured claim for both prejudgment interest and its reasonable attorney's fees, which unsecured claim shall be paid by the Liquidating Trustee pursuant to the terms of the Plan.